## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN
## MADISON DIVISION

| | |
|---|---|
| Wesley Sydow and Theresa Sydow,<br><br>                              Plaintiffs,<br><br>              v.<br><br>Weyerhaeuser Company, *a corporation;*<br>3M Company, *a corporation*;<br>Metropolitan Life Insurance Company*, a corporation*;<br>Owens-Illinois, Inc., *a corporation*;<br>Unknown Insurers of Owens-Illinois, Inc., *a corporation;*<br>Unknown Insurers of Roddis Plywood Corporation, *a corporation;*<br>Unknown Insurers of Weyerhaeuser Company, *a corporation;*<br><br><br>                              Defendants. | Case No. 3:14-cv-219 |

### SECOND AMENDED COMPLAINT

Plaintiffs Wesley Sydow and Theresa Sydow, by their attorneys, Cascino Vaughan Law Offices, Ltd., complain against the above defendants as follows:

### JURISDICTION AND PARTIES

1.     Plaintiffs Wesley Sydow and Theresa Sydow are adult citizens and residents of Marshfield, Wisconsin.

2.     Plaintiffs are lawfully married. Unless otherwise stated herein, "plaintiff" when used in the singular refers to Wesley Sydow.

3.     Defendant Weyerhaeuser Company ("Weyerhaeuser") is the former owner of a plant in Marshfield, Wisconsin ("Marshfield plant") where asbestos fireproofing products were

1



manufactured and asbestos containing products were used in manufacturing production of fire doors.  Weyerhaeuser is legally responsible for the conduct of Roddis Plywood Corporation, the prior owner and operator of the Marshfield plant.

4.      Defendant 3M Company ("3M") designed, manufactured, and sold masks for personal breathing protection in occupational settings, including without limitation the 3M 8710.

5.      Defendant Metropolitan Life Insurance Company ("MetLife") conspired and acted to conceal information about the health hazards of asbestos from both individual end-users and industry.

6.      Defendant Owens-Illinois, Inc. ("O-I") designed and manufactured a product called Kaylo which contained chrysotile and amosite asbestos fibers. O-I also sold licenses for a process patent to manufacture of fire doors incorporating asbestos-containing cores.  O-I also manufactured, sold, and designed asbestos products, including without limitation fire door cores.  The brand name "Kaylo" was associated with both the patented doors and the cores.

7.      Unknown Insurers of Owens-Illinois, Inc. are named pursuant to Wis. Stats. §803.04(2)(a) as they have an interest in the outcome adverse to the plaintiffs.

8.      Unknown Insurers of Roddis Plywood Corporation are named pursuant to Wis. Stats. §803.04(2)(a) as they have an interest in the outcome adverse to the plaintiffs.

9.      Unknown Insurers of Weyerhaeuser Company are named pursuant to Wis. Stats. §803.04(2)(a) as they have an interest in the outcome adverse to the plaintiffs.

10.     Jurisdiction is based on diversity of citizenship of the parties hereto under Title 28, United States Code, §1332.

11.     The amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

12.     Venue is proper pursuant to Title 28, United States Code, §1391.

## GENERAL ALLEGATIONS

13.     During the period of all his exposures, plaintiff did not understand or appreciate the dangerous nature of asbestos and of the nature of the risks of asbestos.

14.     As a direct and proximate result of the conduct of all defendants, plaintiff suffered from the asbestos related disease malignant mesothelioma.

15.     The asbestos disease process and injury began before April, 1994.

16.     All exposures to asbestos that plaintiff received contributed to and caused the plaintiff's asbestos related conditions.

17.     Plaintiff suffers great pain, physical impairment, and great mental pain and anguish. He is liable for large sums of money for medical and hospital care, and suffered losses to his personal property and possessions.

18.     At all times, Plaintiff Theresa Sydow was the wife of Wesley Sydow and was cohabitating with him and was enjoying his services, companionship, society and relationship.

19.     As a result of Plaintiff Wesley Sydow's injuries, his next of kin have suffered and will suffer in the future pecuniary losses and have suffered and will suffer in the future a loss of society and companionship with him.

20.     As a direct and proximate result of the one or more of the wrongful acts or omissions of the defendants, Plaintiff wife Theresa Sydow

        a.      has been deprived of Wesley Sydow's services, companionship, society, and relationship from the time of his injury;

3

     b.     has been hindered and prevented from transacting and attending to her usual business and personal affairs.

21.    The operations at the Marshfield plant involve the manufacture of asbestos containing fire doors, including the disposal of the waste and scrap from such doors.   At certain times the mixing of asbestos fibers to make the cores for the fire doors was a part of the manufacturing process.

22.    Plaintiff inhaled airborne asbestos fibers released as a result of operations at the Marshfield plant as an employee of Weyerhaeuser, household exposures via his parents and community exposures via ambient air outside the plant.

23.    Asbestos was inhaled by plaintiff:

     a.     during periods of his actual employment at the Marshfield plant, from 1947 to 1951 and 1953 to 1990;

     b.     community exposures from asbestos fibers from the Marshfield plant contaminating the air, home, schoolyard, auto, restaurants, bars and other locations outside the plant when the plaintiff was not employed by Roddis or Weyerhaeuser;

     c.     community exposures during his whole life, including when he was not employed at the Marshfield plant, from visible emissions of asbestos dust in the community of Marshfield;

     d.     community exposures, including when he was not employed at the Marshfield plant from the transport of asbestos fibers to and from the Marshfield plant to other locations in the Marshfield community including the creation of visible emissions throughout the community of Marshfield;

     e.     community exposures, from the release of visible emissions by activities outside the plant, including by trucks driving down the road, not while plaintiff was employed;

     f.     community exposures during plaintiff's life, from the dumping of asbestos waste in landfills and former soaking ponds throughout the Marshfield community, not

while employed;

g.      during plaintiffs life, from visible emissions when the baghouse malfunctioned and released asbestos into the community, not while employed;

h.      during plaintiffs life, from the open doors of buildings, wherein asbestos was part of any industrial process and through which wind would blow asbestos out of the plant, not while employed;

## COMMUNITY EXPOSURES CAUSE MESOTHELIOMA

24.     The Environmental Protection Agency (EPA) via its National Emission Standards for Hazardous Air Pollutants (NESHAPs) bars visible emissions of asbestos materials outside the plants involved in the manufacture of fireproofing and insulating materials. NESHAPs recognized that persons in the neighborhood of asbestos sources develop mesothelioma.

25.     Roddis/Weyerhaeuser caused visible emissions of asbestos dust into the air outside the Weyerhaeuser plant in Marshfield, Wisconsin.

26.     Community exposures are well-recognized as sources of asbestos exposure.

27.     The Environmental Protection Agency, subchapter C – Air Program, Part 61, National Emission Standards Hazardous Air Pollutants (hereafter NESHAP), adopted a no visual asbestos emissions standard for plants manufacturing fireproofing materials based upon recognized reports of mesothelioma associated with non-occupational asbestos dust emissions in the neighborhood. It also recognized that mesothelioma cases can occur after much less exposure to asbestos dust.

28.     On March 30, 1973, NESHAP was enacted. Section 61.22, "Emission standard," provided that

        "There shall be no visible emissions to the outside air, except as provided in paragraph (f) of this section, from any building or structure in which the

5

following operations are conducted or directly from any of the following operations if they are conducted outside of buildings or structures...[which applies to the] manufacture of fireproofing and insulating materials."

29.   NSESHAPs cited literature that there are mesothelioma cases of non-workers who lived near an asbestos plant. Some of this literature is part of the body of references that the EPA relied upon in the formulation of its "no visible emissions" standard.   This literature includes Dr. Wagner, who in the British Journal of Industrial Medicine in 1960 found that most cases of mesothelioma were not workers in asbestos-related fields, but people who lived in the surrounding communities. Wagner, in his study of mesothelioma in asbestos mine workers, identified housewives, domestic servants, cattle herders, farmers, an insurance agent and an accountant in the neighborhood who also developed mesothelioma but never worked in the mines. This literature cited in NESHAPs also includes Newhouse and Thompson who in 1965 reported community exposures caused mesothelioma cases in London. Similarly, in 1967, the Archives of Environmental Health reported mesothelioma cases from neighborhood exposures.

30.   In addition, Inase identified a woman with mesothelioma in Japan whose only exposure to asbestos occurred during her childhood as a result of asbestos exposure from the emissions from the town's factories. Inase also summarized the literature on this issue including articles published from studies in the United States, Italy, the United Kingdom and South Africa.

31.   Community exposures from asbestos plants occur miles from the plant site.   When plaintiff was within several miles of the plant he would be exposed to asbestos.   A study published in the American Journal of Industrial Medicine by Kumagai and Kurumatani

6

used a mesothelioma outbreak in Amagasaki city, in southwestern Japan, found a linear relation between asbestos concentration and the reported cases of mesothelioma. The outbreak was tied to an asbestos cement factory that produced asbestos pipe with crocidolite and chrysotile, which operated from 1957 to 1975.   Concentrations of asbestos measured in excess of background levels. Of particular interest is the higher mortality rate in women due to mesothelioma. During the years the asbestos cement plant was operational, women did not work and stayed either at home or out in the community. Kumagai and Kurumatani therefore used women as a benchmark for overall community exposure. They found that mortality decreased with distance from the plant, up to a range of approximately 4 kilometers (approximately 2.48 miles). Of 39 mesothelioma deaths in women, all lived within 4 kilometers of the asbestos cement plant for at least 1 year, died from mesothelioma between 1995 and 2006, and lacked occupational exposure to asbestos.

32.     There is also increased risk for developing mesothelioma from community exposures.   A study published in the British Journal of Cancer by Magnani, et al., reached a similar conclusion through different methods. Their study also found a higher rate of mesothelioma in females, for whom no evidence of occupational exposure to asbestos was found. Magnani and the other scientists concluded that the risk of developing mesothelioma was statistically and significantly higher for environmental exposure, when compared to domestic or household exposure, in mesothelioma patients who had lived at some time within 2000 meters (approximately 1.25 miles) of a mine or asbestos works. The study also observed that "environmental exposure to asbestos started at younger ages and lasted longer" than domestic exposure. Overall, Magnani's study concluded that while

"[environmental and domestic exposures], either alone or combined with the other, showed an increased, significant risk...[but that risk] seems to be higher for subjects with environmental exposure only."

33.    The sources of the visual emissions outside the Marshfield plant included:

a.    The emissions' sources included the wind that blew visible asbestos dust from open doors of buildings in which asbestos was used into the air outside the plant;

b.    emissions into the community's ambient air from Weyerhaeuser's trucks containing asbestos waste materials along the trucks' routes throughout the town of Marshfield;

c.    The emissions' sources included asbestos dust that fell from the air pollution control equipment, including the baghouse, when these devices failed. This asbestos dust would collect in piles and then be dispersed by the wind into the ambient air outside the plant.

d.    The emissions' sources included trucks loaded with asbestos waste materials. These trucks were not properly covered. At any given time, there were two truck drivers working 12-hour shifts disposing of asbestos waste materials at former soaking pits, at least 4 landfills and farmers' fields across Marshfield, Wisconsin.

e.    The emissions' sources included the former soaking pits, at least 4 landfills and farmers' fields where asbestos waste materials were dumped. After the waste materials were dumped, they were not properly covered, and wind dispersed visible emissions of asbestos into the ambient air and community of Marshfield, Wisconsin.

f.    The Weyerhaeuser trucks drove down the main streets of Marshfield, Wisconsin

and gave off visible asbestos emissions.

## SYDOW COMMUNITY EXPOSURES

34.     During most of his adult life, Plaintiff Sydow lived within a short distance of the Marshfield plant. The community of Marshfield, Wisconsin was exposed to asbestos from the Marshfield Plant. People in the neighborhood complained about visible dust outside the plant. Neighbors around the premises complained to Weyerhaeuser and wrote letters to the local newspaper about the dust, especially since it ruined the laundry they had hung out to dry. The pollution control equipment was broken. This equipment was known and baghouse. The baghouse continuously became congested and broke down, spewing dust out of the sides and top and dispersing it into the ambient air. Because of this, people could not hang their laundry out to dry.

35.     The dust collected in the baghouse was hauled to various landfills in and around Marshfield, as well as three old log ponds between the plant and Fourth Street. These log ponds were partially filled with waste from the baghouse. The waste was hauled in large uncovered boxes on the front end of a loader and driven outside the plant's fence and along a driveway around the plant's western side. There was visible dust in the log ponds because Weyerhaeuser chose to never cover them. Weyerhaeuser simply dumped asbestos waste into them. Dumping asbestos waste into these log ponds put even more asbestos dust into the ambient air. Windows in the core mill were left open during the summer, allowing asbestos dust to get into the ambient air.

36.     Plaintiff Wes Sydow was exposed to asbestos due to the proximity he lived from the plant. He lived at 500 North Maple Street in Marshfield, Wisconsin from 1953 through 1956. His

home was less than a mile from the Roddis/Weyerhaeuser plant.

37.  From 1958 through 1968, plaintiff Sydow lived at 800 South Palmetto. This address was 0.5 miles from the plant. Since 1968, plaintiff has lived at 1800 South Cedar Avenue, which is 1.1 miles from the plant.   Sydow normally walked or rode his bike to work

38.  Plaintiff Sydow went to church at St. Vincent de Paul Church, which is located at 169 North Central Avenue in Marshfield. This church is approximately 1.2 miles from the Roddis/Weyerhaeuser plant.

39.  Plaintiff Sydow would have been in the downtown area of Marshfield, as well as at the creamery across the street from the Roddis/Weyerhaeuser plant. His children attended the junior and senior high schools in Marshfield, which are 1.6   and 1.4 miles away from the Roddis/Weyerhaeuser plant, respectively.

40.  Neighbors around the premises complained to Weyerhaeuser and wrote letters to the local newspaper about the dust, especially since it ruined the laundry they had hung out to dry. The baghouse continuously became congested and broke down, spewing dust out of the sides and top and dispersing it into the ambient air. Because of this, people could not hang their laundry out to dry.

41.  The dust collected in the baghouse was hauled to various landfills in and around Marshfield, as well as three old log ponds between the plant and Fourth Street. These log ponds were partially filled with waste from the baghouse. The waste was hauled in large uncovered boxes on the front end of a loader and driven outside the plant's fence and along a driveway around the plant's western side. There was visible dust in the log ponds because Weyerhaeuser chose to never cover them. Weyerhaeuser simply dumped asbestos waste

10

into them. Dumping asbestos waste into these log ponds put even more asbestos dust into the ambient air.

42.   Windows in the core mill were left open during the summer, allowing asbestos dust to get into the plant's ambient air.

43.   The trucks dispersed visible asbestos dust while driving down the roads. At least one of these trucks was not covered. The Weyerhaeuser trucks that were loaded with asbestos waste were driven down highways 97, 13 and 10. These are the main streets both into and out of Marshfield. There were visible emissions from these trucks as they transported asbestos waste down public highways.

44.   Places in town, such as the cheese factory, bars and hamburger restaurants, close to the Weyerhaeuser plant would have their ambient air contaminated by visible asbestos dust.

45.   The baghouse that was intended to collect asbestos waste products continually and regularly broke down, dispersing asbestos into the ambient air.

46.   Community exposures also occurred when asbestos waste was put into trucks and driven to landfills. The dumps were never covered over with dirt after loads were dumped, which allowed more asbestos dust to disperse. The location of one of these dumps was close to Highway H and Highway 10, northwest of Marshfield, Wisconsin including by the airport. Plaintiff Sydow would drive down Highway H and Highway 10 with his father in order to get to and from Marshfield.

47.   Sydow's activities and the conduct of Weyerhaeuser placed him within the distances from the plant which are recognized in the scientific literature as having significant concentrations of asbestos or increased risk of developing mesothelioma.

## WESLEY SYDOW EMPLOYMENT HISTORY

48.   Plaintiff Wesley Sydow was employed by Weyerhaeuser from 1947 to 1951, and 1953 to 1990.   Sydow started working at the Weyerhaeuser Marshfield door plant in 1947 as a laborer. He was in the military from about 1951-1953. Upon returning to the plant in 1953, Sydow took a job as dryer inspector. He worked a variety of quality control-related jobs, working his way up to quality control manager for the plant. Around 1965, Sydow became plant manager (fabrication superintendent). From 1975 until his retirement in 1990, he was customer service manager for North America.

49.   In each of his positions, including management positions, Sydow spent a large portion of his time on the plant floor. He visited various plant departments daily as quality control manager and customer service manager.

## COUNT I - PRODUCT LIABILITY - NEGLIGENCE

50.   Plaintiffs bring this claim for negligence and restate and re-allege the allegations in paragraphs 1 – 49 above.

51.   Plaintiffs bring this claim against O-I and unknown insurers of O-I for selling, purchasing, manufacturing, designing, licensing and/or patenting of a process that used asbestos-containing materials and/or products.

52.   O-I designed, manufactured, and sold Kaylo core to Roddis during the late 1940s into the late 1950s.

53.   The Kaylo core was used to make fire doors. It would be cut, sawed, and sanded.

54.   Plaintiff was exposed to Kaylo dust at the Roddis plant during the 1950s.

55.     The term "Kaylo fire doors" is used to refer to both O-I patented doors and cores sold by O-I. "Kaylow" was a registered trademark of O-I.

56.     O-I manufactured Kaylo block insulation that was used as the fire door core material inside the fireproof doors.

57.     O-I sold Kaylo block insulation that was used as the fire door core material inside the fireproof doors.

58.     Owens Corning Fiberglass, through an agreement with Owens-Illinois, was the distributor of Kaylo block insulation for Owens-Illinois. Owens-Illinois was paid compensation by Owens Corning Fiberglass under the distribution agreement.

59.     Pursuant to a written agreement, defendant O-I allowed Roddis/Weyerhaeuser to manufacture the Kaylo asbestos-containing fire doors at least through September of 1959.

60.     Roddis/Weyerhaeuser licensed the process to make asbestos-containing fire doors from 1956 to 1969. The fire door cores contained asbestos because O-I reported asbestos as an ingredient in order to obtain a patent for the process.

61.     After O-I ceased the sale of asbestos-containing fire doors, Roddis/Weyerhaeuser were given permission by O-I to use O-I's name in the advertisements for Kaylo block insulation fore doors. These advertisements also listed Roddis Plywood Corporation as the successor to Owens-Illinois Plywood Company.

62.     Pursuant to a written license agreement, O-I was paid a royalty for each Kaylo fire door produced pursuant to the patented process. The patent called for the use of asbestos. The Underwriters Laboratories approval was based on the use of asbestos in the fire doors.

63.     It was reasonably foreseeable to O-I that plaintiff and other workers working in or in

proximity to Kaylo fire door production operations at Weyerhaeuser would inhale asbestos fibers released from the Kaylo fire doors during the production operations.

64. Defendant O-I knew or in the exercise of ordinary or reasonable care ought to have known asbestos causes serious and fatal disease. O-I had knowledge in the 1940s and 1950s that asbestos was harmful and caused disease. O-I was a manufacturer and vender of asbestos products, beginning in the 1940s and continuing through the 1950s. O-I had participated in scientific experiments that resulted in literature concerning the harmful effects of asbestos as early as the 1940s.

65. Plaintiff did not know that asbestos products were dangerous or harmful at the time of his exposures.

66. Defendant O-Ihad a duty to exercise reasonable care for the safety of plaintiff and others who worked with or were exposed to the defendants' asbestos products. As early as the 1940s, defendant O-I was on notice that asbestos was harmful and even conducted studies concerning the dangers of asbestos.

67. Defendant O-I breached its duty of care and was negligent, including without limitation in one or more of the following acts or omissions:

a. Failed to adequately warn plaintiff or others of the health hazards of asbestos associated with Kaylo fire doors;

b. Failed to investigate or test for the health effects of asbestos in Kaylo fire doors;

c. Failed to instruct plaintiff, his employers, patent licensees, or others in the use of precautionary measures relating to airborne asbestos fibers released during production of Kaylo fire doors;

d. Defectively designed the Kaylo fire doors to incorporate asbestos as an ingredient or material in their production when substitute materials were available.

68.     As a direct and proximate result of the acts and omissions of the defendant O-I above, the plaintiff was injured as described above.


## COUNT II – PRODUCT LIABILITY (UNREASONABLY DANGEROUS PRODUCT)

69.     Plaintiffs bring this claim for strict product liability and restate and re-allege the allegations in paragraphs 1 – 68 above.

70.     This claim is asserted against O-I.

71.     Defendant was in the business of selling Kaylo fire doors (including patent rights, doors, and cores) and other asbestos containing products.

72.     O-I designed, manufactured, and sold Kaylo core to Roddis during the late 1940s into the late 1950s.

73.     The Kaylo core was used to make fire doors. It would be cut, sawed, and sanded.

74.     Plaintiff was exposed to Kaylo dust at the Roddis plant in the 1950s.

75.     Pursuant to a written agreement, O-I sold the patented process right for each Kaylo fire door produced by Weyerhaeuser and collected a royalty payment.

76.     The Kaylo patent process was sold with the expectation by O-I that the process would be without substantial change and the production of doors pursuant to the process would release asbestos fibers in the air.

77.     Plaintiff was exposed to asbestos fibers released during the production of the Kaylo fire doors pursuant to the patented process.

78.     Defendants' patented process was defective and unreasonably dangerous in one or more of the following ways:

a.   Failed to adequately warn plaintiff or others of the health hazards of asbestos released during production of Kaylo fire doors;

b.   Failed to investigate or test for the health effects of asbestos released during production of Kaylo fire doors;

c.   Failed to instruct plaintiff, his employers, patent licensees, or others in the use of precautionary measures relating to airborne asbestos fibers released during production of Kaylo fire doors;

d.   Defectively designed the Kaylo fire doors to incorporate asbestos as an ingredient or material in their production when substitute materials were available.

79.   As a direct and proximate result of the acts and omissions of the defendants above, the plaintiff was injured as described above.


## COUNT III – NEGLIGENT NUISANCE

80.   Plaintiffs incorporate by reference all general the above allegations and brings this count against defendant Weyerhaeuser for negligent public and private nuisance.

81.   Weyerhaeuser is responsible for the ownership and operation of the door manufacturing plant in Marshfield, Wisconsin during the period of plaintiff's exposures.

82.   Weyerhaeuser, during operations to manufacture fire doors at the Marshfield plant beginning in the 1950s, caused asbestos fibers to be released and contaminate the air in various settings when plaintiff was not employed by Weyerhaeuser and was not engaged in work-related activities, including without limitation:

a.   living in the community of Marshfield;

b.   schools, homes, restaurants, taverns, vehicles and a creamery;

c.   emptying the air pollution control equipment;

    d.  transportation of asbestos waste materials outside the plant onto roads, farmers' fields, old soaking pits and landfills;

    e.  activities on the premises which were not work related; and

    f.  failure of air pollution control equipment that released visible asbestos dust outside of the plant.

83.  The operations of Weyerhaeuser's Marshfield plant caused dangerous asbestos fibers to be transported to areas more distant through various means, including without limitation:

    a.  worker clothing, personal effects, hair, and skin which had become contaminated by asbestos fibers at the plant; and

    b.  collecting, removing, hauling, and dumping asbestos waste materials.

84.  The visible plant emissions and transport of asbestos fibers as described above caused contamination of the community, schools, downtown Marshfield, housing, vehicles, restaurants, bars, creamery and other places frequented by plaintiff Wesley Sydow.

85.  Plaintiff and others inhaled asbestos fibers from the contaminated air and property.

86.  The contamination by the asbestos fibers is an unreasonable interference with a right common to the general public to clean air.

87.  The contamination by the asbestos fibers is an unreasonable interference with plaintiffs' private rights, including the right to use and enjoy private property.

88.  The unreasonable interference with the plaintiff's private rights and property and the public's right to clean air is unrelated to any employment relationship or duties with defendant.

89.  Weyerhaeuser Company had a duty to exercise reasonable care for the safety of plaintiff and the public from asbestos fibers released during Weyerhaeuser's operations of the

Marshfield plant or transported to other locations as a result of plant operations.

90.  Weyerhaeuser knew or in the exercise of ordinary or reasonable care ought to have known asbestos causes disease and/or death.

91.  Plaintiff did not know that asbestos or asbestos products were so dangerous or harmful at the time of his exposures.

92.  Weyerhaeuser knew or in the exercise of ordinary or reasonable care ought to have known that Weyerhaeuser's Marshfield plant operations released asbestos into the community or resulted in transport of asbestos fibers to other locations as a result of plant operations.

93.  Weyerhaeuser permitted the Marshfield plant operations to continue without abating the release into the community and transport to other locations of asbestos fibers.

94.  Weyerhaeuser breached its duty of care and was negligent, including without limitation in one or more of the following acts or omissions:

   a.  Failed to adequately warn plaintiff or others of the health hazards of asbestos;

   b.  Failed to adequately investigate health effects of asbestos;

   c.  Failed to adequately test for air levels of asbestos;

   d.  Failed to adequately instruct plaintiff or others in the use of precautionary measures relating to airborne asbestos fibers;

   e.  Used defectively designed asbestos-containing products when substitutes were available;

   f.  Failed to use proper engineering techniques or methods, or used unsafe techniques or methods, in collecting, removing, hauling, and dumping of asbestos-containing materials.

   g.  Violated agency regulations issued pursuant to the United States Occupational Safety and Health Act, 29 U.S.C. §651, et seq.

   h.  Violated other agency regulations, including without limitation the United States

Environmental Protection Agency National Emission Standards for Hazardous Air Pollutants, adopted originally as Part 61, Chapter 1, Title 40 of the Code of Federal Regulations effective on April 6, 1971.

i.  Violated regulations issued by the Wisconsin Industrial Commission, including without limitation General Orders on Dusts, Fumes, Vapors and Gases, Order 2002; And Wis. Adm. Code Ind 12.20;

j.  Exceeded other air quality standards or guidelines, including without limitation the Wisconsin Division of Natural Resources and Threshold Limit Values of the American Conference of Governmental Industrial Hygienists; and

k.  Failed to take corrective action after being put on notice of the above negligent acts.

95.  The asbestos fibers caused special injury of asbestos related disease to plaintiff Wesley Sydow.

96.  The contamination by asbestos fibers from the Marshfield plant operations:

a.  Adversely affected the health interests of the community at large;

b.  Interfered with the public health and safety;

c.  Interfered with the right of plaintiffs to enjoyment and use of their property.

97.  As a direct and proximate result of the nuisance, the plaintiff was injured as described above

## COUNT IV – INTENTIONAL NUISANCE

98.  Plaintiffs incorporate by reference all general allegations above and brings this count against defendant Weyerhaeuser for intentional public and private nuisance.

99.  Weyerhaeuser is responsible for the ownership and operation of the door manufacturing plant in Marshfield, Wisconsin during the period of plaintiff's exposures.

100.  The operations of Weyerhaeuser's Marshfield plant caused release and emission of

19

dangerous asbestos fibers which contaminated the air in the surrounding community where plaintiffs lived.

101.   The operations of Weyerhaeuser's Marshfield plant caused dangerous asbestos fibers to be transported to areas more distant through various means, including without limitation

    a.   contaminated worker clothing and personal effects; and

    b.   collecting, removing, hauling, and dumping asbestos waste materials.

102.   The plant emissions and transport of asbestos fibers as described above caused contamination of the community, housing, vehicles, lunchroom and other places frequented by plaintiff Wesley Sydow.

103.   The contamination by the asbestos fibers is an unreasonable interference with a right common to the general public to clean air.

104.   The contamination by the asbestos fibers is an unreasonable interference with plaintiffs' right to use and enjoyment of private property.

105.   Plaintiff and others inhaled asbestos fibers from the contaminated air and property.

106.   The unreasonable interference with the public right to clean air and the private property rights is unrelated to any employment relationship or duties with defendant.

107.   Weyerhaeuser had knowledge of the dangers of asbestos fibers to cause serious diseases and death.

108.   Weyerhaeuser created conditions and activities that released asbestos fibers into the community as a result of Weyerhaeuser's operations of the Marshfield plant and transport of asbestos fibers to other locations as a result of plant operations.

109.   Weyerhaeuser knew that asbestos fibers were being released into the community and

transported to other locations as a result of plant operations.

110.   Weyerhaeuser knowingly, intentionally, and recklessly permitted the Marshfield plant operations to continue without abating the release into the community and transport to other locations of asbestos fibers.

111.   Plaintiff Wesley Sydow suffered the special injury of asbestos related disease.

112.   The contamination by asbestos fibers from the Marshfield plant operations:

d.     Adversely affected the health interests of the community at large;

e.     Interfered with the public health and safety;

f.     Interfered with the right of plaintiffs to enjoyment and use of their property.

113.   The conduct of Weyerhaeuser created an intentional nuisance for Weyerhaeuser is liable to plaintiffs for the injuries as described above.


## COUNT V– PRODUCTS LIABILITY – STRICT LIABILITY

114.   Plaintiffs bring this claim for strict liability against defendant 3M.

115.   Plaintiffs restate and re-allege the allegations set forth in lines 1-113 above.

116.   Defendant was at all relevant times in the business of selling personal protective equipment, including without limitation masks.

117.   Defendants knew and expected the masks would be used to protect against the inhalation of asbestos fibers.

118.   Defendant placed its masks into the stream of commerce with the expectation that they would reach plaintiff and other users and consumers without substantial change in the condition they were in when they left the possession or control of defendants.

21

119.    Defendant's masks reached plaintiff without substantial or unforeseeable change in the condition in which it was sold.

120.    Plaintiff used defendant's masks in the condition in which they left the possession or control of such defendants.

121.    Defendant's masks was defective and unreasonably dangerous at the time it left the possession or control of defendants in one or more of the following ways:

    a.    Failed to adequately warn plaintiff or others of the health hazards of asbestos which existed when wearing defendant's masks;

    b.    Failed to investigate or test for the effectiveness of the masks in preventing the inhalation of asbestos fibers;

    c.    Failed to instruct plaintiff, his employers, or others about the inadequacies of using the masks as precautionary measures against airborne asbestos fibers;

    d.    Defectively designed such that the masks did not adequately protect against or prevent exposure to asbestos fibers;

        a.    Failed to specify or instruct in the proper use of the masks.

122.    As a direct and proximate result of the acts and omissions of the defendants above, the plaintiff was injured as described above.


## COUNT VI – PRODUCTS LIABILITY – NEGLIGENCE

123.    Plaintiffs bring this claim for negligence against defendant 3M.

124.    Plaintiffs restate and re-allege the allegations set forth in lines 1-122 above.

125.    It was reasonably foreseeable that defendant's personal protective masks would be used to prevent exposure to asbestos.

126.    Defendants knew and expected the masks would be used to protect against the inhalation of

asbestos fibers.

127.   Defendants represented or held out the masks to be adequate in the protection against inhalation of asbestos fibers during the type of operations at the Marshfield plant.

128.   The masks did not properly protect against inhalation of asbestos fibers from the operations at the Marshfield facility.

129.   Defendant had a duty to exercise reasonable care for the safety of plaintiff and others who used defendants' personal protective equipment to protect against exposure to asbestos fibers.

130.   Defendant knew or in the exercise of ordinary or reasonable care ought to have known asbestos causes disease and/or death.

131.   Defendant breached its duty of care and was negligent, including without limitation in one or more of the following acts or omissions:

a.   Failed to adequately warn plaintiff or others of the health hazards of asbestos which existed when wearing defendant's masks;

b.   Failed to investigate or test for the effectiveness of the masks preventing the inhalation of asbestos fibers;

c.   Failed to instruct plaintiff, his employers, or others about the inadequacies of using the masks as precautionary measures against airborne asbestos fibers;

d.   Defectively designed its personal protective equipment such that it did not adequately protect against or prevent exposure to asbestos fibers;

a.   Failed to specify or instruct in the proper use of the masks.

132.   As a direct and proximate result of the acts and omissions of the defendants above, the plaintiff was injured as described above.

## COUNT VII – CIVIL CONSPIRACY

133.   Plaintiffs bring this cause of action for civil conspiracy against defendant Metropolitan Life Insurance Company.

134.   Plaintiffs restate and re-allege the allegations set forth in lines 1 – 132 above.

135.   Defendant Metropolitan Life and other unnamed co-conspirators knowingly and willfully combined, agreed, and conspired with each other for the purpose of accomplishing one or more of the following unlawful purposes:

    a.   Suppressing information about the health hazards of asbestos, including medical and scientific data, from those persons who would be exposed to the asbestos from the products made and sold by the conspirators,

    b.   Affirmatively asserting, in a manner not warranted by the information possessed by the conspirators, claims that the conspirators knew were false, namely, that it was safe to work with and in close proximity to asbestos.

136.   One or more of the conspirators, including Metropolitan Life, performed the following tortious acts in furtherance of the conspiracy:

    a.   Failed to warn about health hazards of asbestos; failed to investigate health hazards of asbestos;

    b.   interfered with scientific and medical studies about the health hazards of asbestos; or

    c.   failed to instruct about precautionary measures required for protection.

137.   As a direct and proximate result of the acts of the conspiracy described above, the plaintiff was injured as described above.

## COUNT VIII – PUNITIVE DAMAGES

138.   Defendants acted maliciously, with intentional disregard for the rights of plaintiffs for

which plaintiffs are entitled to recover punitive damages.

## COUNT IX - DECLORATORY JUDGMENT – UNCONSTITUTIONAL

139.   In 1995 Wisconsin enacted Act 17 which created restrictions on recoveries by victims of personal injuries.

140.   In 2011 Wisconsin enacted Act 2 which created restrictions on recoveries by victims of personal injuries.

141.   On March 27, 2014 Wisconsin enacted 2013 Act 154 which imposes requirements and creates restrictions on victims of asbestos-related injuries.

142.   Plaintiffs seek a declaration that retroactive application of 2005 Act 155 and 2011 Act 2 to limit the recovery in this case is unconstitutional.

143.   Plaintiffs seek a declaration that 2013 Act 154 is not applicable to this case or, in the alternative, that the requirements and restrictions it creates are unconstitutional.

## PRAYER FOR RELIEF

Plaintiffs pray for relief as follows:

a.   Judgment against defendants, jointly and severally, for compensatory and general damages.

b.   Punitive damages in an amount to be determined against each defendant.

c.   A declaration that 1995 Act 17 and 2011 Act 2 are unconstitutional as applied to this case.

d.   A declaration that 2013 Act 154 is not applicable to this case, or, in the alternative, that the requirements and restrictions it creates are unconstitutional.

e.   Such further legal and equitable relief as the court orders to do justice in this case, including without limitation award of costs and disbursements of this action.

## **JURY TRIAL DEMAND**

Plaintiffs hereby demands a trial by a jury.

Dated: September 19, 2014

/s/ Robert G. McCoy
Attorney for Plaintiff

Michael P. Cascino
Robert G. McCoy
Cascino Vaughan Law Offices, Ltd.
220 S. Ashland Avenue
Chicago, Illinois 60607
Phone: 312.944.0600
Fax: 312.944.1870
Email1: ecf.cvlo@gmail.com
Email2: mcascino@cvlo.com
Email3: bmccoy@cvlo.com

# Exhibit A

Defendants' States of Incorporation and Principal Places of Business

| Defendant | State of Incorporation | State of Principal Business |
|---|---|---|
| 3M Company | Delaware | Minnesota |
| Metropolitan Life Insurance Company | Delaware | New York |
| Owens-Illinois Inc. | Delaware | Ohio |
| Weyerhaeuser Company | Washington | Washington |