## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
--------------------------------------------------------
IN RE: ASBESTOS PRODUCTS
LIABILITY LITIGATION (No. VI)        MDL Docket No. 875

E.D. Pa. Case Nos.

Dianne Jacobs v. Owens-Illinois,        13-CV-60011
Inc., et al.

Cindy Zickert v. Bayer Crop Science,    13-CV-60013
Inc., et al.

Harvey Helms v. 3M Company, et al.      13-CV-60018

Brian Heckel v. 3M Company, et al.      13-CV-60019

--------------------------------------------------------

Deposition of JERRY SAINDON
Wednesday, March 12, 2014
9:43 a.m.
at
HOLIDAY INN CONFERENCE CENTER
750 South Central Avenue
Marshfield, Wisconsin

Reported by Lindsay DeWaide, RPR, RMR, CRR

## Page 2

1        Deposition of JERRY SAINDON, a witness in the
2    above-entitled action, taken at the instance of the
3    Plaintiffs, pursuant to the Federal Rules of Civil
4    Procedure, pursuant to notice, before Lindsay DeWaide,
5    Registered Professional Reporter, Certified Realtime
6    Reporter, and Notary Public in and for the State of
7    Wisconsin, at HOLIDAY INN CONFERENCE CENTER, 750 South
8    Central Avenue, Marshfield, Wisconsin, on the 12th day
9    of March, 2014, commencing at 9:43 a.m. and concluding
10   at 1:30 p.m.
11
12   A P P E A R A N C E S:
13       CASCINO VAUGHAN LAW OFFICES, Ltd., by
             Mr. Robert G. McCoy
14       220 South Ashland Avenue
             Chicago, Illinois 60607
15       Appeared on behalf of Plaintiffs.
16   SCHIFF HARDIN LLP, by
             Mr. Edward M. Casmere
17       233 South Wacker Drive, Suite 6600
             Chicago, Illinois 60606
18       Appeared on behalf of Owens-Illinois, Inc.
19   FORMAN, PERRY, WATKINS, KRUTZ & TARDY, LLP, by
             Ms. Tanya D. Ellis
20       Ms. Ruth F. Maron
             City Center, Suite 100
21       200 South Lamar Street
             Jackson, Mississippi 39201
22       Appeared on behalf of Weyerhaeuser Company.
23   GIERKE FRANK LLC, by
             Ms. Nora E. Gierke
24       7604 Harwood Avenue, Suite 203
             Wauwatosa, Wisconsin 53213
25       Appeared on behalf of General Electric Company.

## Page 3

1    A P P E A R A N C E S:  (continued)
2        SEGAL McCAMBRIDGE SINGER & MAHONEY, Ltd., by
             Mr. James R. Williams
3        233 South Wacker Drive, Suite 5500
             Chicago, Illinois 60606
4        Appeared on behalf of 3M Company.
5
6    ALSO PRESENT:  Ms. Sally Saindon
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1                E X A M I N A T I O N
2                                            PAGE
3    BY MR. McCOY                              7
     BY MS. ELLIS                             37
4    BY MR. CASMERE                           85
     BY MR. WILLIAMS                          87
5    BY MS. GIERKE                            95
     BY MR. McCOY                            138
6    BY MS. GIERKE                           142
     BY MS. ELLIS                            143
7
8                E X H I B I T S
9    NUMBER                          PAGE IDENTIFIED
10   No. 1   Notice of Deposition of      8
              Jerry Saindon
11
     No. 2   4/3/03 Deposition Transcript of   8
12            Jerry Saindon
13   No. 3   5/20/03 Deposition Transcript of  8
              Jerry Saindon
14
     No. 4   Packet of Documents             10
15
     No. 5   5/23/73 Memo                    107
16
     No. 6   1/12/73 Handwritten Document    109
17
     No. 7   1/15/73 Memo                    111
18
     No. 8   3/6/73 Memo                     114
19
     No. 9   4/3/73 Handwritten Note         116
20
     No. 10  5/16/73 Handwritten Memo        118
21
     No. 11  5/3/73 Memo                     119
22
     No. 12  7/27/73 Memo                    120
23
     No. 13  10/23/73 Memo                   121
24
     No. 14  11/12/73 Memo                   121
25

1 (Pages 1 to 4)

Deposition of Jerry Saindon, 3/12/2014

Page 5

1       E X H I B I T S (cont'd)
2    NUMBER                        PAGE IDENTIFIED
3    No. 15   1/11/74 Memo              122
4    No. 16   1/14/74 Memo              124
5    No. 17   Things to Do to Improve Mineral  128
             Core Dust in the Core Mill
6
     No. 18   2/5/74 Memo               129
7
     No. 19   4/30/74 Memo              130
8
     No. 20   5/8/74 Memo               130
9
     No. 21   6/8/76 Memo               133
10
11   (Original Exhibits 1-3 and 5-21 attached to original
     transcript; copies attached to copies of transcript.)
12
           (Exhibit 4 retained by Attorney McCoy.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1              TRANSCRIPT OF PROCEEDINGS
2         (Exhibit Nos. 1-4 marked for identification.)
3              (Witness is sworn.)
4         MR. McCOY:  Before we start, we have an
5    agreement that what's going to be identified as
6    Exhibit No. 4, which are documents that
7    Mr. Saindon had from when he worked at
8    Weyerhaeuser, that these -- this group of
9    documents is going to be kept confidential until
10   there can be some determination by the Court, at
11   the request of Weyerhaeuser's counsel, as to
12   whether there's privileged material within this.
13   And he won't be questioned about the contents of
14   any document that Weyerhaeuser today believes to
15   be privileged.
16        MS. ELLIS:  And this is Tanya Ellis for
17   Weyerhaeuser.
18        I'll just add for the record that these
19   documents were not produced to counsel, at least
20   counsel for Weyerhaeuser, before today's
21   deposition and that it remains to be questioned
22   where this set of documents came from.
23        And so the documents will remain
24   privileged and confidential until we get a court
25   order saying otherwise.

Page 7

1         MR. CASMERE:  I think we should note the
2    Bates range for Exhibit 4 just so that there's no
3    questions later on as to what this --
4         MR. McCOY:  Sure.
5         MR. CASMERE:  -- binder of documents is.
6         MR. McCOY:  Sure.  The Bates range --
7    all the documents in Exhibit 4 have been marked
8    with the word "Saindon," and they're numbered from
9    00001 through 000333 consecutively, so --
10        MR. CASMERE:  Thank you.
11        MR. McCOY:  -- 333 pages.
12        Okay.  Having put that on the record,
13   then, are you ready to go?
14        THE WITNESS:  I guess so.
15        MR. McCOY:  Okay.  All right.
16        THE WITNESS:  Go home?
17        MR. McCOY:  Right.
18        MR. CASMERE:  Thank you, sir.
19        MR. McCOY:  We'll get you home as quick
20   as we can.
21        JERRY SAINDON, called as a witness
22   herein, having been first duly sworn on oath, was
23   examined and testified as follows:
24             E X A M I N A T I O N
25

Page 8

1    BY MR. McCOY:
2    Q   Okay.  I'd like you to begin, Mr. Saindon, by
3        giving us your full name and spelling your last
4        name for everybody.
5         MR. McCOY:  Oh, before I start, I need
6    to put this video on.  Sorry about that.
7    BY MR. McCOY:
8    Q   Okay.  Mr. Saindon, what I'd like you to do first
9        is to give us your name, your full name, and spell
10       your last name for us.
11   A   Jerry Rodney Saindon.
12   Q   Okay.
13   A   S-A-I-N-D-O-N.
14   Q   And where do you live at now, Mr. Saindon?
15   A   205 South Vine.
16   Q   And you are retired from working at Weyerhaeuser;
17       is that right?
18   A   Yes.
19   Q   Okay.  Before we go further, I'd like to mark as
20       Exhibit No. 1 the notice for today's deposition.
21        Exhibit No. 2 is a transcript of a video
22   deposition of Mr. Saindon that's from April 3rd of
23   2003.
24        Exhibit No. 3 is a transcript of the
25   deposition of Mr. Saindon from May 20th of 2003.

2  (Pages 5 to 8)

Deposition of Jerry Saindon, 3/12/2014

1        So, Mr. Saindon, you've given testimony
2  before in cases concerning Weyerhaeuser; is that
3  right?
4  **A   Yes.**
5  Q   Okay.  And we marked as Exhibits 2 and 3 two
6  separate days of testimony.
7        Is that all the ones that you remember?
8  **A   Yes.**
9  Q   Okay.  And is there any changes that you can think
10  of today to your past testimony?
11  **A   No.**
12        MR. CASMERE:  Objection.
13        MS. ELLIS:  Object to form.  Foundation.
14        MS. GIERKE:  Join.
15        MR. CASMERE:  Can we have a stipulation
16  that an objection for one is an objection for all,
17  unless you opt out?
18        MR. McCOY:  Sure.
19        MR. CASMERE:  Thank you.
20  BY MR. McCOY:
21  Q   Okay.  And your answer is?
22  **A   Do you want to repeat that now?**
23  Q   Okay.  The question was, subject to these
24  objections:  Is there any changes you can think of
25  today to your past testimony?

1  **A   Not that I can think of, no.**
2  Q   Okay.  Now, we've also marked today as
3  Exhibit No. 4 a group of documents which is
4  Bates-stamped numbered "Saindon" beginning with
5  00001 and ending with 000333.
6        And what I'd like to do, first off, is ask
7  you if these are copies of documents that you had
8  when you were working at Weyerhaeuser.
9  **A   As near as I can recollect, this -- the top one**
10  **is, yeah.**
11  Q   Okay.  How about the others underneath?
12  **A   Do you want me to go through all of them?**
13  Q   Sure.  If you want to go through each one.  I
14  mean, you had a -- this is the set that you had
15  that I left with you yesterday.  But if you want
16  to go through each one individually, go right
17  ahead, sure.
18  **A   This first one looks like mine.**
19  Q   Okay.
20  **A   I shouldn't speculate if that's mine.  It appears**
21  **to be mine, yes.**
22       **There's my initials on that one, so it's**
23  **gotta be mine.  That's mine.  Yeah.  This -- that**
24  **was a copy that I got, too.  Okay.**
25       **Am I supposed to mention the numbers down**

1  here or just --
2  Q   I think the only time we need to mention the
3  numbers, if there's one that you don't think --
4  **A   Oh.**
5  Q   -- is a document you had at Weyerhaeuser.
6  **A   Okay.  This looks like it was taken out of a trade**
7  **magazine or something.  I don't know.**
8       **These all appear to be from the file, as near**
9  **as I can remember.**
10  Q   Okay.
11  **A   Some of that's my own writing, and I can't read it**
12  **myself.  As near as I can tell, they look like**
13  **they were from my files.**
14  Q   Files at Weyerhaeuser of yours?
15  **A   Yeah.  I would say, yes.**
16  Q   Okay.  And as far as your -- when you left
17  Weyerhaeuser, were these documents, then, that you
18  had kept in your possession?
19  **A   Yes.**
20  Q   And then you provided copies of those back in, I
21  think, 2002 or 2003, in connection with the case
22  of Larry Rogers, to my law firm; is that right?
23  **A   Yes.**
24        MS. ELLIS:  Object to form.
25

1  BY MR. McCOY:
2  Q   She -- they're entitled, as I mentioned to you, to
3  make the objections.  Sometimes you just gotta
4  wait for their objection; then you can answer the
5  question.
6  **A   Oh.**
7  Q   So that's kind of the procedure the lawyers go by,
8  so you might have to pause before my question
9  to -- when you answer.
10       Okay.  And what I wanted to ask you next was
11  the years that you worked in the safety area at
12  Weyerhaeuser, could you tell us approximately what
13  years you were in that area?
14  **A   About 1970 to '77.**
15  Q   Okay.  And what jobs did you have before working
16  in safety with Weyerhaeuser?
17  **A   I started out as the timekeeper for the plant, and**
18  **I went over into the order department or sales**
19  **department for a short amount of time, and then I**
20  **transferred out into the mill into the industrial**
21  **engineering department.  I was in there for --**
22  **well, pretty much until 1970.**
23  Q   Okay.
24  **A   You know, and then, after that I was -- after I**
25  **was out of safety, I was in the -- it was a**

3 (Pages 9 to 12)

Deposition of Jerry Saindon, 3/12/2014

Page 13

1    customer service-type thing.  I took care of all
2    the order changes that came into the mill from all
3    the customers and took care of that part of it.
4    And then I retired in 1993.
5  Q   Do you know -- do you have any better recollection
6    as to when you started in safety in 1970, like the
7    month or when you left safety?
8  A   It would have been in the spring, I think, about
9    April --
10  Q   Okay.
11  A   -- of '70, I think it was.
12  Q   And when -- do you have a better recollection of
13    the month when you left safety in '77?
14  A   July '77.
15  Q   Now, how -- when you were in safety, what would be
16    your best recollection of what your title was or
17    what people called you?
18  A   Safety coordinator.
19  Q   And how was it that you got the position of safety
20    coordinator?
21  A   Well, the general manager, who was Dick Welch at
22    the time, wanted me to take over that job.  And I
23    agreed to do it, and I got into it at that point
24    in time.
25  Q   Before you were safety coordinator, was there

Page 14

1    someone else in that position?
2  A   Well, the personnel department was the -- did the
3    safety activities at that time.
4  Q   When you -- when you got the job as safety
5    coordinator, was that, like, a new position that
6    was created?
7  A   Yes.
8  Q   Before you had -- before you started in safety as
9    coordinator, did you have any special training or
10    education about safety beyond what generally was
11    given to people in the plant?
12  A   No.
13  Q   After you became safety coordinator, did you get
14    additional training and education on safety
15    issues?
16  A   Other than to go to seminars and corporate
17    meetings and, you know, of that sort.
18  Q   Okay.  As safety coordinator, did you have a
19    budget?
20  A   No.
21  Q   You know Joe Wendlick; right?
22  A   Yes, I do.
23  Q   And how is it that you first started knowing
24    Joe Wendlick?
25  A   Well, he would come to Marshfield on various

Page 15

1    occasions and do visual inspections on his own.
2  Q   And what was your understanding of his role in the
3    Marshfield operations?
4  A   Well, he was concerned with the health.  He was
5    the indust- -- excuse me, industrial hygienist, so
6    he was pretty much concerned about the health
7    problems or issues.
8  Q   All right.  Do you know -- how many different
9    times do you remember Mr. Wendlick coming to
10    Marshfield?
11    You may not know the exact count, but would
12    it be, like, more than five times or what?
13  A   It was several times, yes.  About -- at least a
14    couple times a year, I'm thinking.
15  Q   A couple times a year while you had the position
16    in safety?
17  A   I would say at least two times a year.  Maybe
18    more.
19  Q   And what was he doing when he came to Marshfield?
20  A   Well, he'd meet -- he'd meet with people out on
21    the floor, he'd meet with the management people,
22    and he'd do his own visual inspections throughout
23    the plant.
24    He just kind of roamed around the plant and
25    did what he wanted to do.

Page 16

1  Q   Was he reporting to anybody at Marshfield or just
2    working with people at Marshfield?
3  A   He was just working with people, I think.
4  Q   Who was it that Mr. Wendlick would usually deal
5    directly with in terms of any recommendations or
6    plans or programs?
7    MS. ELLIS:  Object to form.
8    THE WITNESS:  The general manager.
9  BY MR. McCOY:
10  Q   I'm sorry.  Your answer was?
11  A   General manager, probably.
12  Q   And who was the general manager during -- during
13    the time that you were safety coordinator?
14  A   Dick Welch.
15  Q   Throughout the whole period?
16  A   Yes.
17  Q   Before Dick Welch had the position as general
18    manager, who had it?
19  A   Boy.  I don't -- I don't remember who the manager
20    was.
21  Q   Okay.  That's fine.
22    Okay.  Now, I want to ask you as far as
23    what -- what, if any, role did Mr. Wendlick have
24    in developing the plans or programs or procedures
25    concerning asbestos at Marshfield?

4 (Pages 13 to 16)

Page 17

1            MS. ELLIS:  Object to form.  Foundation.
2    BY MR. McCOY:
3    Q   Go ahead.  You can answer.
4    A   **Well, he was pretty much the main man that set up**
5        **all the program as far as the asbestos control**
6        **problems.**
7    Q   How about as far as invest-- -- investigating or
8        testing the -- for any levels of asbestos in the
9        air?  What role did Mr. Wendlick have in that?
10           MS. ELLIS:  Object to form.
11           THE WITNESS:  He was -- he was the one
12       that directed on what was to be monitored, and a
13       fellow by the name of Norm Pacourek was the one
14       that did the testing or the monitoring.
15   BY MR. McCOY:
16   Q   Did you personally ever do any testing?
17   A   **Yes.**
18   Q   Okay.  Most of it was Mr. Pacourek; is that right?
19   A   **Um-hum.**
20           MS. ELLIS:  Object to form.
21   BY MR. McCOY:
22   Q   You gotta answer "yes" or "no."
23   A   **Yes.**
24   Q   Okay.  As far as your role as safety coordinator
25       is concerned, how did you interface with or

Page 18

1        utilize the programs that Mr. Wendlick had
2        developed on asbestos?
3            MS. ELLIS:  Object to form.
4            THE WITNESS:  I guess I would -- I would
5        help to implement anything that he wanted done and
6        maybe follow up and make sure that things were
7        done, you know.
8    BY MR. McCOY:
9    Q   Okay.  And so you weren't the person developing
10       the programs yourself?
11   A   **Not necessarily, no.**
12   Q   You were just an implementer?
13           MS. ELLIS:  Object to form.
14           THE WITNESS:  Yes.
15   BY MR. McCOY:
16   Q   Okay.  What, if any, program do you remember being
17       developed by Mr. Wendlick for controlling
18       exposures of asbestos fibers being emitted into
19       the community?
20           MS. ELLIS:  Object to form and
21       foundation.
22           THE WITNESS:  I have no idea.  I don't
23       remember.
24   BY MR. McCOY:
25   Q   Was -- was the -- any questions about the

Page 19

1        community exposures within the scope of your own
2        duties?
3            MS. ELLIS:  Object to form --
4            THE WITNESS:  No.
5            MS. ELLIS:  -- and foundation.
6    BY MR. McCOY:
7    Q   I'm sorry.  Your answer was?
8    A   **No.**
9    Q   Okay.  What was your understanding of the person
10       or persons that would be responsible for any
11       community exposure issues at Marshfield?
12           MS. ELLIS:  Object to form and
13       foundation.
14           THE WITNESS:  I have no idea.
15   BY MR. McCOY:
16   Q   I just wanted to identify a few of these people
17       whose names appear in the documents that are
18       marked as Exhibit 4, to the best of your
19       recollection, on these people.
20           Just for clarification, I guess the first one
21       is -- is Saindon 24.  And I just wanted to know,
22       is that your signature down there?
23   A   **Yes.**
24   Q   Okay.  Is that your writing?
25   A   **Yes, it is.**

Page 20

1    Q   And you're sending this to Wes.  Who would that
2        be?
3    A   **Wes Sydow.**
4    Q   Okay.  And who was Wes at this time?
5    A   **He was a supervisor.  I believe he was a**
6        **fabrication supervisor, I think they called him.**
7    Q   For Weyerhaeuser in Marshfield?
8    A   **Yes.**
9    Q   And next is Saindon 31, and I wanted you to
10       identify these people, if you could.
11           First off, K.A. Schommer?
12   A   **Schommer.  Ken Schommer.**
13   Q   Yes.
14   A   **He was -- what the hell?  I'm not sure.  What is**
15       **that?  He was right underneath the general**
16       **manager.  I don't remember what his title was.**
17   Q   Okay.  Reported directly to the general manager?
18   A   **I think he reported --**
19           MS. ELLIS:  Object to form.
20           THE WITNESS:  -- to Dick Welch.
21   BY MR. McCOY:
22   Q   Okay.  And next is?
23   A   **Lois.**
24   Q   Lois Brundidge?
25   A   **Lois Brundidge.  She was the nurse.**

Deposition of Jerry Saindon, 3/12/2014

Page 21

1  Q   Jim Gallatin?
2  A   **At this time, he was a supervisor in**
3     **particleboard.  And I'm not sure if he was in**
4     **mineral core then or -- or not, but he was a**
5     **supervisor in that area over there in the**
6     **particleboard area, I believe.**
7  Q   Okay.  And then --
8  A   **Ken Powers was a personnel man.**
9  Q   All right.  Dale?
10 A   **Dale Schultz was a maintenance man.  He was a**
11    **maintenance and a manager.**
12 Q   And then next is Wes Sydow, who you --
13 A   **Wes Sydow, yes.**
14 Q   Right.  That's what you just talked about?
15 A   **Um-hum.**
16 Q   You gotta say "yes."
17 A   **Yes.**
18 Q   Okay.  All right.  Next is Saindon 32, and there's
19    a few more names on here that we haven't talked
20    about.
21       Doug Ehlke?
22       MS. ELLIS:  This is -- I'm objecting to
23    the use of this document, Bob.  This is a
24    privileged communication between internal
25    Weyerhaeuser people and their attorney.

Page 22

1        MR. McCOY:  I'm not going to question
2     him, you know, subject to the determination of
3     whether this is privileged or not.
4        THE WITNESS:  I don't know.
5        MR. McCOY:  But I'm not going to
6     question him on the document.
7        MS. ELLIS:  Okay.
8        MR. McCOY:  I'm just going to ask him
9     who --
10       THE WITNESS:  I don't recall.
11       MR. McCOY:  -- the people are.
12       THE WITNESS:  I don't recall who he is.
13    I don't recall who Willard Gee is either.
14       Jim LeRoux, he was originally at
15    Marshfield, so I knew who he was.  He was
16    stationed out in Tacoma.  I'm not sure what his
17    title was.
18 BY MR. McCOY:
19 Q   What job did he have out at Marshfield when he was
20    here?
21 A   **He had several.**
22 Q   What jobs?
23 A   **He was -- he was a foreman, and he was -- he**
24    **worked all the way -- all the way up to -- he**
25    **might have been the general manager at one time,**

Page 23

1     too.
2  Q   Okay.  Al Clark?
3  A   **Al Clark, he was a product and planning manager,**
4     **his title was.  And then Ken Schommer again.**
5  Q   You already talked about Ken Schommer.
6  A   **Um-hum.  Yes.**
7  Q   Okay.  The next one is Saindon 35.  It's got a few
8     other --
9        MS. ELLIS:  Bob, same objection.  This
10    document is privileged.
11       MR. McCOY:  I'm not asking about the
12    substance again.  Just to identify the people.
13       THE WITNESS:  I don't know.  I don't
14    know.  There's LeRoux again and Welch.  Those are
15    the only two that I would know.
16 BY MR. McCOY:
17 Q   Okay.  So you don't know Frost?
18 A   **No.**
19 Q   And you don't know -- is it --
20 A   **Haydu or Hay- -- I don't know who that is.**
21 Q   Okay.  And you don't know W.P. Reynolds?
22 A   **No.**
23 Q   R.S. Welch, that's Dick Welch; right?
24 A   **Yes.**
25 Q   Saindon 52 has a couple more new names.

Page 24

1        Harold Semandel?
2  A   **Semandel.**
3  Q   Yes.
4  A   **He was a foreman in the glue room on second shift,**
5     **I believe it was.**
6        **And Gauger, he was a foreman in the core**
7     **mill.**
8  Q   Okay.
9  A   **He might have been second shift foreman at that**
10    **time.**
11 Q   When you talk about second shift, what hours did
12    that operate?
13 A   **3:00 to 11:00 or somewhere in those hours.**
14       **Art Boushon, he was a sub-foreman in the core**
15    **mill.  And Jim Ekes was a foreman in the core**
16    **mill.  And Al Werther, I think he was a -- like an**
17    **assistant foreman down there.**
18 Q   Okay.  And then it has Wes Sydow, fabrication
19    supervisor?
20 A   **Yes.**
21 Q   Okay.  What was done in the fabrication area,
22    basically?
23       MS. ELLIS:  Object to form.
24       THE WITNESS:  It was the core mill where
25    they put the doors together and the glue room

6 (Pages 21 to 24)

Deposition of Jerry Saindon, 3/12/2014

Page 25

1     where they glued them together.  Saw, sand, any of
2     the operations where they're actually assembling
3     the doors.
4  BY MR. McCOY:
5  Q   Did you have any role in purchasing to know where
6     the cores came from?
7        MS. ELLIS:  Object to form.
8        THE WITNESS:  No.
9  BY MR. McCOY:
10  Q   Okay.  Saindon 78, a couple more new names on
11     there.  Let's see.
12        Ehlke, I think you already said you didn't
13     know him?
14        MS. ELLIS:  Same objection to this
15     document.
16  BY MR. McCOY:
17  Q   Okay.
18  A   **Dr. Robert Heywood, he was -- he would come out**
19     **and visit with the nurse and go over there.  So**
20     **that was the medical problems.**
21  Q   Okay.  A couple new names on Saindon 79, which,
22     again, I'll only ask about the identity of the
23     people.
24        MS. ELLIS:  Same objection to the
25     document.

Page 26

1        MR. McCOY:  Right.
2  BY MR. McCOY:
3  Q   Let's see.  We've got Cliff?
4  A   **Cliff Schweke, he was a personnel man.**
5     **And Ken Powers was personnel, but we already**
6     **talked about him.**
7  Q   Right.  Ron Koepke?
8  A   **Ron Koepke, he was a supervisor.**
9  Q   For what?
10  A   **At that time, I'm not sure.  He might have been**
11     **supervisor in the mineral core.  I'm not -- I'm**
12     **not sure on that.**
13  Q   All right.  Saindon 86, a couple other names on
14     there.
15        We already covered Mr. Gallatin.
16  A   **John Binder?**
17  Q   Right.
18  A   **He was an expeditor.**
19     **And Dick Luther was a -- I think he was a**
20     **supervisor on the second shift, second or third**
21     **shift, too.**
22  Q   Do you know what area he was in?
23  A   **I don't recall.**
24  Q   What does an expeditor do?
25  A   **They expedite doors through the mill.**

Page 27

1  Q   Okay.  Exhibit-- from Exhibit 4, which is document
2     Saindon 87, this one makes reference to --
3        MS. ELLIS:  Hey, Bob, I'm objecting to
4     the use of this document as a privileged
5     communication, and I'd instruct the witness not to
6     answer any questions about it.
7        MR. McCOY:  And what's the basis for the
8     privilege?
9        MS. ELLIS:  Because this is an internal
10     Weyerhaeuser communication between Weyerhaeuser
11     employees and Weyerhaeuser's attorney.
12        Additionally, it's marked
13     "Confidential."
14        MR. McCOY:  Is there any other basis for
15     it being -- being privileged?
16        MS. ELLIS:  Other than it's a
17     communication between a Weyerhaeuser attorney and
18     Weyerhaeuser employees, no.
19        MR. McCOY:  Okay.  All right.
20        MS. ELLIS:  I guess I will add that it's
21     about -- it is discussing matters of a legal
22     context.
23        MR. McCOY:  Yeah.  Well, for the record,
24     I mean, it's sent to -- sent by Mr. Wendlick,
25     who's industrial hygiene, to the general manager.

Page 28

1        MS. ELLIS:  That's right.  And the --
2     Weyerhaeuser's in-house counsel was copied on the
3     correspondence, Douglas Ehlke.
4        MR. McCOY:  Just copied.  I mean, it
5     wasn't sent to him.
6        All right.  Well, we don't have to ask
7     anything about that.  We'll just hold that for the
8     Court's ruling if we need to later.
9  BY MR. McCOY:
10  Q   Okay.  Then let's see here.  Okay.  A couple other
11     names from Saindon -- begins with 93.
12     D.N. McClary, who's that?
13  A   **He was a general manager here after Dick Welch.**
14     **He came in and -- after Dick left.**
15  Q   Okay.
16        MS. ELLIS:  And I'm objecting to
17     discussions about the content of this document as
18     well.
19        MR. McCOY:  Yeah.  I don't have any
20     questions about the content on this one.
21  BY MR. McCOY:
22  Q   The other people at the back, there's a couple
23     more names.  I'm just wondering if you know who
24     these are, Mr. Saindon.  One is J.D. Henry.
25  A   **He was over in the Schofield office, one of the --**

7 (Pages 25 to 28)

Deposition of Jerry Saindon, 3/12/2014

Page 29

```
 1    Weyerhaeuser had an office over in Schofield at
 2    one time, kind of a regional office.  But I don't
 3    recall what he -- what he did.
 4  Q  How about L.B. Hoelscher?
 5  A  I don't recall him either.
 6  Q  R.T. Jenkins?
 7  A  No.
 8  Q  Don't recall him?
 9  A  No.
10  Q  R.S. Jones?
11  A  No.
12  Q  G.C. Meyer?
13  A  He was -- he was, I believe, vice president over
14    in Schofield, I think is what he was, in charge --
15    he was in charge of that office over there, that
16    region.
17  Q  Okay.  And G.G. Stinson, do you know who he was?
18  A  He was a personnel man.
19  Q  At Marshfield?
20  A  Yes.
21  Q  Okay.  Okay.  Saindon 1 -- hold on.  Saindon 169,
22    I see more names on here.  Let's see if we know
23    any of these.
24       Dave McGiveron?
25  A  He was maintenance supervisor.
```

Page 30

```
 1  Q  Terry Wolf?
 2  A  He was maintenance, too.
 3  Q  Lloyd McDonald?
 4  A  Foreman.
 5  Q  Wally Mannigel?
 6  A  He was a foreman.  Foreman or -- yeah.  I guess he
 7    was a foreman at the time.
 8  Q  What was McDonald foreman of?
 9  A  He was in a couple of different areas.  Once I
10    think he was in the glue room, and he was also in
11    the core mill.  I don't recall what he was in '74.
12  Q  Okay.  Which is the time of this document.  All
13    right.
14  A  Yeah.
15  Q  Wally Mannigel, do you know what he was foreman
16    for?
17  A  He was kind of the general foreman on the night
18    shift at one time.  At this -- then he came on
19    days, but I don't recall just when he made the
20    shift.
21  Q  Okay.  So general foreman would be in charge of
22    all the different departments?
23  A  Yes.
24  Q  Bill Haeni?
25  A  Bill was down in detail, supervisor.
```

Page 31

```
 1  Q  Okay.  Saindon 255.  All right.  This one is one
 2    that you prepared; right?
 3       MS. ELLIS:  Object to form.
 4       THE WITNESS:  Um-hum.  Yes.
 5  BY MR. McCOY:
 6  Q  Okay.  And it makes reference in here to -- the
 7    subject says, "Improvements made for handling
 8    asbestos per OSHA request - Mr. Milan Racic."
 9       Do you remember who Milan Racic was?
10  A  To the best of my recollection, he was an
11    industrial hygienist also.
12  Q  From where?
13  A  From OSHA.  I don't know where he was stationed at
14    this -- at that time.
15  Q  Okay.  You mean from the Occupational Safety --
16  A  Yes.
17  Q  -- and Health --
18  A  Um-hum.  Yes.
19  Q  -- government?
20  A  Yes.
21  Q  Okay.  And how -- what do you recall him being
22    involved with as far as Weyerhaeuser's operations?
23  A  I don't recall.
24  Q  Did you personally meet with him?
25  A  I don't remember if I did or not.  I don't believe
```

Page 32

```
 1    I did.
 2  Q  Do you know who met with Mr. Racic?
 3  A  No.
 4  Q  One other question about this Saindon 255.
 5       It says here No. 9, "Provide and enforce
 6    wearing of 3M-8710 masks."
 7       So what do you remember about the -- that
 8    particular mask?
 9       MR. WILLIAMS:  Object to form.
10       THE WITNESS:  The only ones I remember
11    are the white masks that -- with a strap around
12    the back.
13  BY MR. McCOY:
14  Q  Okay.  Did you personally get involved in
15    selecting the brand or type of masks?
16  A  No.
17  Q  Who did that?
18  A  I don't know.
19  Q  What was your -- your concerns as far as the masks
20    in your position as safety coordinator?
21       MR. WILLIAMS:  Object to form.
22    Foundation.
23  BY MR. McCOY:
24  Q  And by that, I'm saying were you concerned to make
25    sure everybody's wearing it or make sure it was
```

Deposition of Jerry Saindon, 3/12/2014

Page 33

```
 1      available; or what role did you have on the mask,
 2      if any, as safety coordinator?
 3   A   None, I would think.
 4   Q   Okay.  Who was handling the concerns about
 5      availability of masks?
 6          MS. ELLIS:  Object to form.
 7          MR. WILLIAMS:  Foundation.
 8          THE WITNESS:  Who would --
 9   BY MR. McCOY:
10   Q   Yeah.  Who would be -- who would be making sure
11      the masks were available?
12          MR. WILLIAMS:  Same objection.
13          THE WITNESS:  The supervisors.
14   BY MR. McCOY:
15   Q   In the particular departments?
16   A   That was their responsibility.  Yes.
17   Q   Okay.  Okay.  Saindon 260, one other name on here.
18      Is that Norm --
19   A   Norman.
20   Q   -- Pacourek?
21   A   Norman Pacourek, yes.
22   Q   Okay.  That's the person we talked about earlier?
23   A   That's the one that did the monitoring, yes.
24   Q   Okay.  Who determined what and where should be
25      monitored for the asbestos?
```

Page 34

```
 1          MS. ELLIS:  Object to form.
 2          THE WITNESS:  As far as I know,
 3      Joe Wendlick.
 4   BY MR. McCOY:
 5   Q   Okay.  This is Saindon 302.  302.  This has a
 6      couple additional names on here I wanted to ask
 7      about.  One is R.D. Mahoney.
 8   A   I don't know who that is.
 9   Q   And another one is David P. --
10   A   I don't know who that would be either.
11   Q   I can't read the last name myself.  Okay.  Looks
12      like maybe D.P. Lewis.
13   A   I don't know the man.
14   Q   Okay.
15   A   I don't know who that would be.
16   Q   And T.R. Frost?
17   A   No.
18   Q   Okay.  And this makes reference at the beginning
19      to the statement, it says, "Jerry Saindon from
20      Marshfield, Wisconsin, mineral core plant
21      collected 17 asbestos samples."
22          MS. ELLIS:  Object to form.
23   BY MR. McCOY:
24   Q   How many times did you actually yourself collect
25      asbestos samples, to your recollection?
```

Page 35

```
 1          MS. ELLIS:  Object to form.
 2          THE WITNESS:  Very few.  Once or twice
 3      maybe, that I can remember.
 4   BY MR. McCOY:
 5   Q   At whose direction did you collect the samples?
 6   A   Well, it was coordinated with Joe, I believe, out
 7      in Longview, Washington.
 8   Q   Joe --
 9   A   Joe Wendlick.  When we got done with it, then we
10      would ship them out there.
11   Q   Did the results typically come back to you?
12   A   No.
13   Q   Okay.  And then finally, I've got Saindon 332 and
14      333.  That's one document that's handwritten and
15      has a date of 1/20/77.  Looks like it was -- it
16      was addressed to you --
17   A   Um-hum.
18   Q   -- about mineral core dust on lumber.  And the
19      back of it's signed.  It just says the name
20      "Mark."
21          Do you remember a person named Mark who sent
22      this?
23   A   I believe that was Mark Tracy.
24   Q   Okay.  And where did he work at?
25   A   He was a supervisor.  I don't recall if he was a
```

Page 36

```
 1      supervisor over in particleboard or if he was --
 2      I'm not sure.
 3   Q   Okay.
 4   A   I don't think he was ever around.
 5   Q   I don't think I have too many more questions.
 6      I'll let you know here in a moment.
 7          I'm not sure if I asked you who these two
 8      people's names were -- but this is Saindon 52 --
 9      or what their -- what their role was, is what I --
10      is what I mean.
11          Art Boushon?
12   A   He was an assistant foreman down in the core mill.
13   Q   Jim Ekes?
14   A   He was a foreman in the core mill, too.
15   Q   Al Werther?
16   A   He was in the core mill, too, but I don't know
17      what his position would have been.
18   Q   And Jerry Gauger or --
19   A   Those two were both foremen, I believe, on the
20      second shift.
21   Q   In what area?
22   A   Semandel was in the glue room, I believe, and
23      Gauger was in the core mill.
24   Q   Okay.  And on -- finally, on Saindon 79 -- just,
25      again, I don't have questions on the substance
```

9 (Pages 33 to 36)

Page 37

1    because I'm sure there's -- subject to the
2    objection on privilege.
3         MS. ELLIS:  That's right.
4  BY MR. McCOY:
5  Q   The person I want to ask about, his name is
6      Cliff Schweke.
7  **A   Personnel.**
8  Q   Okay.  Oh, let me ask this question:  What was the
9      last -- do you remember the last year in which you
10     saw Joe Wendlick at Marshfield?  The year?
11 **A   1986.**
12        MR. McCOY:  Okay.  That's all the
13    questions I have for you.  Thanks, Mr. Saindon.
14        MR. CASMERE:  Let's take a break.
15    (A recess is taken from 10:32 a.m. to 10:58 a.m.)
16          E X A M I N A T I O N
17 BY MS. ELLIS:
18 Q   This is Tanya Ellis.  I represent Weyerhaeuser
19     Company.
20        How are you, Mr. Saindon?
21 **A   Fine.  How are you?**
22 Q   Very good.  Thank you.  And we met on Monday
23     afternoon --
24 **A   Yes.**
25 Q   -- for the first time; is that right?

Page 38

1  **A   Yes.**
2  Q   Okay.  And we had had a phone call conversation
3      last week, I believe; is that right?
4  **A   Yes.**
5         MS. ELLIS:  Okay.  Before we get
6      started, I have one objection I just want to note
7      on the record, and that is that the same objection
8      for use of any privileged documents in Exhibit 4
9      that I made with plaintiffs' counsel, the same
10     goes to codefense counsel.  And I would ask that
11     they would refrain from using or referring to any
12     privileged documents as well until -- if and until
13     we get a ruling from the Court on those documents.
14        MR. WILLIAMS:  If I may, this is
15     Jim Williams for 3M company.
16        In the interest of going forward with
17     the deposition, I'll ask questions that I can ask
18     without looking at those documents and reserve the
19     right to later ask about those documents at such
20     time as the Court allows.
21        MS. GIERKE:  Same reservation for
22     Nora Gierke, counsel for General Electric Company.
23 BY MS. ELLIS:
24 Q   So, Mr. Saindon, just talking about while we're
25     here today, are you here under a subpoena today?

Page 39

1  **A   No.**
2  Q   Okay.  So you appeared here voluntarily?
3  **A   Yes.**
4  Q   And you were asked to come by the Cascino Vaughan
5      firm; is that right?
6  **A   Yes.**
7  Q   Okay.  And when were you first contacted about
8      this case by the Cascino Vaughan firm?
9         MR. McCOY:  Let me just clarify this.
10    You're talking about -- by "this case,"
11    there's, I think, multiple cases involved here.
12        And you're referring to the ones in this
13    notice of deposition --
14        MS. ELLIS:  Yep.  I'll --
15        MR. McCOY:  -- today, or are you
16    referring to, like, back when he first was
17    involved with the Rogers case and so on?  That's
18    my -- my only question.
19        MS. ELLIS:  How about you hand me the
20    deposition notice and we'll go from there.
21        MR. McCOY:  Okay.
22 BY MS. ELLIS:
23 Q   Mr. Saindon, I'll have you look at Exhibit 1 and
24     ask if you've seen this document before.
25        I'll represent to you it's the notice of

Page 40

1      today's deposition.
2  **A   This, I have never seen this before.  No.**
3  Q   Okay.  Was there a time when you were contacted by
4      the Cascino Vaughan firm in the last six months?
5  **A   Yes.**
6  Q   Okay.  And when was that?
7  **A   I think it was in December sometime.  I don't know**
8      **the exact date.  I think I got a phone call from**
9      **Bob here first -- what the date was, I don't**
10     **remember -- and then I got a call from**
11     **Mike Cascino, Mike, and he stopped by the house.**
12     **That was, like, in December sometime.**
13 Q   Okay.  So Mike Cascino came to your home --
14 **A   Yes.**
15 Q   -- back in December --
16 **A   Yes.**
17 Q   -- you think?
18 **A   Yes.**
19 Q   Okay.  And did he talk to you about some ongoing
20     litigation involving the Weyerhaeuser plant?
21 **A   Yes.**
22 Q   And what did he tell you about that litigation?
23 **A   Oh, gee.  I don't really remember what the**
24     **conversation all involved.  That I -- you know,**
25     **that he wanted me to do a deposition.**

10 (Pages 37 to 40)

Page 41

1  Q   And did he tell you at that time that Weyerhaeuser
2      was not a defendant in the lawsuits?
3  A   **That they were not a -- yes, he did.**
4  Q   He told you that Weyerhaeuser was not a defendant;
5      is that right?
6  A   **Yes.**
7  Q   Okay.  And have you since come to understand that
8      Weyerhaeuser is, in fact, a defendant in the
9      lawsuits?
10 A   **Yes.**
11 Q   Okay.  Have you been offered any compensation for
12     your time here today or any time related to this
13     litigation?
14 A   **He mentioned that they could pay, like, $25 an**
15     **hour or something like that, when he was at the**
16     **house.**
17 Q   And he offered $25 an hour for your time in
18     connection with -- with this case, or what were
19     the specifics?
20 A   **That's what was my understanding, yeah.**
21 Q   Okay.  Did he tell you to keep track of your
22     time --
23 A   **No.**
24 Q   -- and how much time you put in?  No?
25 A   **No.**

Page 42

1  Q   Okay.  Have you or do you intend to send him your
2      bill for your time --
3  A   **No.**
4  Q   -- for these cases?  No?  Okay.
5          So we've had a lot of discussion about the
6      documents here that we've been looking at today.
7      And I understand that you maintained a file from
8      your employment with Weyerhaeuser that you took
9      with you when you left the company; is that right?
10 A   **Yes.**
11 Q   Okay.  Did you ask anybody at the company if you
12     could take that file with you?
13 A   **No.**
14 Q   Okay.  And did you know the file contained
15     privileged and confidential information?
16         MR. McCOY:  Objection to the form and
17     foundation for that question.
18         Go ahead.  You can answer.
19         THE WITNESS:  Not really.
20 BY MS. ELLIS:
21 Q   Okay.
22 A   **When I left, it was a -- I just took the whole**
23     **file that I had and threw it in a box and I took**
24     **it home and it laid up in the attic for, I don't**
25     **know, ten years until 2003, I guess it was.**

Page 43

1  Q   And at that time, when you found the file in your
2      attic in what you remember to be 2003, what did
3      you do with the file when you found it?
4  A   **Well, this was after my daughter's husband died.**
5      **And I gave that to her, and then she forwarded it**
6      **to them.**
7  Q   Okay.
8          MR. CASMERE:  I'm sorry.  "Them" who?
9          THE WITNESS:  Cascino.
10         MR. CASMERE:  Thank you.
11 BY MS. ELLIS:
12 Q   So your daughter took your file and sent it to the
13     Cascino Vaughan law firm?
14 A   **Yes.**
15 Q   Okay.  And did you ever get the file back after
16     that transaction occurred?
17 A   **I believe I did.**
18 Q   Okay.  Do you still have the file?
19 A   **I think I do somewhere, yeah.**
20 Q   Okay.  And just generally, the file that you kept
21     that you took with you from Weyerhaeuser, would
22     that be -- would that have contained documents
23     from your work as a safety coordinator at
24     Weyerhaeuser?
25 A   **Yes.**

Page 44

1  Q   Okay.  Would it have contained documents from any
2      of your other work outside of safety coordinator
3      at Weyerhaeuser?
4  A   **Well, it was a combination.  It could have been**
5      **from trade magazines.  You know, anything that**
6      **related just to safety or asbestos, I just threw**
7      **it in that file.**
8  Q   Okay.  Would it have contained documents dated
9      after 1993?
10 A   **No, I don't believe so.**
11 Q   Would it have contained documents relating to
12     research and development and research and
13     development of fire doors at Weyerhaeuser?
14 A   **I don't believe so, no.**
15 Q   And you never had any involvement with research
16     and development at Weyerhaeuser, did you?
17 A   **No.**
18 Q   And it wouldn't have contained documents related
19     to UL rating or obtaining of UL certification for
20     any products made by Weyerhaeuser, would it?
21 A   **Not to my knowledge.**
22 Q   Now, I guess you came to understand that the
23     Cascino Vaughan firm made a copy of your file; is
24     that right?
25 A   **Yes.**

Deposition of Jerry Saindon, 3/12/2014

Page 45

1    Q    And did you ever see the copy that they made of
2         your file?
3    A    I believe I did, yes.
4    Q    Okay. And did you understand that they copied
5         every single thing in your file?
6    A    I wasn't aware of what they copied or if they
7         copied it all or not. I didn't -- I -- I wasn't
8         sure.
9    Q    Okay. So you don't know if they copied the whole
10        file or just took parts of it --
11   A    No.
12   Q    -- is that right?
13   A    No, I don't.
14   Q    How big is the file that you took with you from
15        Weyerhaeuser?
16   A    Similar to this, I would say.
17   Q    Okay. Now, this set of documents that's sitting
18        here in front of us -- it's been marked as
19        Exhibit 4 -- you didn't bring that set of
20        documents with you today, did you?
21   A    These?
22   Q    Correct.
23   A    The only thing we brought is what he left with us
24        yesterday.
25   Q    Okay. Well, let me back up, then, I guess.

Page 46

1              MR. McCOY: For the record, I left him
2         an exact copy of what we have as Exhibit 4
3         yesterday.
4    BY MS. ELLIS:
5    Q    Okay. So I guess you met with Mr. McCoy
6         yesterday?
7    A    Yes.
8    Q    And he brought with him a set of documents, and he
9         left those with you; is that right?
10   A    Yes. Yes.
11   Q    Did you look through those last night?
12   A    No.
13   Q    Okay. And so the set he brought to you is what
14        you brought back today; is that right?
15   A    That's right. Yes.
16   Q    So you did not bring your file with you today; is
17        that right?
18   A    Right. Yes.
19   Q    Have you given your file to anyone else since that
20        time in 2003 when you gave it to your daughter?
21   A    No.
22   Q    And did you verify that the documents that are
23        here today as Exhibit 4 are, in fact, copies of
24        the documents that are in your file?
25   A    They appear to be.

Page 47

1    Q    They appear to be?
2              And you looked at them all, I understand, and
3         I guess you're saying generally, the way the
4         documents look, they appear to be the type of
5         documents you keep in your file; right?
6    A    Yes.
7              MR. McCOY: Objection. That misstates
8         his testimony.
9    BY MS. ELLIS:
10   Q    Is there any way you can be sure that every page
11        of these documents came from your file?
12             MR. McCOY: Objection.
13             THE WITNESS: Reasonably sure.
14   BY MS. ELLIS:
15   Q    Okay. What about documents that might be in this
16        stack that don't have your name on them? How
17        would you have come to get those documents?
18   A    They could have been sent to me by other
19        coordinators throughout the company or -- you
20        know, hard to tell. I mean, they come from all
21        over. That's been so long ago.
22             Whenever I got something like that, I'd maybe
23        read it. And if I didn't have to do anything
24        more, it just went in the file, and that's the
25        last I saw of it.

Page 48

1    Q    And when you gave these documents to the Cascino
2         firm, did you intend to disclose privileged and
3         confidential information?
4              MR. McCOY: Objection to form and
5         foundation.
6              THE WITNESS: No.
7    BY MS. ELLIS:
8    Q    Okay. And did anyone from the Cascino Vaughan
9         firm or anywhere else ever advise you that
10        possibly there were -- there were privileged and
11        confidential documents --
12   A    No.
13   Q    -- in your file?
14   A    No.
15             MR. McCOY: Same objection to form and
16        foundation. There's been no ruling of such.
17   BY MS. ELLIS:
18   Q    I'm going to show you one of the documents in this
19        stack, Mr. Saindon.
20             MS. ELLIS: And, Bob, if you don't mind,
21        would you pull this out of your stack and show it
22        to him so I can talk to him about it?
23             MR. McCOY: Sure.
24             MS. ELLIS: It's Saindon 75.
25

12 (Pages 45 to 48)

Page 49

1  BY MS. ELLIS:
2  Q   Mr. Saindon, this document that's been represented
3      as part of Exhibit 4 here, your name doesn't
4      appear on this document, does it?
5  A   No.
6  Q   Okay.  Do you recognize this document?
7  A   No, I don't.
8  Q   Okay.  Can you state with any certainty that this
9      document was in your file?
10 A   No.
11 Q   Okay.  So for documents in this stack on which
12     your name does not appear, can you tell us when
13     you received those documents?
14 A   Oh, excuse me.  Only by the dates that are on
15     them.
16 Q   Okay.  I guess what I'm saying, if your name isn't
17     on them, though, I guess, can you tell us when you
18     actually received them or who actually gave them
19     to you?
20     I'll show you this one, for example.  This is
21     Saindon -- starts at Saindon 156, and it's a
22     multipage document, through -- through Saindon
23     167.
24     And after you've had a chance to kind of look
25     at it, you can flip to the last page, and it has

Page 50

1      the date of the document.  And it's dated
2      April 10, 1968; is that correct?
3  A   Yes.
4  Q   So that would be before your time as a safety
5      director; correct?
6  A   Yes.
7  Q   And at that time you would have been maybe the
8      administrative assistant with Dick Welch; is that
9      right?
10 A   '68?  That would be -- yes.
11 Q   And would you have reason in 1968, as the
12     administrative assistant to Dick Welch, to receive
13     a document like this?
14 A   I don't recall.
15 Q   Okay.  So can you testify that this was a document
16     that was actually maintained in your file that you
17     took with you from Weyerhaeuser?
18 A   I couldn't testify to that, no.
19 Q   Okay.  Do you know who gave you this document?
20 A   I don't.
21 Q   And do you know when you got this document?
22 A   It would have had to have been around '68 or, you
23     know, around that time, I would imagine.  I don't
24     recall.  I don't remember.
25 Q   So you don't know when you got the document?

Page 51

1  A   No.  Not exactly, no.
2  Q   Okay.  Okay.  The two previous depositions that
3      have been marked here today as Exhibits, I
4      guess -- B and C?  2 and 3?  3 and 4?
5      The two days of deposition that you gave
6      before, have you read those transcripts recently?
7  A   No.
8  Q   Okay.  Do you know when the last time you read
9      them was?
10 A   I don't know if I ever did, to be honest about it.
11 Q   Okay.  All right.  So you're not familiar with
12     what all was discussed in those depositions?
13 A   Just what I can remember off the top of my head.
14 Q   Okay.
15 A   Yeah.
16 Q   But certainly not line for line; right?
17 A   No.
18 Q   Okay.  I'm going to kind of rewind now, switch
19     gears and go back through your employment history
20     with the company and talk to you about when you
21     started in 1953.  And when you started, you would
22     have been working for Roddis; is that correct?
23 A   Yes.
24 Q   And you recall that Weyerhaeuser purchased the
25     plant in 1960; is that right?

Page 52

1  A   1960, um-hum.
2  Q   Okay.  So I'm going to talk about this time period
3      from 1953 to 1960.  And during that time period,
4      you didn't have any responsibilities for safety,
5      did you?
6  A   No.
7  Q   Okay.  And what were your job duties from 1953 to
8      1960?
9  A   Well, I was a timekeeper -- I guess that was what
10     they called us, the timekeeper -- to start with.
11     And then I did some work in the order department.
12     I helped out there for a while.
13     And then I got into the industrial
14     engineering department, and I stayed there for
15     quite a few years, up until 1960, I guess.
16 Q   So when Weyerhaeuser bought the plant in 1960, you
17     were in industrial engineering; is that right?
18 A   Yes.
19 Q   Okay.  And after Weyerhaeuser bought the plant in
20     1960, how long did you stay in industrial
21     engineering?
22 A   Oh, I don't know just what the time frame was.  I
23     got -- I went from there to administrative
24     assistant to Dick Welch.  But I still had a lot of
25     the same duties.  I did a lot of costing work,

Deposition of Jerry Saindon, 3/12/2014

Page 53

1    which I had learned from Dick, and -- costing out
2    doors or whatever.
3        We made a thousand different kinds of
4    products back then, plywoods. And we were kind of
5    a specialty shop, really.
6  Q   Okay.
7  A   I did that and worked for Dick, you know, as an
8    administrative assistant --
9  Q   From --
10  A   -- until --
11  Q   I'm sorry. Go ahead. I didn't mean to interrupt
12    you.
13  A   -- until I got up to the safety job.
14  Q   So from 1953 to 1960, when Roddis owned the plant,
15    you didn't have any manufacturing
16    responsibilities, did you?
17  A   No.
18  Q   I mean, you weren't actually making the products,
19    were you?
20  A   No.
21  Q   Okay. So would it be safe to say you had an
22    office job --
23  A   Yes.
24  Q   -- when Roddis owned the plant --
25  A   Yes.

Page 54

1  Q   -- is that right?
2  A   Yes.
3  Q   And then in 1960, when Weyerhaeuser took over --
4    and we'll talk about it from 1960 to 1970.
5        So after Weyerhaeuser bought the plant, but
6    before you took over as safety director, you
7    didn't have any responsibility for manufacturing
8    during that time either, did you?
9  A   No.
10  Q   Okay. From '53 to '60, when Roddis owned the
11    plant, what structures and buildings were on the
12    plant property?
13  A   We had the brick building, the main office. Then
14    we had the hardwood -- well, I call it the
15    "hardwood plant." That was the old plant that's
16    gone now. And --
17  Q   Would that be the structure with the basement and
18    the three floors?
19  A   Yes.
20  Q   The fabrication plant?
21  A   Yes.
22  Q   Okay.
23  A   Yeah. And this was -- when I started there?
24  Q   Right.
25  A   Well, that would be about it, as far as I can

Page 55

1    remember.
2  Q   Was there a sawmill there when Roddis --
3  A   There was.
4  Q   -- owned the plant?
5  A   Yeah. There was a sawmill, too, right.
6  Q   Okay.
7  A   That was a separate -- separate building there,
8    yeah.
9  Q   What about the particleboard plant? Was it there
10    when Roddis owned the facility?
11  A   No.
12  Q   All right. What about the molded products plant?
13  A   No.
14  Q   All right. Again, when Weyerhaeuser took over in
15    1960, how did the layout of the facility change
16    after Weyerhaeuser took over?
17  A   They built the particleboard plant, I believe,
18    first, and then they put up the molded products
19    plant. And those two were added on until they
20    went out of business.
21  Q   When did the particleboard plant -- when was it
22    put up?
23  A   I just -- I'm not certain of the dates, to be
24    honest about it, the way time flies by. It could
25    have been in the late '60s, early '70s, maybe. I

Page 56

1    don't know.
2  Q   All right. What about molded products? Do you
3    recall when that went up?
4  A   I think that was shortly afterwards, after the
5    particleboard plant.
6  Q   Okay. And from 1953 to 1970, before you became
7    safety director, you didn't have any
8    responsibilities for safety in the plant, did you?
9  A   No.
10  Q   Okay. So your testimony that you gave earlier
11    today and your knowledge about safety issues in
12    the plant relates to that period of 1970 to 1977;
13    is that right?
14  A   Yes.
15  Q   Okay.
16        MR. McCOY: Objection at this time.
17    These questions are beyond the scope of any direct
18    examination, and I object to the leading nature of
19    this.
20        Can I have a standing objection on
21    that --
22        MS. ELLIS: Sure.
23        MR. McCOY: -- for questions beyond the
24    scope of the direct?
25        Thanks.

14 (Pages 53 to 56)

Deposition of Jerry Saindon, 3/12/2014

Page 57

1          MS. ELLIS:  This is a discovery
2    deposition, Counsel.
3    BY MS. ELLIS:
4    Q   Between 1953 and 1960, what products do you recall
5        Roddis manufacturing?
6    A   Between '53 and '60?
7    Q   Right.
8    A   They manufactured doors and they manufactured
9        plywood, architectural plywood.  What else did
10       they make?
11           They made wall paneling, too, but I'm not
12       sure just what period that was in.  They made wall
13       paneling for many years out there, too.  But it
14       primarily was doors and plywood, I guess.
15   Q   And so you said before, I think, that there was --
16       that there was a sawmill on the property when
17       Roddis owned the plant; right?
18   A   Yes.
19   Q   So is it true that logs came in to Roddis and
20       Roddis took the logs and took them from the log
21       all the way to the final -- final product?
22   A   Yeah.
23   Q   Is that right?
24   A   Yeah.  Yes.
25   Q   So the plant dealt with a lot of wood?

Page 58

1    A   Yes.
2    Q   Fair to say?
3    A   Yes.
4    Q   And then when Weyerhaeuser took over in 1960, what
5        products did Weyerhaeuser make?
6    A   They continued making about the same ones until
7        they put up the particleboard and the molded
8        products plant.
9    Q   And what -- what products were made out of the
10       particleboard plant?
11   A   Just hardboard.  I can't even remember what they
12       used to call it.  Just compressed chips, you know,
13       and then just a particleboard.
14   Q   Particleboard.
15   A   Yeah.
16   Q   Right.
17   A   That's about what they made.
18   Q   Right.  All right.  What about in molded products?
19       What was made there?
20   A   They started out making, oh, pressed plastic
21       trays, kind of specialty things like that.
22           And then they switched over and made door
23       skins, and they sold those through other door
24       manufacturers.  So they just applied them, like,
25       on hollow core doors.

Page 59

1          And that's about all they made out there at
2    that time.  Just "door skins," they called them.
3    Q   So from -- when Roddis owned the plant from 1953
4        to 1960, what type of doors did Roddis make?
5          MR. McCOY:  Objection to foundation.
6          THE WITNESS:  They made solid core
7    doors, hollow core doors, mineral core doors,
8    sound doors, lead-lined doors.  Let's see.  What
9    else is there?
10          Well, just about any kind of door that
11   you can put in an opening they made, outside of
12   metal doors.
13   BY MS. ELLIS:
14   Q   Okay.  And so would the same be true for
15       Weyerhaeuser?  Would those same types of doors
16       have been made by Weyerhaeuser?
17   A   Yes.
18   Q   Okay.  And can you distinguish in your mind what
19       types of doors Weyerhaeuser made as opposed to
20       what types of doors Roddis made?
21   A   As far as I can recall, they made basically the
22       same -- same kind of doors.
23   Q   Okay.  And what about fire doors?  Did Roddis make
24       fire doors?
25   A   Yes.

Page 60

1    Q   Okay.  And I guess there came a point in time when
2        the plant started making mineral core fire doors;
3        is that right?
4    A   Yes.
5    Q   And do you recall what they were using to make the
6        mineral core fire doors with?
7          MR. McCOY:  Objection to foundation.
8          Go ahead.
9          THE WITNESS:  Mineral core?  Well, they
10   were using a mineral core.  "Kaylo" core I guess
11   they called it.
12   BY MS. ELLIS:
13   Q   Okay.
14   A   To my recollection.
15   Q   Okay.  And do you know where that Kaylo came from?
16   A   I'm not sure.
17   Q   Okay.  And could you say for sure whether Roddis
18       was using Kaylo before Weyerhaeuser took over?
19   A   I don't remember.
20   Q   Okay.  So you don't know whether or not --
21   A   I don't know --
22   Q   -- Weyerhaeuser started using it?
23   A   -- what the date was when they -- when they
24       started that.  That's -- you know, I just don't
25       recall that.  They made -- Roddis made a chip

15 (Pages 57 to 60)

Deposition of Jerry Saindon, 3/12/2014

Page 61

1   **core, too, that was a fire-retardant door.  But**
2   **they were really heavy and hard to handle, and**
3   **that's why I think they switched out of that into**
4   **the -- into the other -- the mineral core.**
5   Q   Okay.  But when that actually happened, you don't
6   know?
7   **A   I don't recall the date.**
8   Q   Okay.  Now, Mr. Saindon, you're married; is that
9   right?
10  **A   Yes.**
11  Q   Okay.  And how long have you been married?
12  **A   60- -- going to be 61 years in May.**
13  Q   Okay.  And your wife is Mrs. Sally Saindon; right?
14  **A   Yes.**
15  Q   Okay.  She's here with you today; right?
16  **A   Yes.**
17  Q   Okay.  What year did you and Mrs. Saindon get
18  married?
19  **A   1953.**
20  Q   1953.  All right.  And I understand that
21  Mrs. Saindon's family lived right on 4th Street,
22  right next to the mill property; is that right?
23  **A   Yes.**
24  Q   Okay.  And I also understand that you and
25  Mrs. Saindon actually lived there for a period of

Page 62

1   time; is that right?
2   **A   Yes.**
3   Q   And when did you all live there?
4   **A   '53 to '50- --**
5       THE WITNESS:  When did we live there?
6       MS. SAINDON:  I don't know.
7   BY MS. ELLIS:
8   Q   Just whatever you remember.
9   **A   Right after we first got married, we -- they fixed**
10  **up a little apartment upstairs.  And then her dad**
11  **had died in an unfortunate accident in '55, so we**
12  **moved back with her mother for a short time.**
13      **And then not too long --**
14      THE WITNESS:  It was about a year?
15  BY MS. ELLIS:
16  Q   That's okay.  That's good enough.
17  **A   Yeah.**
18  Q   So mid -- early, mid-'50s you guys --
19  **A   Yeah.**
20  Q   -- lived there with her parents --
21  **A   Yeah.**
22  Q   -- or her mom, as the case may be?
23  **A   Yes.**
24  Q   Do you recall what that address was on 4th Street?
25  **A   1103 East 4th.**

Page 63

1   Q   And what were Mrs. Saindon's parents' names that
2   lived there at 1103 East 4th Street?
3   **A   Helen and Charles Braem.**
4   Q   Can you spell Braem for me?
5   **A   B-R-A-E-M.**
6   Q   And Mrs. Braem continued to live there up until, I
7   believe, 1984; is that right?
8   **A   Yes.**
9   Q   Okay.  And so fair to say you and Mrs. Saindon
10  would have continued to visit the house and visit
11  Mrs. Braem --
12  **A   Yes.**
13  Q   -- while she lived there?
14  **A   Yes.**
15  Q   Okay.  And in those visits and when you lived
16  there, you never saw any dust or debris from the
17  plant come onto the property, did you?
18  **A   No.**
19  Q   And I think before you had testified about seeing
20  some dust in the windowsills --
21  **A   Yes.**
22  Q   -- at that house; is that right?
23  **A   Yes.  Yes.**
24  Q   When you would -- when you would help clean or
25  remove the storm windows; is that right?

Page 64

1   **A   Yes.  Um-hum.  Yes.**
2   Q   You can't testify where that dust came from, can
3   you?
4   **A   No.**
5   Q   And you never knew of Mr. and Mrs. Braem making
6   any complaints about dust or debris from the
7   plant, do you?
8   **A   No.**
9   Q   And I also understood that the Braems sold some of
10  their land behind their house to Roddis; is that
11  right?
12  **A   Yes.**
13  Q   And they sold that land for Roddis to use as log
14  ponds; is that right?
15  **A   Yes.**
16  Q   And Roddis used log ponds on that property for a
17  number of years; is that right?
18  **A   Yes.**
19  Q   Okay.  And there came a time when -- or, I guess,
20  those log ponds were eventually filled in; is that
21  right?
22  **A   Yes.**
23  Q   Okay.  And do you know when that was?
24  **A   Not -- I can't tell you the exact dates, but it**
25  **was sometime after they no longer needed them and**

Deposition of Jerry Saindon, 3/12/2014

Page 65

1    they weren't using the cutting department.  They
2    shut that down, and so they had no use for them.
3    Q   Okay.
4    A   So they just decided to fill them in.
5    Q   Okay.  But you don't know when that was?
6    A   I don't.  I can't tell you the exact date.
7    Q   Okay.  And do you recall seeing anyone actually
8        filling in those log ponds?
9    A   No.
10   Q   Okay.  So you never saw anybody actually putting
11       the stuff to fill the log ponds in; right?
12   A   No.
13   Q   Okay.  And do you have any personal knowledge as
14       to how those log ponds were actually filled in?
15   A   Just what I had heard.
16   Q   Okay.  And what did you hear about how the log
17       ponds were filled in?
18   A   That they were filled in with whatever they wanted
19       to get rid of from the hardwood plant and --
20   Q   So you heard that they had been filled in with
21       waste from the hardwood plant?
22   A   Yeah.  That was my understanding.
23   Q   Okay.  And do you know who told you that?
24   A   I don't recall.
25   Q   Okay.  And I guess it'll go -- again, you never

Page 66

1        saw anybody actually filling in those ponds?
2    A   Just what I was -- what I was told, because I was
3        usually done at night.
4    Q   Okay.  And you were working on first shift?
5    A   Yes.
6    Q   Okay.  And did you move to your house on South
7        Vine Street where you live now after you and
8        Mrs. Saindon moved from 4th Street?
9    A   Let's see.
10          MS. SAINDON:  No.
11          THE WITNESS:  No, we didn't.  No.
12   BY MS. ELLIS:
13   Q   Okay.  Let me -- that was a bad question.
14       How long have you lived on South Vine?
15   A   On South Vine, it'll be 50 years this summer.
16   Q   Okay.  So let's see if I can do math here.
17       You moved in --
18   A   '64.
19   Q   Thank you.  All right.  Where did you live before
20       '64?
21   A   We lived down on 809 South Apple, and then we
22       lived over on 803 East 5th Street, which is just a
23       couple blocks up, until we moved into the
24       Vine Street.
25   Q   So say between '55 and '64, you lived on

Page 67

1        South Apple and East 5th Street --
2    A   Yes.
3    Q   -- is that fair?
4    A   Yes.
5    Q   Okay.  At either of those residences, did you
6        notice any dust or debris from the plant coming
7        onto your property?
8    A   No.
9    Q   Okay.  Now, you've been at South Vine since 1964.
10       About how far is that from the plant?
11   A   Four, five, six blocks maybe from where the plant
12       would be.
13   Q   Have you ever noticed at South Vine any dust or
14       debris from the plant coming onto your property?
15   A   No.
16   Q   Throughout your career at the plant, even when
17       Roddis owned it and Weyerhaeuser owned it, you
18       never had any responsibility for waste removal
19       from the plant, did you?
20   A   No.
21   Q   It was never within your job --
22   A   No.
23   Q   -- description; right?
24       Okay.  And you never actually participated in
25       waste removal from the plant, did you?

Page 68

1    A   No.
2    Q   I guess, do you understand at a certain point
3        there was a ventilation system installed in the
4        fabrication plant and the mineral core plant as
5        well to collect and dispose of dust?
6    A   They had -- yeah.  They had ventilation systems
7        all over the plant.  Yeah.
8    Q   And they had ventilation systems in the
9        particleboard plant, didn't they?
10   A   I believe they did.
11   Q   And in pretty much all areas of the plant they had
12       a ventilation system; right?
13   A   Yes.
14   Q   Because there was, frankly, a lot of wood dust
15       created in the plant; right?
16   A   Yes.
17   Q   From 1960 to 1970, do you know where the
18       ventilation system in the core mill vented to or
19       exhausted to?
20   A   Where the ventilation system was?
21   Q   Right.  So there was a ventilation system in the
22       core mill; correct?
23   A   Yes.
24   Q   In the '60s --
25   A   Yes.

17 (Pages 65 to 68)

Deposition of Jerry Saindon, 3/12/2014

Page 69

1  Q   -- right?
2       And where did the ventilation system exhaust
3  to?  What was the end point on that ventilation
4  system?
5  A   **The one that I can remember was on the -- it would**
6  **be on the west side of the old plant there.**
7  Q   Okay.  And would that be what you would consider
8  to be a baghouse?
9  A   **I believe it was.**
10 Q   Even throughout the '60s?
11 A   **Well, it was where they collected dust.  Whether**
12 **it was a baghouse there at that time, I don't**
13 **recall.**
14 Q   Okay.  So you don't know when the baghouse was
15 actually installed?
16 A   **No.**
17 Q   All right.  And it could have been something else
18 before it was a baghouse --
19 A   **Yes.**
20 Q   -- correct?
21      Are you familiar with cyclones, the cyclone
22 system?
23 A   **Yeah.  I've heard the word, yeah.**
24 Q   Okay.  And you're aware that there -- there was a
25 cyclone system at certain parts of the plant as

Page 70

1  well?
2  A   **Yes.**
3  Q   Okay.  And do you have an understanding of what
4  the cyclone system collected?
5  A   **Not really.**
6  Q   All right.  Do you know the difference between
7  what was collected in the cyclone system as
8  opposed to the baghouse system?
9  A   **No.**
10 Q   And you never had any responsibility for the
11 baghouses; is that true?
12 A   **That's true.**
13 Q   Across your entire --
14 A   **Yes.**
15 Q   -- tenure at the plant?
16      Okay.  And there's been testimony that at
17 certain points in time that these baghouses were
18 emptied into trucks, waste trucks, that would then
19 dispose of the waste.
20      Did you ever have any responsibility for
21 doing that, for emptying the baghouses into a
22 truck?
23 A   **No.**
24 Q   Okay.  Did you see the trucks that were used for
25 that purpose?

Page 71

1  A   **Yes.**
2  Q   And those trucks had a cover on the back.  Is that
3  consistent --
4       MR. McCOY:  Object --
5  BY MS. ELLIS:
6  Q   -- with what you remember?
7       MR. McCOY:  Object to foundation.  Form.
8       THE WITNESS:  Yes.
9  BY MS. ELLIS:
10 Q   Okay.  And you don't know where those trucks went
11 with the waste when they left the plant, do you?
12 A   **To my knowledge, they went to the landfill.**
13 Q   Okay.  And do you know where the landfill is or
14 was, where the trucks went?
15 A   **Not really at that time, no, about where they**
16 **went, but I was -- I didn't know exactly where**
17 **they were located.**
18 Q   Okay.  Do you know who manufactured the baghouses?
19 A   **No.**
20 Q   Do you know who designed the ventilation system
21 that was in the -- at any point in the plant?
22 A   **I don't know who would have done that.**
23 Q   Okay.  Do you know who specified the kind of
24 baghouse that was installed, the type or the brand
25 or anything about that?

Page 72

1  A   **No.**
2  Q   Okay.  Now, while you were safety director at
3  Weyerhaeuser from 1970 to 1977 -- the questions
4  I'm about to ask you all relate to that period of
5  time.
6  A   **Um-hum.**
7  Q   Just so we're all on the -- on the same page.
8       -- I understand you had monthly inspections
9  where you walked through the entire mill; is that
10 right?
11 A   **Yes.**
12 Q   And your purpose would be to look for anything
13 that you thought needed correction or attention;
14 is that right?
15 A   **Yes.**
16 Q   And could you give us some examples of things you
17 might look for while you're out on those monthly
18 inspections?
19 A   **Machine guarding possibly, electrical outlets,**
20 **housekeeping.  Anything that would create a safety**
21 **hazard that, you know, should be corrected.**
22 Q   Okay.  And so safety at a plant this big, you had
23 anything from earplugs to hard hats to steel-toed
24 shoes; is that right?
25 A   **Yes.**

18 (Pages 69 to 72)

Deposition of Jerry Saindon, 3/12/2014

Page 73

1   Q   As well as the asbestos issues that we've talked
2       about as well; is that right?
3   A   Yes.
4           MR. McCOY: Objection to form and
5       foundation. That misstates his earlier testimony.
6   BY MS. ELLIS:
7   Q   So your role as safety director encompassed a lot
8       of different issues as with respect to safety; is
9       that right?
10  A   Yes.
11  Q   And when you came on board in 1970, you mentioned
12      that you attended some conferences and corporate
13      meetings; is that right?
14  A   Yes.
15  Q   And was the purpose of those to get you educated
16      on safety issues as it related to the plant?
17  A   Yes.
18  Q   And when you had these corporate safety meetings,
19      can you tell us a little bit about what happened
20      at those meetings?
21  A   Well, the one I attended in Tacoma, that lasted
22      about a week. And it had the safety people from
23      throughout all Weyerhaeuser's buildings out
24      there -- or businesses.
25          And they had the senior vice president. He

Page 74

1       talked about safety and what they expected. And
2       they had the various speakers out there and just a
3       kind of overall general safety theme, so --
4   Q   And what message did you get from Weyerhaeuser
5       about their interest and involvement in safety?
6   A   They were quite concerned. It was one of their
7       top priorities, I'm thinking, when I was involved
8       there.
9   Q   And would you say that Weyerhaeuser cared about
10      the safety of its employees?
11  A   Yes.
12  Q   And would you say that the people at Marshfield,
13      in management at Marshfield, that the Marshfield
14      plant cared about the safety of the employees?
15  A   Yes.
16  Q   And in your role as the safety coordinator, was it
17      your feeling that you did whatever you could to
18      keep the workers safe?
19  A   Yes.
20  Q   Was there -- do you recall a time when you were
21      safety director that you asked the company for a
22      safety issue to be resolved and were turned down?
23  A   No.
24  Q   And Mr. McCoy asked you quite a few questions
25      about Joe Wendlick.

Page 75

1           I guess the same question as to Joe: Is it
2       your impression that Joe cared about the safety of
3       the workers at Marshfield?
4   A   Yes, he did.
5   Q   And I understand that Joe, he came in and tried to
6       whip everybody into shape; is that fair?
7   A   Yes. That sounds like Joe, yes.
8   Q   And if you spotted a safety issue, did you do your
9       best to get it resolved as soon as you could?
10  A   Yes.
11  Q   And is that generally true at the Marshfield plant
12      for safety issues?
13  A   Yes.
14  Q   We talked about sampling. You talked about
15      sampling with Mr. McCoy, about testing for
16      asbestos in the -- in the plant. And you said
17      that there were times when you actually conducted
18      the testing on the workers; is that right?
19  A   Yes.
20  Q   And I think you said you didn't recall whether you
21      actually received those results or not; is that
22      right?
23  A   Yes.
24  Q   Well, I'm going to show you a document that it's
25      been represented was in your file and see if it

Page 76

1       might refresh your memory.
2           So this is Saindon ending in 302, and this
3       was a document, Mr. Saindon, that's been
4       represented as being a part of your file that you
5       took with you from Weyerhaeuser.
6           Does it look familiar to you?
7   A   Yes.
8   Q   And what is that document?
9   A   What is it?
10  Q   Yes.
11  A   Marshfield -- the title of it?
12  Q   Well, what -- just take a look at it --
13  A   Oh.
14  Q   -- and tell me, you know, after you look at it,
15      how you would describe what that document is.
16          MR. McCOY: Which one is that one?
17          MS. ELLIS: It's 302.
18          THE WITNESS: These were the results of
19      the test that I had taken. That was in '77, so
20      that had to be -- that had to be the one and --
21      the only ones that I took, probably, because that
22      was in July that I left.
23  BY MS. ELLIS:
24  Q   So those are the results of one of the rounds of
25      air monitoring; is that true?

19 (Pages 73 to 76)

Deposition of Jerry Saindon, 3/12/2014

Page 77

1    A   These were the results of the tests that I took.
2        This was in February of '77.
3    Q   Okay.
4    A   17 samples.  And over here it says I took -- in
5        March I took 14 asbestos samples.  So, yeah, that
6        would be twice that I did that.
7    Q   Okay.
8    A   Yeah.
9    Q   So do you believe you received those results of
10       the sampling that you conducted?
11   A   I wouldn't have gotten this.
12   Q   You didn't?
13           Okay.  So it was in your --
14   A   It probably -- yeah.  It probably was sent to
15       Dick Welch, I'm thinking, and he probably gave me
16       a copy of it.
17   Q   Okay.  So you did get a copy of it?
18   A   So that would -- if I had it in the file, that's
19       how it would have come.
20   Q   Okay.
21   A   But he wouldn't have sent that direct to me.
22   Q   Okay.  And so do you think Dick Welch received the
23       results of this -- of the sampling that occurred
24       in the plant?
25   A   Well, he or -- he or Doug McClary.

Page 78

1            Now, I'm not sure just what year Dick left
2        and then McClary came in because I didn't work for
3        McClary very long.
4    Q   So was it the practice that the general manager at
5        Marshfield would receive the --
6    A   I believe that's --
7    Q   -- results from the sampling?
8    A   I believe that's where it always went, and
9        Joe Wendlick dealt with the top gun.
10   Q   Okay.  I'm going to show you the document that
11       Mr. McCoy had asked you about before, and this is
12       Bates-labeled 332 and 333.  Saindon 332 and 333.
13           Do you recall Mr. McCoy showing that to you?
14   A   Um-hum.  Yes.  Um-hum.
15   Q   Okay.  And do you recall that being a document in
16       your file?
17   A   Yes.
18   Q   Okay.  Do you recall that specific incidence as
19       you sit here today?
20   A   Do I recall this specific --
21   Q   Right.
22   A   No, I don't.  No.
23   Q   Okay.  Okay.  Do you recall whether or not you
24       addressed the issue raised in that -- in that
25       particular document?

Page 79

1    A   I don't know.  I'm assuming I did, but --
2    Q   Would it have been your practice to --
3    A   Yeah.
4    Q   -- have addressed it?
5    A   Yes.  Yes.
6    Q   It would have been your practice, when an issue
7        was raised, that you would have taken care of it?
8    A   Yes.
9    Q   I'm going to show you this document -- it's
10       Bates-labeled Saindon 328 and Saindon 329 -- and
11       see if you recall this document.
12           MR. McCOY:  What was that one?
13           MS. ELLIS:  328 and 329.
14           THE WITNESS:  Yeah.  Dave McGiveron was
15       the maintenance manager at that time, I believe,
16       and Galen Bergmann was his foreman over in -- I
17       believe he was a foreman in the mineral core
18       plant.  Yeah.
19   BY MS. ELLIS:
20   Q   And your name is not on either of those pages, is
21       it, Mr. Saindon?
22   A   No.
23   Q   Okay.  Do you recall receiving that document in
24       your role as safety director at Weyerhaeuser?
25   A   I don't recall --

Page 80

1    Q   Okay.
2    A   -- when I would have gotten it, no.
3    Q   Okay.  Do you know whether or not, in fact, you
4        actually received this document in your role as
5        safety director?
6    A   It's something that I probably would have gotten
7        from Jim Gallatin or one of the guys over there,
8        yeah.
9    Q   Okay.  But you don't recall specifically receiving
10       it --
11   A   No.
12   Q   -- is that right?
13           Also, you talked briefly earlier with
14       Mr. McCoy about OSHA and the OSHA inspections that
15       occurred at the plant.  And was it your
16       responsibility as safety director to lead the OSHA
17       representatives around the facility if they came
18       to visit and wanted to check the plant?
19   A   Not the one he was talking about.
20   Q   Okay.
21   A   That was -- that was the Racic -- Racic guy.  No,
22       I don't even recall him being there, to be honest
23       about it.
24   Q   Putting that gentleman aside, were there times
25       when you did escort OSHA representatives around

Deposition of Jerry Saindon, 3/12/2014

Page 81

```
 1    the plant?
 2  A  Yes.
 3  Q  Okay.  And the OSHA representatives would have
 4     been inspecting the plant for all sorts of safety
 5     issues; is that right?
 6  A  Yes.
 7  Q  And that would include asbestos issues as well;
 8     right?
 9        MR. McCOY:  Objection to form and
10     foundation.
11        THE WITNESS:  I don't know if they got
12     into it or not, to be honest about it.
13        But they -- it was a -- just a general
14     overall inspection where they come in and they
15     look at practically everything, you know, every
16     little corner.
17  BY MS. ELLIS:
18  Q  Okay.
19  A  Because it took, I don't know, at least two full
20     days maybe.  Maybe a little longer.
21  Q  Okay.  So is it fair to say you escorted the OSHA
22     representative throughout the entire plant
23     wherever they wanted to go?
24  A  Yes.
25  Q  Was there anything that Weyerhaeuser said was off
```

Page 82

```
 1     limits or --
 2  A  No.
 3  Q  -- didn't want the OSHA representative to see?
 4  A  No.
 5  Q  Okay.  So if Weyerhaeuser was using asbestos or,
 6     you know, had -- using asbestos products and the
 7     OSHA representative was there, then the OSHA
 8     representative presumably saw that; is that right?
 9  A  Yes.
10  Q  And is it your understanding that -- that
11     Weyerhaeuser stopped using asbestos in the
12     manufacture of mineral core in 1978?
13  A  It was around that time, I'm thinking, yeah.  I
14     don't know the exact date.
15  Q  I'm kind of hopping around, but I want to back up
16     to around 1970, when you took over as safety
17     director and trying to get yourself up to speed
18     for being the safety director.  And that included
19     reading the Federal Register, didn't it?
20  A  Um-hum.  Yes.
21  Q  And reading the OSHA regulations; is that right?
22  A  Yes.  Yes.
23  Q  And familiarizing yourself with those regulations;
24     right?
25  A  Yes.
```

Page 83

```
 1  Q  I'm going to go through a list of names for you --
 2     and maybe then I'll be just about done when I do
 3     that -- and see if you can recall any of these
 4     folks and whether or not you worked with them.
 5        Do you know Mabel Karl?
 6  A  I don't know her.
 7  Q  Okay.
 8  A  The name is familiar, but I don't -- I don't know
 9     her.
10  Q  Okay.  So you don't know anything about whether or
11     not she worked in the plant or what she did?
12  A  No.
13  Q  What about Sharon Heckel?  Do you know
14     Mrs. Heckel?
15  A  I knew her, yes.
16  Q  Okay.  And do you know what she did or whether or
17     not she worked in the plant?
18  A  I believe she did, yeah.  She -- I don't know what
19     her job was.
20  Q  Okay.  So you don't know where she worked in the
21     plant?
22  A  No.
23  Q  And you don't know when she worked there?
24  A  I don't really know.
25  Q  Okay.  What about Roger Seehafer?  Do you know
```

Page 84

```
 1     Mr. Seehafer?
 2  A  There, again, the name is familiar, but I -- I
 3     don't know him personally.
 4  Q  So you don't know whether or not he worked in the
 5     plant or what he did?
 6  A  I believe he worked in the plant, but I don't know
 7     where.
 8  Q  Okay.  What about Mr. Valmore Prust?  Do you know
 9     Mr. Prust?
10  A  Val Prust?
11  Q  Right.
12  A  I knew who he was, but I don't know -- I don't
13     know where he worked.
14  Q  What about Mrs. Virginia Prust?
15  A  I don't know.
16  Q  Okay.  What about Rita Treutel?
17  A  I knew Rita, yeah.
18  Q  And do you know whether or not she worked at the
19     plant?
20  A  She worked in the -- last I knew, she worked in
21     the detail in the office.  She was the clerk in
22     the office down there.
23  Q  Okay.  What about Leroy Treutel?
24     Mr. Leroy Treutel?  Do you know Leroy?
25  A  He was a foreman in the cutting and drying
```

21 (Pages 81 to 84)

Page 85

1    department.
2    Q   And cutting and drying, does that involve veneer?
3    A   Veneers.
4    Q   And there wouldn't have been any work on mineral
5        core doors in the cutting and drying department,
6        would there?
7    A   No.
8    Q   What about Diane Treutel?  She's now Diane Jacobs.
9    A   No.
10   Q   What about John Treutel?
11   A   No.
12   Q   One last question, Mr. Saindon.
13           Are you aware whether or not Weyerhaeuser
14       ever received any citations from OSHA related to
15       asbestos?
16   A   Not to my knowledge.
17           MS. ELLIS:  I think that's all I have
18       for now.  I'm just going to glance at my notes.  I
19       think that's all I have right now.
20           MR. CASMERE:  I'll ask a couple
21       questions.
22               E X A M I N A T I O N
23   BY MR. CASMERE:
24   Q   Mr. Saindon, my name is Ed Casmere.  Nice to meet
25       you, sir.

Page 86

1    Q   Owens-Corning Fiberglass Corporation
2        manufactured the Kaylo door cores, to the best of
3        your recollection; isn't that true?
4    A   Yes.
5    Q   In terms of -- strike that.
6            To the best of your recollection, the Kaylo
7        mineral core doors began to be manufactured in and
8        around 1960?
9    A   I don't know exactly when they started to make
10       them.
11   Q   In terms of between your recollection and
12       documents that might exist, would you rely on
13       documents that might exist about when they started
14       using Kaylo cores as opposed to your own memory?
15           MR. McCOY:  Objection to form and
16       foundation.
17           Go ahead.
18           THE WITNESS:  Probably.
19   BY MR. CASMERE:
20   Q   You never had any responsibility for ordering
21       Kaylo cores, did you?
22   A   No.
23   Q   You never saw the word "Kaylo" written on any
24       material out at the plant, did you?
25   A   Not that I can recall.

Page 87

1            MR. CASMERE:  I'll stop there.  Thank
2        you, sir.
3            THE WITNESS:  That was short.  Thank
4        you.
5               E X A M I N A T I O N
6    BY MR. WILLIAMS:
7    Q   Hi, sir.  My name is Jim Williams.  I'll try to be
8        short.  I probably won't be that short.
9    A   Okay.
10   Q   I represent 3M company.
11           I want to go back to the list of individuals
12       who you discussed with another attorney briefly a
13       second ago.  And these seem like kind of obvious
14       questions, but I just need to ask them for the
15       record.
16           You mentioned that the name Mabel Karl is
17       familiar but you don't know her.
18           Is it accurate, then, that you don't know
19       whether she ever wore a mask or a respirator at
20       the facility?
21   A   That's true, yes.
22   Q   Is it okay if when I say the "facility," I'm
23       talking about the Marshfield Weyerhaeuser plant?
24   A   Yes.
25   Q   Same -- same sort of question for Sharon Heckel.

Page 88

1        I think you said you knew her but you didn't know
2        her in the plant she worked.
3    A   Right.
4    Q   Would it also be accurate to say you don't know if
5        she ever wore a mask or a respirator?
6    A   Correct.
7            (Interruption in proceedings.)
8    BY MR. WILLIAMS:
9    Q   Okay, sir.  Same sort of question for
10       Rita Treutel.  You knew her and you believe she
11       worked in the detail department in the office.
12           Is it also accurate to say you don't know one
13       way or another whether she ever wore a mask or a
14       respirator at the facility?
15   A   Yes.
16           MR. WILLIAMS:  Okay.  I'd like to --
17       just something for the record, sir.  Not really
18       for you.
19           But I just want to object to the use of
20       any documents that were not previously disclosed
21       in the course of discovery as required by any rule
22       or scheduling order.
23   BY MR. WILLIAMS:
24   Q   You were asked by Mr. McCoy earlier, sir, about a
25       3M-8710, 8710 mask.

Deposition of Jerry Saindon, 3/12/2014

Page 89

1         Are you familiar with that designation, 8710,
2    at all, or is that something you just heard today?
3    **A    That's -- that's something I heard today, I guess.**
4    Q    So you don't know if the 8710 mask was used at the
5         facility at all, do you?
6    **A    No.**
7    Q    Okay.  Now, I want to try to -- I've read one of
8         your prior depositions and some other employees
9         out at the Weyerhaeuser facilities' depositions,
10        so I'm going to try to summarize this and see if
11        this all comports to try to put it all into one
12        package.  You know, get all the testimony
13        together.
14            It's my understanding that masks were not
15        used until 1970; is that correct?
16   **A    I don't know when they started using them.**
17   Q    Okay.  And at the point when you were in health
18        and safety, there were other -- there were various
19        brands of masks used; is that correct?
20   **A    I believe so.**
21   Q    Okay.  And you can't tell me as we sit here today
22        when one particular brand of mask was used versus
23        any other brand, could you?
24   **A    No.**
25   Q    And were masks discontinued for a period in around

Page 90

1    1977?
2    **A    I don't know.**
3    Q    I think you testified earlier you didn't have any
4         role in ordering any masks or respirators?
5    **A    No.**
6    Q    You don't know how the decisions were made to use
7         a particular brand; is that correct?
8    **A    No.  That's correct, yes.**
9    Q    And you don't know how the decision was made as to
10        what particular model to use; is that correct?
11   **A    That's correct.**
12   Q    Do you know if 3M masks were ever used at the
13        facility?
14   **A    I don't know.**
15   Q    Do you associate any product or service with the
16        name 3M other than masks?
17   **A    3M is a pretty -- yeah.  Yeah, I've heard -- I've**
18        **heard the name.**
19   Q    Okay.  Do you associate any products or services
20        with that company as you sit here today?
21   **A    I can't think of any right off the top of my head,**
22        **no.  But I -- you know, stick-them-ons or**
23        **something like that or --**
24   Q    So you're saying if you go into an office supply
25        store or maybe Home Depot --

Page 91

1    **A    Yeah.**
2    Q    -- you might see some products?
3    **A    Yeah.**
4    Q    Okay.  The packaging of -- did you ever see the
5         packaging of any masks or respirators out at the
6         facility?
7    **A    I don't recall.**
8    Q    Was there ever any writing on any of the masks or
9         respirators out at the facility?
10   **A    I don't know.**
11   Q    Can you describe the masks for me?  I think you
12        said they were, like, a white paper mask?
13   **A    They come in all -- all together, and you just**
14        **grab one and kind of form it to the face and with**
15        **a -- with a rubber band, or whatever you want to**
16        **call it, on the back.**
17   Q    Okay.
18   **A    The ones that I -- that I've seen.**
19   Q    Do you recall if there was just one rubber band or
20        more than one?
21   **A    I don't know.**
22   Q    Do you recall how the rubber band was attached to
23        the mask?
24   **A    I don't recall.**
25   Q    Other than the paper-appearing material on the

Page 92

1    mask, was there any -- and the band, was there any
2    other material on that?
3    **A    I don't know.**
4    Q    Were the masks all similar sized?
5    **A    I don't know if they had different sizes or not.**
6    Q    Okay.  What was the color of the masks?
7    **A    White.**
8    Q    All of them were white?
9    **A    The ones that I saw.**
10   Q    Is it, like, a smooth texture on the -- on the
11   mask?
12   **A    I don't recall.**
13   Q    Are there any logos on the masks?
14   **A    Not that I can recall.**
15   Q    I believe I read somewhere -- correct me if I'm
16   wrong -- that there were cartridge respirators
17   used in certain departments; is that correct?
18   **A    I believe there was, yeah.**
19   Q    Were you responsible for -- and I think you might
20   have said you weren't responsible for masks.  It
21   was the manager in each department, but were you
22   responsible for any fit testing or training on how
23   to wear properly these masks?
24   **A    No.**
25   Q    Okay.  So do you know if the managers in the

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Jerry Saindon, 3/12/2014

Page 93

1   departments were responsible for that?
2   A   I don't know.
3   Q   Okay.  You mentioned kind of -- kind of made a
4       movement like you would take a mask.
5           Was there -- would it just be a pile of masks
6       sitting somewhere?
7   A   I think they were kind of in a -- I don't know if
8       they were in a box or in a -- you know, there was
9       quite a few of them in a -- in a bundle or
10      whatever you want to call it.
11  Q   Would these be in a supply area, or were they just
12      kind of sitting around?
13  A   Well, this was in each department where you had to
14      wear them.  I can't even remember where they had
15      them placed, but before you could go into the
16      area, you're supposed to put a mask on.
17  Q   Okay.  And in what time period are you talking
18      about?  Could this be later?  Like in the -- I saw
19      that there was -- I think masks were worn in the
20      '80s or '90s; is that correct?
21          MS. ELLIS:  Object to form.
22          THE WITNESS:  I don't know.
23  BY MR. WILLIAMS:
24  Q   Okay.  It wasn't the entire time you were at this
25      facility that masks were readily available, was

Page 94

1       it?
2           MS. ELLIS:  Object to form.
3           THE WITNESS:  All the while I was there?
4   BY MR. WILLIAMS:
5   Q   Correct.
6   A   No.
7   Q   Okay.  Do you have any way of telling me when -- I
8       think you might have already answered this, so a
9       apologize -- but when masks were first available?
10  A   I don't know.
11  Q   Do you know who was responsible for ordering
12      masks?
13  A   Purchasing, to my knowledge.
14  Q   You don't know where the masks came from, do you?
15  A   No.
16  Q   I think you already said you don't know the
17      manufacturer of any of the masks or respirators
18      used at the facility?
19  A   No.
20  Q   I think I asked if you saw any logos on the masks.
21          You don't recall any writing on the masks, do
22      you?
23  A   No.
24  Q   And you couldn't tell me the model number of any
25      mask, could you?

Page 95

1   A   No.
2   Q   You couldn't tell me if there was any -- do you
3       know if there were any NIOSH, Bureau of Mines, or
4       OSHA designations for the masks?
5   A   I don't know.
6           MR. WILLIAMS:  Okay, sir.  Thank you
7       very much for your time today.
8           MS. GIERKE:  Can we take a short break?
9           MS. ELLIS:  Yes.
10  (A recess is taken from 12:04 p.m. to 12:35 p.m.)
11  (Exhibit Nos. 5-21 marked for identification.)
12          E X A M I N A T I O N
13  BY MS. GIERKE:
14  Q   Mr. Saindon, my name is Nora Gierke, and I'm going
15      to ask you some follow-up questions.
16          First question, I represent General Electric
17      company.
18  A   Um-hum.
19  Q   Do you have any knowledge about any GE equipment
20      or products that you worked with or around while
21      you were at Weyerhaeuser?
22  A   No.
23  Q   So is it fair to say you can't give any testimony
24      about working with or around a GE product that
25      contained asbestos during your time at

Page 96

1       Weyerhaeuser?
2   A   Not to my knowledge.
3   Q   Now, you were asked about a bunch of names, and
4       I'm going to run through those names to remind you
5       and then ask you that same question.
6           With regard to Mabel Karl, you testified you
7       didn't know who she was.  So fair to say you're
8       not going to be able to testify that Mabel Karl
9       was ever exposed to a GE product; correct?
10  A   Yes.
11          MR. McCOY:  Object to the form of these
12      questions.
13          Can I have a standing objection to that?
14          MS. GIERKE:  Yes.
15          What is your form objection?
16          MR. McCOY:  Well, you're here to ask him
17      about facts that he knows and observes.  Whether
18      he can legally testify to something is a matter
19      for the judge to rule on.
20          MS. GIERKE:  I'll give you a standing --
21          MR. McCOY:  So you can certainly ask him
22      if he knows anything about her exposure to a GE
23      product that contained asbestos, but you can't --
24      the way you phrased the question is not proper
25      form.

Deposition of Jerry Saindon, 3/12/2014

Page 97

1          MS. GIERKE: I'll give you a standing on
2    that.
3          MR. McCOY: Okay.
4    BY MS. GIERKE:
5    Q   You testified that you didn't know what jobs
6        Sharon Heckel worked on.  And so based on that
7        testimony and what you've just said about GE
8        products, fair to say that you're not going to be
9        able to give any testimony that you have any
10       knowledge of Sharon Heckel working with or around
11       a GE product?
12   A   Yes.
13         MR. McCOY: That also misstates his
14   testimony, but he's answered.  That's fine.
15   BY MS. GIERKE:
16   Q   With regard to Rita Treutel -- Treutel, is it fair
17       for me to assume you aren't going to be able to
18       give any testimony Ms. Treutel worked with or
19       around a GE product; right?
20   A   Yes.
21   Q   Same thing with Leroy Treutel.  You don't have any
22       information and are not going to be able to give
23       any testimony that Mr. Treutel ever worked with or
24       around a GE product?
25   A   Yes.

Page 98

1    Q   Meaning that's correct?  My --
2    A   Correct.
3    Q   And I don't know if you were asked about
4        Frank Zickert.  And if you were, I maybe missed
5        it.
6          Do you know who Frank Zickert is?
7    A   I knew him.
8    Q   Do you have any information or knowledge about
9        whether he worked with or around a GE product?
10   A   No.
11   Q   So you can't give any testimony with regard to
12       that?
13   A   No.
14   Q   Now, I --
15         MR. McCOY: So I think we're done -- I
16   think we're done, aren't we, since he doesn't have
17   any testimony?
18         MS. GIERKE: I actually have some --
19         MR. McCOY: I mean, isn't that the end
20   of it?
21         MS. GIERKE: No.  I do have some more
22   questions.
23         MR. McCOY: Okay.
24   BY MS. GIERKE:
25   Q   You testified that you -- when you first started

Page 99

1    as safety director, you reviewed the OSHA
2    regulations that were in place at the time;
3    correct?
4    A   Yes.
5    Q   Is it also correct that in 19- --
6          MR. McCOY: Are you saying that he's now
7    permitted to testify to these things?  I mean,
8    you've established that he can't testify in these
9    cases.  Are you saying now it's okay for him to
10   testify?
11         MS. GIERKE: I'm not sure what you're
12   getting at, Bob.
13         MR. McCOY: Well, I mean, my
14   objection -- my objection is, you know, you've
15   just -- you're asking him questions now.  And he
16   said he -- he said he wasn't going to be able to
17   testify in these cases.
18         MS. GIERKE: No.
19         MR. McCOY: Go ahead.  You can ask your
20   questions.
21         MS. GIERKE: Okay.  Are you going to
22   keep objecting, or do you want some sort of
23   standing objection?
24         MR. McCOY: Well, again, if you can give
25   me a standing objection, fine.  I just --

Page 100

1          MS. GIERKE: What is the standing
2    objection you want?
3          MR. McCOY: Well, it's to what you're
4    doing now, which is asking him to --
5          MS. GIERKE: Taking discovery?
6          MR. McCOY: -- to take discovery in
7    cases where you established that you think he
8    can't testify.
9          Go ahead.
10         MS. GIERKE: Well -- okay.  Well, I
11   won't give a standing objection that I can't take
12   discovery.
13         MR. McCOY: Okay.
14         MS. GIERKE: I asked questions about
15   what he can testify with regard to GE products.
16         MR. McCOY: Well, like I said, go ahead
17   so we can move -- move it along.
18         MS. GIERKE: Happy to.
19   BY MS. GIERKE:
20   Q   So back to my question about OSHA.
21         Is it fair to assume -- well, is it true that
22       you also would have reviewed regulations in 1972
23       that OSHA issued regarding the dangers associated
24       with asbestos?
25   A   I probably did.  I don't recall.

25 (Pages 97 to 100)

Deposition of Jerry Saindon, 3/12/2014

Page 101

1    Q   Would that have been part of your role as safety
2        director, to keep abreast of new regulations that
3        OSHA issued?
4    A   I guess that's safe to say that, yeah.
5    Q   Did you take it upon yourself to periodically
6        brush up on what the -- what the current OSHA
7        regulations were?
8    A   Well, I got the Federal Register, and then, you
9        know, go through that.
10   Q   And that's where the regulations with regard to
11       OSHA would have been?
12   A   As far as I can remember.
13   Q   Okay.  And so you had a copy of the Federal
14       Register somewhere on site at Weyerhaeuser?
15   A   Yes.
16   Q   And you would periodically review that?
17   A   Yes.
18   Q   And is it true, though, that at some point you did
19       become aware that OSHA issued regulations with
20       regard to asbestos while you were at Weyerhaeuser
21       as safety director?
22   A   I guess I did, yeah.
23   Q   Are you guessing or -- I mean, I don't want you to
24       guess.
25   A   It's just --

Page 102

1    Q   You knew --
2    A   -- it's a long --
3    Q   You knew about OSHA having regulations regarding
4        asbestos.
5    A   Yes.
6    Q   And you knew that when you were at Weyerhaeuser?
7    A   Yeah.  Yes.
8    Q   And it sounds like what you're saying is you can't
9        remember specifically when you became aware of
10       that?
11   A   Yes.
12   Q   You were aware that one of the things that
13       Mr. Wendlick was doing when he came on site at
14       Weyerhaeuser was to -- in reaction to OSHA issuing
15       regulations with regard to asbestos, Mr. Wendlick
16       was trying to put into place policies and
17       procedures to comply with those OSHA regulations;
18       correct?
19   A   As far as I remember, yes.
20   Q   And part of your role at Weyerhaeuser was to make
21       sure that the policies and procedures for safety
22       were complying with OSHA?
23   A   Yes.
24   Q   And you worked hard to do that?
25   A   Yes.

Page 103

1    Q   And your understanding was Mr. Wendlick was doing
2        his best to comply with OSHA regulations?
3    A   Yes.
4    Q   Including those with regard to asbestos?
5    A   Yes.
6    Q   I'm going to ask you, at some point did you recall
7        meeting -- do you recall meeting with Mr. Wendlick
8        to set up something referred to as an "asbestos
9        monitoring program" to comply with OSHA
10       regulations?
11   A   I don't remember.
12   Q   Do you remember whether Weyerhaeuser ever
13       implemented something, whether it was called an
14       "asbestos monitoring program" or known by some
15       other name, but does any of that ring a bell with
16       you?
17   A   The only thing would be the -- air sampling is the
18       only thing that I can recall.
19   Q   Okay.
20   A   If that's what you're talking about.
21   Q   Well, let me ask this:  Do you remember whether
22       Weyerhaeuser ever implemented a program where they
23       were monitoring employees for whether they had
24       been exposed to asbestos?
25   A   Well, the medical center didn't -- they did chest

Page 104

1        x-rays and things like that.  And that would have
2        been the medical end of it more, I think.
3    Q   Was that happening when you were the safety
4        director from 1970 to 1977?
5    A   Yes.
6    Q   And do you have any understanding about what
7        exactly the medical center was doing chest x-rays
8        for?
9    A   Yes.
10   Q   And what was your understanding?
11   A   They were looking for any changes in their lungs,
12       as far as I can understand.
13   Q   Do you know anything more than that about why they
14       were looking at that specifically?
15   A   I -- I don't know.
16   Q   Do you have any idea about whether the testing
17       regarding x-rays had anything to do with asbestos?
18   A   I don't recall.
19   Q   Did you play any role in that testing that the
20       medical center was doing?
21   A   No.
22   Q   You just had knowledge of it?
23   A   Yes.
24   Q   Did you personally have tests done on site at
25       Weyerhaeuser with the medical personnel there?

26 (Pages 101 to 104)

Deposition of Jerry Saindon, 3/12/2014

Page 105

1  A  Did I what?
2  Q  Did you have tests done by the medical
3     personnel --
4  A  No.
5  Q  -- on site?
6  A  No.
7  Q  Who was -- who was the medical personnel -- who
8     were the medical personnel testing on site at
9     Weyerhaeuser?
10 A  Lois Brundidge handled most of that.  She was the
11    plant nurse there, and they had a -- she had a
12    doctor that came in and helped her, I guess.
13 Q  What was the doctor's name?
14 A  The last one I can remember, his name was Heywood.
15    Dr. Heywood.
16 Q  That's the last doctor that was there that you
17    can --
18 A  That I can remember.
19 Q  Was there somebody else who preceded him?
20 A  No.
21 Q  You don't know the name of any other doctor?
22 A  No.
23 Q  And you didn't work with those folks personally?
24 A  No.
25 Q  I asked you, I think, who -- do you know who

Page 106

1     they -- they weren't testing -- you never received
2     a test?
3  A  No.
4  Q  Okay.  Do you know who they were testing?  Which
5     employees?
6  A  They had a list of them, and I couldn't tell you
7     who they were.
8  Q  Okay.
9  A  Not anymore.
10 Q  At some point did you ever participate in putting
11    together that list that they were working off of
12    to identify who -- which employees were going to
13    be tested?
14 A  Not that I can recall.
15 Q  You should have a stack of documents in front of
16    you, and I've asked the court reporter to premark
17    those as Exhibits 5 through 21.  And I'd like to
18    ask you to take a look at these one by one.  I'll
19    walk you through and maybe ask some questions
20    about each of these.
21       MS. ELLIS:  Is this set marked right
22    here?
23       MS. GIERKE:  It is.
24       MS. ELLIS:  Let me just take a quick
25    look.

Page 107

1       MS. GIERKE:  Yep.
2       MS. ELLIS:  Tanya Ellis on behalf of
3    Weyerhaeuser, and I would object to Exhibits
4    Nos. -- Exhibit Nos. 5, 6, 8, 9, 10, 11, 12, 13,
5    14, 18, and 20 as -- for foundation and source of
6    documents.  They are not documents that have been
7    produced in the course of this litigation.
8       MS. GIERKE:  And I'll represent that
9    these were documents that I retrieved from the
10   Rule 26 disclosures that plaintiff offered.
11      Some of them are not Bates-labeled.
12   These are how they were produced to me.
13 BY MS. GIERKE:
14 Q  And I'll ask the witness now to look at Exhibit 5,
15    which should be the first one on the stack.
16       Do you see Exhibit 5, Mr. Saindon?
17 A  Um-hum.
18 Q  Just can you look at this?  And I'll ask you,
19    first of all, it appears to be date-stamped
20    May 23, 1973, and there's an indication -- a
21    "From" line that says "R.S. Welch."  And then --
22 A  Yes.
23 Q  -- above that it says, "For attention of:
24    Jerry Saindon, Jim Gallatin, and R.S. Welch"
25    again.

Page 108

1       Do you recognize that document?
2  A  Do I recognize it?  Not really.
3  Q  Okay.  Do you know -- you've already testified, I
4     think, about some of those folks.
5        You would agree, you worked at Weyerhaeuser
6     with Mr. Gallatin and Mr. Welch?
7  A  Yes.
8  Q  And Mr. Welch was -- remind me again.  What was
9     his job?
10 A  He was a general manager.
11 Q  It appears to be Mr. Welch is sending you a memo
12    with regard to an update on some news that he
13    wanted you to hear about with regard to asbestos.
14       Is that something that Mr. Welch regularly
15    did, keep you informed about updates with regard
16    to asbestos regulations?
17       MS. ELLIS:  Object to form.
18       THE WITNESS:  I would say he did, yes.
19 BY MS. GIERKE:
20 Q  And how would a memo be sent to you if you were to
21    receive a memo from Mr. Welch?
22       This was back in the days before email;
23    correct?
24 A  Yes.
25 Q  So would you receive a paper copy of a memo that

27 (Pages 105 to 108)

Deposition of Jerry Saindon, 3/12/2014

Page 109

1    Mr. Welch wanted you to review?
2  **A   Yeah.  Like this one.**
3  Q   Like this one?
4    And then did you have a mailbox, or did
5  somebody from Weyerhaeuser walk around and deliver
6  paper memos?
7  **A   We -- they had a mailbox out there, yeah.**
8  Q   You had your own mailbox personally?
9  **A   Yeah.  Yeah.**
10 Q   And was it part of your job duty to check the
11 mailbox daily and review any memos that you
12 received?
13 **A   Usually, yes.**
14 Q   Did you personally make it a regular practice to
15 do that, to check your mail and review the memos
16 that you would have received?
17 **A   I believe I did, yeah.**
18 Q   And I understand some of this information is
19 several decades old, so --
20 **A   Yeah.**
21 Q   -- that's why I'm asking you, to see if any of
22 this refreshes your recollection.
23    Can I ask you to turn to Exhibit 6?  And this
24 is a -- it's a five-page handwritten document.  At
25 the top, it's dated January 12, 1973.  It says,

Page 110

1    "To: R.S. Welch.  From: J.R. Saindon."
2    First of all, do you recognize this
3  handwriting?
4  **A   Looks like mine.**
5  Q   And it's not signed, I'll represent to you.  At
6  the end of the pages, there is no signature.  But
7  you say you recognize that handwriting as your
8  own?
9  **A   Um-hum.**
10 Q   Do you recall -- and I'll give you a minute to
11 flip through it.
12    Do you recall writing this memo?
13 **A   No.**
14 Q   So if I ask you questions about what was going on
15 at the time, you're not going to remember?
16 **A   (Indicating.)**
17 Q   It appears that --
18    MR. McCOY:  I don't think he answered
19 the question.
20    MS. GIERKE:  Oh, sorry.  You're right.
21 BY MS. GIERKE:
22 Q   You shook your head.  Could you answer verbally?
23 **A   I don't recall writing it.  It's my writing, but I**
24 **don't specifically remember doing it.**
25 Q   If you would, please, just take a minute to read

Page 111

1  through real quickly and see if it refreshes your
2  recollection.
3  **A   Apparently we were -- they were looking at any**
4  **jobs where they were working with asbestos.**
5  Q   Do you remember doing that now that you've looked
6  at this -- and is it correct that in reading this,
7  your understanding is that it's you writing to
8  Mr. Welch talking about creating a list of jobs at
9  Weyerhaeuser that may involve exposure to
10 asbestos?
11    MR. McCOY:  It's a compound question.
12    MS. ELLIS:  Object to form.
13    MR. McCOY:  Go ahead.  You can answer.
14    THE WITNESS:  Yes.
15 BY MS. GIERKE:
16 Q   Do you remember doing that, putting together a
17 list for Mr. Welch?
18 **A   I don't remember that, no.**
19 Q   I'm going to ask you to flip to Exhibit 7.  And
20 Exhibit 7 appears to be a memo, and it's a
21 two-page document.
22    At the bottom, we have the Bates numbering on
23 here.  It's been cut up, but it appears to be
24 Bates-labeled WY02-001070 and 1072, so I'm not
25 sure if there's a page missing in there.  But the

Page 112

1  cover page is what I wanted to ask you about.
2    This appears to have been dated January 15,
3  1973, which is about three days after the
4  Exhibit 6 handwritten --
5  **A   Um-hum.  Um-hum.**
6  Q   -- from J.R. Saindon, and then it's signed --
7  there's a signature there.  It's a little faint.
8    Can you recognize whether that's your
9  signature or not?
10 **A   That looks like my signature, yeah.**
11 Q   In looking at Exhibit 7, the first page, do you
12 recall this memo to R.S. Welch?
13 **A   This looks like it's an after-shoot of this one**
14 **here.**
15 Q   I was going to ask you whether you recall that.
16 **A   Yeah.**
17 Q   So it appears, from the face of it, that Exhibit 7
18 is a follow-up to the work that was done on
19 Exhibit 6.
20 **A   That's what it looks like, yes.**
21 Q   Is it -- is your answer similar to your answer
22 about Exhibit 6, that you don't recall doing the
23 work on --
24 **A   Yes.**
25 Q   -- creating this job list?

28  (Pages 109 to 112)

Deposition of Jerry Saindon, 3/12/2014

Page 113

1    A   Yes.
2    Q   Okay.  And so with regard to whether you had any
3        follow-up conversations with Mr. Welch about this
4        job list, is that similar?  Do you recall one way
5        or the other what happened?
6    A   No.  I don't remember.
7    Q   And is it fair, then, to assume that you don't
8        recall who would have asked you to put together
9        this kind of job list?
10   A   I'm not sure who would have done that.  Probably
11       R.S. Welch.
12   Q   Okay.  But do you recall one way or the other?
13   A   I don't.  No, I don't.
14   Q   Is Mr. -- was it Mr. Welch's role with regard to
15       you that you would report to him on safety issues?
16   A   Yes.
17   Q   And at times, would Mr. Welch ask you to take
18       certain follow-up actions with regard to
19       implementing safety practices or procedures at
20       Weyerhaeuser?
21   A   Yes.
22   Q   And then if you did do a job for Mr. Welch or you
23       did take some steps that he asked you to do, was
24       it your practice to memorialize that by putting
25       together a memo and then sending it to him?

Page 114

1    A   A follow-up letter, yes.
2    Q   Okay.  So that was something you did in the
3        ordinary course of --
4    A   Yes.
5    Q   -- your job at Weyerhaeuser?
6    A   I believe I did, yeah.
7    Q   I'm going to ask you just to flip to Exhibit 8,
8        then.
9            First of all, this is a memo it appears
10       you're copied on, if you look at the cc list.
11       It's a one-page memo, dated March 16, 1973, from
12       L. Brundige, who it's indicated is the RN that
13       you were just talking about.
14   A   Yes.
15   Q   First of all, do you remember receiving this memo?
16   A   No.
17   Q   Were you regularly copied on memos from
18       Ms. Brundige when you were at Weyerhaeuser as the
19       safety director?
20   A   I think I was probably pretty much, yeah.
21   Q   So this wouldn't have been unusual to see a memo
22       come from Ms. Brundige --
23   A   No.
24   Q   -- talking about employee safety issues?
25   A   No.

Page 115

1    Q   You were kept in the loop pretty regularly on
2        safety issues --
3    A   Yes.
4    Q   -- from Ms. Brundidge?
5            Is that a "yes"?  Was that a "yes"?  Sorry.
6    A   Yes.
7    Q   The memo is talking about identifying certain
8        employees who aren't physically in a certain
9        condition that they would be able to work in the
10       mineral core area.
11           Are you aware of what standards or review was
12       done of employees to determine --
13   A   I don't remember that anymore.
14           MS. ELLIS:  Hold on one second.  Object
15       to the form of that question.
16   BY MS. GIERKE:
17   Q   You can go ahead and answer.
18   A   I don't --
19           MR. McCOY:  He answered.
20           THE WITNESS:  I don't remember.
21   BY MS. GIERKE:
22   Q   Did you make -- did you take any role in
23       evaluating employees for whether they were fit for
24       duty, so to speak?
25   A   No.

Page 116

1    Q   Do you know who would have done that at
2        Weyerhaeuser?
3    A   I don't know, other than Lois.  I don't know.
4    Q   Exhibits 9 and 10 I can ask you about just real
5        quickly one -- one at a time.  But pull those out.
6            Those appear to be, Exhibit 9, a handwritten
7        document.  At the bottom it appears to be a
8        signature.
9            Can you recognize whether that's your
10       signature?
11   A   Yes.
12   Q   It is?
13   A   Yes, it is.
14   Q   And it's dated April 3, 1973, to Wes.
15   A   Yes.
16   Q   Do you remember -- and take a minute if you want
17       to read through it.
18           Do you remember writing this handwritten memo
19       to Wes?
20   A   I don't remember it.  I don't remember handwriting
21       it, no.
22   Q   And is that Wes Sydow?
23   A   Yes.
24   Q   Okay.  The memo is talking about that there was a
25       problem on the second shift in the core mill and

29 (Pages 113 to 116)

Deposition of Jerry Saindon, 3/12/2014

Page 117

1    there was an issue in terms of creating -- well,
2    the way it's written I'll say, "They have been
3    throwing entire rejected core and rails in hog
4    rather than removing rails and disposing of core
5    via whole pieces to dump. This is creating
6    serious dust problems in dry clipping."
7        Was it your practice if you saw an issue at
8    Weyerhaeuser to notify Wes Sydow?
9        MS. ELLIS: Object to the form of the
10   question.
11       THE WITNESS: Yes.
12   BY MS. GIERKE:
13   Q   Do you have any recollection of notifying
14   Mr. Sydow of an issue --
15       Well, first of all, I know you don't recall
16   this particular issue, but in general, as you sit
17   here today, do you have any recollection of ever
18   notifying Mr. Sydow of a problem, with regard to
19   the core mill and dust, where it wasn't addressed
20   to your satisfaction?
21       MR. McCOY: Objection to form and
22   foundation. It's leading.
23       THE WITNESS: No, I don't recall any.
24   BY MS. GIERKE:
25   Q   You don't -- you don't have any recollection of

Page 118

1    you telling Mr. Sydow that there was an issue and
2    that he didn't respond to it?
3    **A   No.**
4    Q   The second -- Exhibit 10, the second page I asked
5    you to pull through, it's similarly a handwritten
6    memo. It appears to be your signature there.
7        Can you confirm whether you recognize that as
8    your signature?
9    **A   Yes, that's my signature.**
10   Q   Okay. And this is, again, a handwritten memo to
11   Wes. This one is dated May 16, 1973. Take a
12   quick minute. It's a one-paragraph memo.
13       If you can look at that and let me know
14   whether you recall writing to Wes, writing this
15   memo to Wes.
16   **A   Well, that's my writing.**
17   Q   It's your handwriting?
18   **A   I don't recall -- yes. I don't recall writing it.**
19   Q   In general, again, this is the same issue of
20   you're notifying Wes of an issue that you've seen.
21       You don't recall this particular incident,
22   though, is what you're saying?
23   **A   No.**
24       MS. ELLIS: Object to the form and
25   object to questioning the witness about a document

Page 119

1    without him laying a foundation for the contents
2    of the document.
3    BY MS. GIERKE:
4    Q   I'm going to ask you to turn to Exhibit 11. It's
5    a two-page document. The cover page is a memo
6    dated May 3, 1973, from R.S. Welch to
7    Dale Schultz. And at the bottom, there's a cc,
8    and you appear to be named as a cc on that, on the
9    first page there.
10   **A   Um-hum. Um-hum.**
11   Q   Do you recall receiving this document?
12   **A   No.**
13   Q   Who is Dale Schultz again?
14   **A   He was the manager of engineering. Engineering**
15   **manager, I believe that was his title.**
16   Q   Were you pretty typically cc'd on documents like
17   this to other -- well, I shouldn't say "like
18   this."
19       Was it -- in your role as safety director,
20   would you be cc'd when Mr. Welch would write to
21   other managers about safety concerns at
22   Weyerhaeuser?
23       MR. McCOY: Objection to form and
24   foundation.
25       THE WITNESS: I believe I was, yes.

Page 120

1    BY MS. GIERKE:
2    Q   And that was to keep you informed of what was
3    going on in the plant?
4    **A   Yes.**
5    Q   Next, Exhibit 12, if you could turn to, please.
6    It's a one-page exhibit. It's dated -- a memo
7    dated July 27, 1973. The subject is "Working in
8    Mineral Core Department" from D.C. McGiveron,
9    M-C-G-I-V-E-R-O-N, to Dave McGiveron.
10       It appears he's memo'd himself, but you're
11   cc'd at the bottom. Do you see that?
12   **A   Yes.**
13   Q   Take a quick look. Do you recall receiving this
14   memo?
15   **A   No.**
16   Q   Do you recall the topic of whether or not -- let
17   me ask it this way.
18       Do you recall monitoring the mineral core
19   areas as to whether or not they were meeting OSHA
20   standards with regard to the need to wear masks or
21   not?
22   **A   I don't recall.**
23   Q   So you don't recall that being a topic when you
24   were safety director?
25   **A   Not that I can remember.**

30 (Pages 117 to 120)

Deposition of Jerry Saindon, 3/12/2014

Page 121

```
 1   Q   Okay.  Is it fair to say, though, that you -- you
 2       can't say that this wasn't happening?
 3           In other words, you don't have any basis to
 4       say that Weyerhaeuser wasn't monitoring the
 5       mineral core area and trying to meet OSHA
 6       standards with regard to whether or not masks were
 7       needed?
 8   A   No.
 9           MS. ELLIS:  Object to the form of the
10       question.
11           MR. McCOY:  Yes, I join.
12   BY MS. GIERKE:
13   Q   I'm going to ask you to turn to Exhibit 13 --
14       actually, 13 and 14 I can ask you both about at
15       the same time.
16           13 is a one-page memo dated October 23, 1973,
17       from R.S. Welch, and you're one of the recipients.
18           And then Exhibit 14 is a November 12, 1973,
19       memo from K.A. Schommer, S-C-H-O-M-M-E-R, and
20       you're also a recipient.
21           Both of these talk about -- well, let me ask:
22       Do you ever remember receiving documents like
23       these?
24           MR. McCOY:  Objection to form.
25           THE WITNESS:  We got documents like
```

Page 122

```
 1       these all the time on meetings.
 2   BY MS. GIERKE:
 3   Q   So --
 4   A   I don't -- I don't recall ever receiving these
 5       specific ones.
 6   Q   These documents specifically you're reviewing and
 7       not recalling receiving; correct?
 8   A   No.
 9   Q   But it's fair to say that you recall receiving
10       regular notices of meetings with regard to
11       asbestos exposure issues while you were at
12       Weyerhaeuser?  That's something that you got
13       notice of meetings taking place; correct?
14           MS. ELLIS:  Objection to form.
15           THE WITNESS:  I guess, yeah.  We got all
16       kinds of notices of all kinds of meetings.
17   BY MS. GIERKE:
18   Q   And was it your regular practice that if you got
19       notice of a meeting like this, that you would
20       attend the meeting?
21   A   Yes.
22   Q   Exhibit 15, if you could turn to that next
23       document.  And actually, I think somehow there's
24       a -- this is a four-page document, but I actually
25       thing it's duplicative.  There are four pages, but
```

Page 123

```
 1       the first two appear to be relatively similar,
 2       almost identical to the second two.
 3           If you could look at the four pages.  It's a
 4       memo dated January 11, 1974, from J.R. Gallatin to
 5       Jerry Saindon, titled "Precautionary Procedures
 6       for Handling Asbestos."
 7           Do you recall receiving this document?
 8   A   I don't specifically remember receiving this, you
 9       know, no.
10   Q   Let me ask you about the topic of creating a list
11       of mechanical and procedural changes to make to
12       the mineral core plant to meet certain health
13       standards.  That's something that it would have
14       been regular for you to be involved in while you
15       were safety director at Weyerhaeuser; correct?
16   A   Yes.
17   Q   And Mr. Gallatin -- it would -- it would have been
18       typical for Mr. Gallatin to work with you on those
19       issues?
20   A   Gallatin?
21   Q   Sorry.  I'm mispronouncing his name.  Gallatin.
22   A   Yeah.  Well, he was the superintendent out there.
23   Q   So he's someone you recall working with on --
24   A   Yes.
25   Q   -- health and safety issues at Weyerhaeuser?
```

Page 124

```
 1       Is that a "yes"?
 2   A   Yes.
 3   Q   The very last page of that exhibit, if you can
 4       flip to it, it appears there's a signature there.
 5           Do you recognize whether that's
 6       Mr. Gallatin's signature?
 7   A   It looks like his signature, yes.
 8   Q   And you received memos from Mr. Gallatin regularly
 9       when you were at Weyerhaeuser?
10   A   Yes.
11   Q   So you're familiar with his signature?
12   A   Yes.
13   Q   All right.  No. 16 -- we're coming to the end
14       here -- it's a memo, two pages, dated January 14,
15       1974, from J.R. Saindon.
16           And for the record, there's a -- there's two
17       different Bates numbers on this document.  One is
18       WY02-000810 through 811 and there's also a Bates
19       number, all caps, WEYER 1050 through 1051.
20           Do you recognize this document?
21   A   What am I looking at?
22   Q   Exhibit 16.
23   A   16. Yeah. Okay.
24   Q   Is that the one you have in front of you?
25   A   Yes. Okay.
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Jerry Saindon, 3/12/2014

Page 125

1   Q  Have you ever seen that document before?
2   **A  I probably have. I don't remember.**
3   Q  It's not signed, so it appears that it says it's
4     from you, but you don't recall sending it?
5   **A  I don't remember it, no.**
6   Q  The subject is, "Improvements Made for Handling
7     Asbestos (Per OSHA Request - Mr. Milan" -- I don't
8     know if I'm going to say this right -- "Racic)."
9   **A  Racic.**
10  Q  Racic?
11  **A  Yeah.**
12  Q  Who is Milan Racic?
13        MR. McCOY: He's already answered that.
14  BY MS. GIERKE:
15  Q  Oh, I'm sorry if you have.
16  **A  He was an industrial --**
17  Q  Oh, the hygienist.
18  **A  He was from OSHA, and he was the same -- same as**
19    **Joe Wendlick. What do I want to say?**
20    **What was Joe's title again?**
21  Q  Industrial -- was he an industrial hygienist?
22  **A  Industrial -- yeah, industrial hygienist. That's**
23    **what he was, I believe, yeah.**
24  Q  Do you have any recollection of providing any kind
25     of recommended procedural changes in response to

Page 126

1     OSHA coming in and suggesting changes --
2        MS. ELLIS: Object to the form of the
3     question.
4  BY MS. GIERKE:
5  Q  -- in 1974?
6  **A  I don't remember specifically, no.**
7  Q  I'm going to ask you, turn to the second page of
8     that Exhibit 16. And midway down the page there's
9     a paragraph 21, and it talks about, "Institute
10    tagging of third-party products, stating" -- all
11    caps -- "Caution. Contains asbestos fibers.
12    Avoid creating dust. Breathing asbestos dust may
13    cause serious bodily harm."
14     Do you recall taking part when you were
15    safety director at Weyerhaeuser in any effort to
16    tag, or I'm understanding that to be label,
17    third-party products?
18  **A  I remember those --**
19       MS. ELLIS: Object to the form of the
20    question.
21       THE WITNESS: I remember those tag -- or
22    those labels, you know, that they put on, but I --
23    that's about all I can tell you.
24  BY MS. GIERKE:
25  Q  Okay. So you remember Weyerhaeuser would -- and

Page 127

1     when I say "tagging" means "labeling," is that
2     consistent with your understanding?
3  **A  Yes.**
4  Q  So you have a recollection of while you were at
5     Weyerhaeuser, there was an effort to label
6     third-party products?
7  **A  Yes.**
8  Q  But do you remember anything more than that?
9  **A  As far as labeling, you mean?**
10  Q  Let me ask it this way.
11       MR. McCOY: Object to foundation. What
12    time period are we talking about now?
13       MS. GIERKE: Let me ask the witness.
14  BY MS. GIERKE:
15  Q  Do you remember when that effort to label
16     third-party products was happening?
17  **A  I don't re- -- I don't recall.**
18  Q  Was it -- was it when you were safety director?
19       MS. ELLIS: Objection. Asked and
20    answered.
21       THE WITNESS: If it was in '74, it would
22    have been, yeah.
23  BY MS. GIERKE:
24  Q  Okay. Do you have an independent recollection?
25  **A  No.**

Page 128

1   Q  And do you have any independent recollection of
2     what the label actually said?
3  **A  Just on what this says on the sheet here.**
4  Q  Does that refresh your recollection or are you
5     relying on that document?
6  **A  Well, I can -- I know they put labels on, yeah. I**
7    **don't know just exactly what they looked like**
8    **anymore, but I remember they had labels on them.**
9  Q  Other than being aware of it, did you participate
10    in that process of coming up with a label or --
11  **A  No.**
12  Q  -- figuring out what products to label?
13  **A  No.**
14  Q  If you can turn to Exhibit 17, which is a
15    three-page document.
16     For the record, it's Bates-labeled capital
17    WEYER 1079 through 1081.
18     Take a minute and flip through that. It's
19    not dated, and there's no "To" and "From" line.
20     So do you recognize that document?
21  **A  No.**
22  Q  And do you know whether you -- well, let me ask
23    you to flip to page 2. The document is titled
24    "Things to Do to Improve Mineral Core Dust in the
25    Core Mill."

32 (Pages 125 to 128)

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Jerry Saindon, 3/12/2014

1    And on page 2 there's a notation that says,
2  "Additional clothing - (headgear-coveralls).
3  Responsibility: C." -- I'm sorry, "G. Gauger,"
4  G-A-U-G-E-R, "and J. Saindon."
5    Does that refresh your recollection as to
6  whether you were involved in any kind of
7  improvements with regard to additional clothing?
8  **A  Apparently I was involved, but I don't remember.**
9    MS. ELLIS:  Let me object to the form of
10  the question and lack of any foundation about this
11  document and any questions related to it.
12  BY MS. GIERKE:
13  Q  And I'm not asking you whether you remember this
14  particular memo. I'm asking about the topic of
15  were you ever involved in any kind of efforts to
16  provide some sort of clothing with regard to
17  safety in terms of mineral dust?
18  **A  That's possible.**
19    MS. ELLIS:  Object to the form of the
20  question.
21    THE WITNESS:  But I don't remember.
22  BY MS. GIERKE:
23  Q  You don't remember?
24  **A  No.**
25  Q  Exhibit 18 is a memo dated February 5, 1974. It's

1  a two-page document. And the title -- or the
2  beginning of it -- it doesn't have a "To," but it
3  says "J.R. Saindon." And on the second page
4  there's a notation again, "J.R. Saindon."
5    Do you recall whether or not -- well, do you
6  recognize this document?
7  **A  I don't recognize it, no. I probably wrote it,**
8  **but I don't remember.**
9  Q  You don't have an independent recollection?
10  **A  I don't remember, no.**
11  Q  This next -- Exhibit 19, if you could turn to.
12    Exhibit 19 is a memo dated April 30, 1974,
13  from D.C. McGiveron to D.C. Schultz, and you're
14  one of the people that appears to be cc'd on that
15  document.
16  **A  Um-hum.**
17  Q  Do you remember receiving that?
18  **A  No.**
19  Q  And for the record, it's Bates-labeled, all caps,
20  WEYER 1052.
21    So you don't have any recollection of this
22  document?
23  **A  I don't remember.**
24  Q  Exhibit 20 is a memo dated May 8, 1974. The
25  subject is "Non-Employees Who Go into Mineral Core

1  Areas."
2    And you're in the cc list at the bottom
3  there, and it's from Ken Powers.
4  **A  Um-hum.**
5  Q  Do you have any recollection of receiving this
6  document?
7  **A  I don't remember. No.**
8  Q  The subject matter -- let me ask you about that --
9  relates to taking certain safety precautions with
10  regard to non-employees being on site at
11  Weyerhaeuser.
12    Do you have any recollection of what, if any,
13  safety precautions were in place at Weyerhaeuser
14  for non-employees?
15  **A  I don't remember.**
16  Q  Is that something that was within your job duties,
17  to come up with safety precautions, if there were
18  non-employees coming on site?
19  **A  I don't believe so. I don't -- I don't re- -- I**
20  **don't recall.**
21  Q  Do you recall, when you were working as safety
22  director, having non-employees come on site at
23  Weyerhaeuser?
24  **A  They would have people come on-site, but I --**
25  **outside salesmen and people like that, you know,**

1  **but I didn't really have anything to do with them.**
2  Q  It wasn't your -- it wasn't part of your job duty
3  to --
4  **A  No.**
5  Q  -- to be concerned about the safety with respect
6  to those --
7  **A  No.**
8  Q  -- folks?
9    Do you know who, if anyone, would have been
10  concerned with that at Weyerhaeuser?
11  **A  Well, the maintenance and -- maintenance and**
12  **engineering departments were responsible, like,**
13  **for all the outside contractors and things like**
14  **that. It would have been up to them, if I**
15  **remember.**
16  Q  This memo references warning signs.
17    Let me ask you: Do you recall at
18  Weyerhaeuser there being warning signs with regard
19  to -- posted signage, I should say, warning
20  visitors who might be in the area?
21    MS. ELLIS:  Object to the form of the
22  question.
23    THE WITNESS:  I don't remember.
24  BY MS. GIERKE:
25  Q  I'm going to ask you about Exhibit 21. And that

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Jerry Saindon, 3/12/2014

1   should be a two-page document. I think I was
2   being paper conscious, so it should have two sides
3   to it.
4         MR. McCOY: Got two, yes.
5   BY MS. GIERKE:
6   Q   And the front page, which is marked, is dated
7       June 8, 1976, it says "J.D. Wendlick," and then
8       below that it says "May 1976 Marshfield
9       Spotlight," and below that it says "J.R. Saindon."
10        Do you recognize that document?
11  A   I don't remember it, no.
12  Q   What's the Marshfield Spotlight?
13  A   That was a -- kind of a weekly or -- not a weekly.
14      A monthly or a trimonthly -- I don't know how
15      often they put it out -- just local news.
16  Q   And who put that out?
17  A   I don't remember at all.
18  Q   Okay. Was it a newsletter that came out through
19      Weyerhaeuser or some independent organization?
20  A   No. It was done locally. I think it was just a
21      local -- that Wilma Sossaman, she was -- I think
22      she was Dick Welch's secretary, and she was
23      involved in that, I think.
24  Q   So -- and you're reading the name Wilma
25      Sossaman --

1   A   Yeah.
2   Q   -- S-O-S-S-A-M-A-N?
3   A   Yeah.
4   Q   That's someone you recall working at Weyerhaeuser?
5   A   Yes.
6   Q   As Dick Welch's secretary?
7   A   Yes.
8   Q   And she may have worked on, you recall, this
9       "Marshfield Spotlight"?
10  A   Yeah.
11  Q   The memo appears to be Mr. Wendlick writing to you
12      and -- and asking some questions about something
13      he's read in the "Marshfield Spotlight."
14        And do you remember this incident? I know
15      you said you don't remember this memo, but does
16      it -- do you recall specifically this incident?
17        MS. ELLIS: Object to the form --
18        THE WITNESS: I remember --
19        MS. ELLIS: -- of the question.
20        THE WITNESS: -- the safety -- that
21      "Safety Emphasis Week," that I do remember, yeah,
22      because that was when Doug McClary was -- he had
23      just came on board, not before that, and he was
24      involved in that.
25

1   BY MS. GIERKE:
2   Q   And that "Safety Emphasis Week" is what you said,
3       that's something referenced in this memo?
4   A   Yes. They had a -- they got -- well, they had one
5       whole building. They had all kinds of safety
6       displays and the outside -- outside vendors that
7       came in for safety glasses and whatever.
8   Q   And you had mentioned earlier that Mr. Wendlick
9       was someone that took safety seriously.
10  A   Yes.
11  Q   So would it have been -- when you were safety
12      director, would it have been unusual for
13      Mr. Wendlick to write to you and point out a way
14      that you could improve safety?
15  A   No. That sounds about like something he would do,
16      yeah.
17  Q   And he was pretty serious about that?
18  A   Yeah.
19  Q   And if he wrote to you and said, "Here's something
20      I want you to do, Jerry, to improve safety," would
21      you have followed that directive?
22  A   Yes.
23  Q   I'm going to ask you just a few more questions.
24        One of those memos referred to visitors. Do
25      you have any specific knowledge with regard to any

1   on-site visits from anyone at General Electric
2   coming to Weyerhaeuser?
3   A   No.
4   Q   And so you don't have any personal knowledge of
5       that?
6   A   No.
7   Q   You've testified today about Weyerhaeuser's safety
8       policies and procedures, and it appears that --
9       well, is it -- it's fair to say, and it seems as
10      if, to me, they had -- they had policies and
11      procedures in place while you were safety director
12      with regard to the safe handling of asbestos;
13      correct?
14        MR. McCOY: Object to foundation. Form.
15        THE WITNESS: Yes.
16        MR. McCOY: Go ahead.
17  BY MS. GIERKE:
18  Q   Are you aware of ever being told in your role as
19      safety director to look to some outside third
20      party to instruct you on what types of safety
21      procedures Weyerhaeuser should be implementing?
22  A   Not that I can remember.
23  Q   And specifically as to -- if a company like
24      General Electric came to Weyerhaeuser and said,
25      "Here are some specific safety procedures we want

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Jerry Saindon, 3/12/2014

Page 137

1    Weyerhaeuser to implement," is that something
2    Weyerhaeuser would have ever followed?
3            MS. ELLIS: Object to the form of the
4    question.
5            THE WITNESS: If it would have made
6    sense, I'm sure they would have, yes.
7    BY MS. GIERKE:
8    Q   Okay. Do you have any knowledge as to
9        Weyerhaeuser and GE talking about any kind of
10       safety policies and procedures?
11   A   No.
12           MS. ELLIS: Object to the form of the
13   question.
14   BY MS. GIERKE:
15   Q   And therefore, you don't have any knowledge with
16       regard to -- let me back up.
17           MS. GIERKE: Well, I think that's
18       actually my last line of questions, so I don't
19       have anything further. But I'm going to let
20       anyone else who wants to follow up. And I
21       appreciate your time.
22           MR. McCOY: Do you got any further
23       questions?
24           MS. ELLIS: (Indicating.)
25           MR. McCOY: Okay. I have just a few.

Page 138

1            MS. ELLIS: Subject to your questions, I
2    do not.
3            E X A M I N A T I O N
4    BY MR. McCOY:
5    Q   Mr. Saindon, did anyone from General Electric ever
6        provide information about asbestos exposures
7        during inspection and cleaning of switchgear
8        equipment?
9            MS. GIERKE: Objection. Lacks
10       foundation.
11           THE WITNESS: Not to my knowledge.
12   BY MR. McCOY:
13   Q   Okay. And did you personally know anything about
14       asbestos exposures during the inspection and
15       cleaning process for switchgear?
16           MS. GIERKE: Objection. Lacks
17       foundation. Assumes facts --
18           THE WITNESS: No.
19           MS. GIERKE: -- not in evidence.
20   BY MR. McCOY:
21   Q   Did Mr. Wendlick give you any direction about
22       asbestos exposures and protecting people during
23       inspection and cleaning of switchgear?
24   A   Not that I can remember.
25   Q   You mentioned about doing some safety inspections

Page 139

1    at the plant when you were safety director.
2        Do you recall that?
3    A   I'm not sure what you're talking about.
4        Specifically what?
5    Q   I think that there was some questioning about your
6        doing inspections in the plant --
7    A   Yes.
8    Q   -- for safety purposes.
9    A   Yes.
10   Q   Okay. In the course of those inspections, did you
11       personally develop any programs or procedures for
12       asbestos?
13   A   Not that I can remember.
14   Q   Where did you get information or direction about
15       practices and procedures for asbestos safety?
16       Where or who?
17   A   Well, off of the Federal Register, I think
18       mentioned, and probably Joe Wendlick were the two
19       main ones, I guess.
20   Q   You made some distinction earlier about health
21       issues.
22           Can you explain to us as between yourself
23       and, like, Joe Wendlick where the responsibility
24       fell for the health issues on asbestos?
25           MS. ELLIS: Object to the form of the

Page 140

1    question.
2            THE WITNESS: The health -- the health
3    problems were probably taken through the -- or
4    taken care of through the medical people in the --
5    in the plant.
6            I was more involved with the overall
7    safety program. That was part of it, but the
8    actual -- I don't know what you mean by "the
9    health."
10   BY MR. McCOY:
11   Q   Okay. I'm talking about health -- is asbestos --
12       was that regarded as a health or as a safety issue
13       in your thinking?
14   A   Probably both.
15           MS. ELLIS: Object to the form of the
16       question.
17   BY MR. McCOY:
18   Q   All right. Let me ask this: Did you get any
19       direction or -- on procedures to be followed for
20       protecting the community against asbestos
21       exposures from Mr. Wendlick?
22           MS. ELLIS: Object to the form of the
23       question.
24           THE WITNESS: No.
25

35 (Pages 137 to 140)

Deposition of Jerry Saindon, 3/12/2014

Page 141

1   BY MR. McCOY:
2   Q   Did you get any information or direction from the
3       medical facilities personnel at Marshfield about
4       protecting against community exposures from
5       asbestos?
6   A   Not --
7           MS. ELLIS:  Object to the form --
8           THE WITNESS:  Not that I --
9           MS. ELLIS:  -- of the question.
10          THE WITNESS:  -- remember.
11  BY MR. McCOY:
12  Q   You said that there was some times where an OSHA
13      inspector was present and you took them through
14      the plant.
15          Do you remember that?
16  A   Yes.
17  Q   Okay.  Were those occasions planned scheduled
18      visits that you knew about in advance?
19  A   No.
20          MS. ELLIS:  Object to the form of the
21      question.
22  BY MR. McCOY:
23  Q   Did you ever see the OSHA inspector doing testing
24      of the air for asbestos?
25  A   I didn't, no.

Page 142

1   Q   Did OSHA ever provide, to your knowledge, any air
2       testing information about asbestos levels that it
3       had done at the Marshfield facility?
4   A   I don't know.  Unless that might have been Racic,
5       the one that was brought up, unless he did.  I
6       don't recall.
7   Q   So you don't --
8   A   That's what he was here for, as I understand.
9   Q   Do you remember any actual records from OSHA being
10      provided?
11  A   I don't remember.
12          MR. McCOY:  Okay.  I think that's all
13      the questions I've got.  Thanks.
14          MS. GIERKE:  I've got a follow-up.  Just
15      one.
16          E X A M I N A T I O N
17  BY MS. GIERKE:
18  Q   Mr. McCoy just asked you whether you were ever
19      given any warnings regarding the cleaning --
20      warnings from GE regarding the cleaning of
21      switchgear, and you said you didn't recall;
22      correct?
23  A   Right.
24  Q   You've testified already that you don't recall
25      there being any GE products on site at

Page 143

1   Weyerhaeuser; correct?
2   A   That's correct.
3           MS. ELLIS:  One last question for me.
4           E X A M I N A T I O N
5   BY MS. ELLIS:
6   Q   Mr. Saindon, on behalf of Weyerhaeuser, if I ask
7       for you to return that file that you have that you
8       took with you upon learning that it might contain
9       privileged and confidential documents, would you
10      agree to do that?
11          MR. McCOY:  Objection to the form of
12      that question.
13          THE WITNESS:  If I can -- if I can
14      locate it.
15          MS. ELLIS:  Okay.  Thank you.
16          MR. McCOY:  You can either have the
17      court reporter get this typed up and read it and
18      correct anything that you want or you can agree
19      here today that you'll waive that requirement and
20      that that would be deemed acceptable, whatever she
21      prepared.
22          THE WITNESS:  That's fine.
23          MR. McCOY:  The latter?
24          THE WITNESS:  Waive it, yeah.
25          MR. McCOY:  Okay.

Page 144

1           (Discussion off the record.)
2           MR. McCOY:  We're going to put on the
3       record, then, that the court reporter will be
4       taking all the original exhibits except for No. 4,
5       which I'll keep at my firm, and we'll resolve
6       whatever questions that need to be resolved on
7       that before we would release any of those
8       documents.
9           And I understand you'll get back to me
10      on that, Ms. Ellis, within, say, by the end of
11      next week about procedures, how we might resolve
12      that?
13          MS. ELLIS:  Sure.
14          MR. McCOY:  Okay.
15          MR. WILLIAMS:  Ms. Ellis, do you also
16      have a copy of this Exhibit 4 as well?
17          MS. ELLIS:  Yes, I do.  Yes, I do.  I
18      have the copy that Bob gave to me and represented
19      was a copy of Exhibit 4.
20          (Deposition concluded at 1:30 p.m.)
21
22
23
24
25

36 (Pages 141 to 144)

Deposition of Jerry Saindon, 3/12/2014

Page 145

```
 1    STATE OF WISCONSIN   )
                           )  SS:
 2    COUNTY OF MILWAUKEE  )
 3         I, Lindsay DeWaide, a Registered Professional
 4    Reporter, Certified Realtime Reporter, and Notary
 5    Public in and for the State of Wisconsin, do hereby
 6    certify that the preceding deposition was reported by
 7    me and reduced to writing under my personal direction.
 8         I further certify that said deposition was
 9    taken at HOLIDAY INN CONFERENCE CENTER, 750 South
10    Central Avenue, Marshfield, Wisconsin, on the 12th day
11    of March, 2014, commencing at 9:43 a.m.
12         I further certify that I am not a relative or
13    employee or attorney or counsel of any of the parties,
14    or a relative or employee of such attorney or counsel,
15    or financially interested directly or indirectly in
16    this action.
17         In witness whereof, I have hereunto set my
18    hand and affixed my seal of office at Milwaukee,
19    Wisconsin, this 18th day of March, 2014.
20
21
                _____
22              LINDSAY DEWAIDE, RPR/RMR/CRR
                Notary Public, State of Wisconsin
23
      My Commission Expires: January 22, 2017.
24
25
```

37 (Page 145)