STATE OF WISCONSIN   :   CIRCUIT COURT   :   MILWAUKEE COUNTY
BRANCH 33

------------------------------------------------------------

SHIRLEY ANN PENNOCK, ESTATE
OF WILMAR ROBERT PENNOCK,

               Plaintiff,

    vs.                        Case No. 750-082

H.K. PORTER, INC., SOUTHERN
TEXTILE CORP., CELOTEX CORP.,
EAGLE PICHER INDUSTRIES, INC.,
UNITED STATES GYPSUM COMPANY,
W.R. GRACE & COMPANY,
OWENS-ILLINOIS, INC.,
BUILDING SERVICE INDUSTRIAL
SALES COMPANY, INC.,

               Defendants.

------------------------------------------------------------

<u>TESTIMONY OF SAM SCHILLACI</u>

<u>June 23, 1989</u>

        Before the HONORABLE LAURENCE C. GRAM, JR.
Circuit Court Judge, Branch 33, presiding.

<u>A P P E A R A N C E S</u>:

           BORGELT, POWELL, PETERSON & FRAUEN, S.C., by
STEVEN CELBA, 15th Floor, 735 North Water Street,
Milwaukee, Wisconsin 53202-4188, appeared on behalf
of Owens-Corning Fiberglas.

           DAVIS & YOUNG, by MARTIN MURPHY, 1700 Midland
Building, Cleveland, Ohio 44115, appeared on behalf of
Eagle Picher Industrices, Inc.

           FOLEY & LARDNER, by TREVOR WILL, Suite 3800,
777 East Wisconsin Avenue, Milwaukee, Wisconsin
53202-5367, appeared on behalf of Owens Illinois, Inc.

Appearances Continued:

        SCHIFF, HARDIN & WAITE, by ROBERT RILEY
and BARBARA HERMANSEN, 7200 Sears Tower, Chicago,
Illinois 60606, appeared on behalf of Owens Illinois
Inc.

        NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE,
by THOMAS HART III, P.O. Box 365, Barnwell,
South Carolina 29812, appeared on behalf of the
Plaintiff.

        ATTORNEY JOHN CABANISS, 207 East Michigan
Avenue, Milwaukee, Wisconsin 53202, appeared on
behalf of the Plaintiff.

## WITNESS INDEX

| SAMUEL SCHILLACI | | Page |
|---|---|---|
| Direct Examination | by Mr. Riley | 3-30 |
| Cross-Examination | by Mr. Hart | 31-61 |
| Redirect Examination | by Mr. Riley | 61-63 |
| Recross-Examination | by Mr. Hart | 63-65 |

(No exhibits marked for identification)

<u>TRANSCRIPT OF PROCEEDINGS</u>

1       (Court back in session at 12:30 p.m.)

2       THE COURT:  Be seated, please.

3       Mr. Riley.

4       MR. RILEY:  Thank you.  Owens Illinois would

5    like to call Sam Schillaci to the stand, please.

6       Mr. Schillaci.

7       THE CLERK:  Right up here, sir.  Raise your

8    right hand.  Do you solemnly swear the testimony you

9    give in this matter will be the truth, the whole truth

10   and nothing but the truth, so help you God?

11      THE WITNESS:  So help me God.

12      THE COURT:  Please be seated, sir.  Thank you.

13      Would you state your name and spell your last

14   name?

15      THE WITNESS:  Samuel Francis Schillaci,

16   S-c-h-i- double l-a-c-i.

17      SAMUEL SCHILLACI, having been first duly sworn

18   on oath to tell the truth, the whole truth and nothing

19   but the truth testified as follows:

20                   <u>DIRECT EXAMINATION</u>

21   BY MR. RILEY:

22   Q   Mr. Schillaci, would you tell the Ladies and Gentlemen

23       where you live?

24   A   5780 Strathmore Lane, S-t-r-a-t-h-m-o-r-e, Dublin,

25       Ohio.

```
1    Q    Would you tell the Ladies and Gentlemen your date of
2         birth, please?
3    A    September 26th, 1913.
4    Q    Okay.  My understanding, sir, is that you wear hearing
5         aids in both ears; is that correct?
6    A    Yes.  That's correct.
7    Q    I'm going to try to speak up and more importantly,
8         speak clearly.  You got all the batteries all charged
9         up and ready to go?
10   A    Yes.  I have no problem with volume, it's enunciation.
11   Q    Okay.  Are you currently working, sir?  Are you
12        currently working?
13   A    No, retired -- semi-retired.  I do a little consulting
14        work.
15   Q    What kind of consulting do you do, sir?
16   A    Well, I consult with Owens Illinois and some
17        responsibilities that I had during the time that I was
18        an employee there.
19   Q    All right.  Now, did you -- were you ever an employee
20        for Owens Illinois in its Kaylo Division, sir?
21   A    Yes.
22   Q    During what period of time?
23   A    About mid-1952 to mid 1954.
24   Q    All right.  Now, we'll come back to that, but first
25        could you go through your working career, sir, and tell
```

1          us the kind of jobs you have held and what you did?

2     A    Well, let's see.  In 1932 I just started college and I

3          needed a job if I was going to continue with my

4          education, so I found a job with Owens Illinois in

5          their Columbus, Ohio plant.  And I did janitor work so

6          that I could work nights and go to school days and to

7          the extent it was possible, for the next several years

8          we worked that way.  Most of the work that I did was

9          general labor until the latter 30's when I became a

10         foreman and then later on I became purchasing agent for

11         the Columbus, Ohio plant and service manager.  And when

12         I left the plant in 1947 I was quality control

13         supervisor.  In '47 I was transferred to the Toledo,

14         Ohio offices and I was made production manager for that

15         part of the business that made glass containers that

16         served the food industries, milk bottles, ketchup

17         bottles, pickle jars, so forth.  It was on that

18         assignment and for five years after, 1952, I was asked

19         to take on a special assignment in the Kaylo Division.

20         I was there for two year.  After my assignment in Kaylo

21         I was asked to leave the company and go with a --

22         another company that Owens Illinois had a 50 percent

23         interest in.  It was called Plax Corporation, P-l-a-x.

24         It was in the process of developing plastic bottles,

25         and I went there as production manager and was with

1     them for ten years.  When I left the company in 1964 I

2     was vice-president for marketing.  In '64 I returned to

3     Owens Illinois proper and I was assigned to the Forest

4     Products Division, and they sent me to

5     New York City area where there were two carton box

6     plants.  And I ran those two box plants until 1966 and

7     then I was brought back to Toledo and given

8     responsibility for running three small businesses which

9     were a part of the Forest Products Division.  One of

10    them was fiber cans, that's the paper body and metal

11    ends that you find for orange juice concentrate, quarts

12    of motor oil and so forth.  The other business was

13    paper and platic shipping sacs used for aggregate or

14    pet foods or for general materials.  And the third

15    business was pine oil fractionating.  Pine oil being a

16    byproduct of the paper-making process.  We would

17    distill and get terpentine, fatty acids, rosin, things

18    of that nature.

19          I ran those three businesses until 1970 and I

20    was made general manager of the T.V. Products Division.

21    And the principal product of that division were the

22    glass parts for the television picture tube.

23          In 1971 I was made a vice president of the

24    company, and I retired in 19 -- I ran that division

25    until 1978 and retired in 1979.

1   Q   Now, sir, when you became a vice president did you ever
2       have any responsibilities concerning that Columbus
3       plant where you used to sweep floors?

4   A   Yes.  I had a lot of frieds there.

5   Q   Did you ever actually get any college degree, sir?  You
6       mentioned you were going to school while you were
7       working?

8   A   No.  I never managed the degree.  I pieced together
9       maybe equivalent of three years, or something like
10      that.

11  Q   How come you didn't go all the way and get the degree,
12      sir?

13  A   Well, 1936 I fell in love and got married and I had a
14      wife and house to think about and 1939 I became a
15      father, more responsibilities, and my education kept
16      getting farther and farther back on the stove.  Then we
17      had a war and that took care of it.

18  Q   All right.  Sir, would you please go back in time then
19      to this 1952 to 1954 period --

20  A   Yes.

21  Q   -- and the Kaylo Division?  Would you tell us, please,
22      what was your assignment?

23  A   Well, to begin with the materials that were made in the
24      so-called Kaylo Division had become commercial, that is
25      it went to continuous operation in 1948 and the company

```
 1            in that division had been experiencing considerable
 2            losses ever since they went commercial and -- this was
 3            1952.  And after four years of this the management of
 4            Owens Illinois came to the conclusion that it was time
 5            to make a change.  So they asked one of their vice
 6            presidents, a Mr. Gordon King, J. Gordon King, if he
 7            would take over the division, learn it as quickly as he
 8            could, as much as he needed to know about the business
 9            and determine whether or not it could ever be made
10            viable, profitable, and following this to come back to
11            management with recommendations with what should be
12            done with it.  Mr. King asked me to go with him on this
13            assignment.  So in that sense it was my assignment,
14            too.
15      Q     Well, how did you go about your assignment, sir?
16      A     Well, the first thing we did was to visit the two
17            plants in which this material was being made.  One was
18            in Sayreville, New Jersey, which is near New York, and
19            the other one was Berlin, New Jersey, which is near
20            Philadelphia.  And we met with people and Mr. King
21            decided that since the big ends of the business, where
22            the most capital had been spent, where the greatest
23            hope for making a viable business out of this was, that
24            he would take it over.  So he took over the Sayreville
25            plant which made roof tiles and core material for fire
```

1      doors.  He asked me to go to the Berlin plant and take

2      that over.

3              Now, at the Berlin plant it was originally a

4      small brick plant which had been purchased by

5      Owens Illinois I think in 1943 and made into a paylot

6      plant.  That's where all of the Kaylo products were

7      developed.  And it was at that time that I became

8      involved.  It was producing insulation blocks and pipe

9      coverings.  It was a relative small business so that

10     was given to me to do.  And Mr. King and I would meet

11     every week, two or three times depending on how much

12     information we had to exchange and we would exchange

13     that information and make determinations of what our

14     next steps were.  That's pretty much how we get

15     involved in the thing.

16   Q  Well, when you went to the Berlin plant, sir, what did

17      you do?

18   A  Well, of course I had to learn the business from

19      scratch and I had to do it fast.  So having been grown

20      up in the merchandising plant from the very beginning

21      my mode of operation was to become immersed in the

22      business by first of all moving into and office on the

23      operating floor, I remember it didn't even have a door,

24      and working with the people that actually made the

25      product.  At one time or the other I spent at least one

1    shift in every step of the operation so that I would

2    know first hand what we were doing, what we were

3    making, we we expected of it, so forth.  The next thing

4    that I did was to get involved in engineering to find

5    out how did we get into this business, Owens Illinois,

6    who was a glass company, primarily, glass container

7    company and a substantial company in the business.  How

8    did they ever get into this.  And I found that maybe in

9    the early 30's somebody from -- from management had

10   discussed with someone in research what else could we

11   make with sand lime soda ash besides glass.  And so a

12   little research was done and someone found an old

13   German patent that said if you took equal parts of sand

14   and lime and mixed them with water and put them in a

15   mold of some kind and put that in a chamber where you

16   could introduce a high pressure state, an autoclave,

17   that you could produce a material that was an excellent

18   insulating material in the higher temps.  And by higher

19   temps I mean over 450 degrees, because it was hydrous.

20   It was not water soluble.  It would withstand the

21   element.  And it was an interesting material.  So

22   somebody experimented with the mold, this pattern, sure

23   enough, it came.  It was interesting.  So they acquired

24   the patent.  The engineering people were able to give

25   me some of the milestones of the developments along the

2

1   time when all of this started up, until the time that I

2   was there.  And then my third step was to go into the

3   field.  I wanted to know who did we sell this too, how

4   did they use it, how was it applied, who were our

5   customers, who were the people that actually did the

6   installation work, so forth.  And during the course of

7   two years I visited more than 50 sites where our

8   material was being applied and talked to the -- not

9   only to our customers, which were usually the

10   contractors on the job, but to -- to the people who

11   actually applied it to see what they thought of it.

12   This was my way of getting as much knowledge as fast as

13   I could to round out what I needed to know in order for

14   us to come to the decisions that we had to based on the

15   assignment we had.

16 Q Would you tell us, sir, what this Kaylo product was?

17 A Kaylo consisted of -- as we made the pipe covering and

18   the block was made of equal parts of sand and lime up

19   to 85 percent of a mass.  The other 15 percent was

20   chrysotile asbestos, and of course there was water in

21   the beginning so as to make it into a slurry so when

22   the piece was finished it was something that looked

23   like concrete.  After all it had the same ingredients

24   so -- as concrete, so it had concrete-like

25   characteristics.  It was hard.  It was brittle.  If you

1       pounded on it you broke it.  You scrapped it.  It was
2       of no use.  It was not water soluble, which meant that
3       if it got wet and dried, you still have a good piece of
4       material.  Did not lose any of its properties.  Did not
5       disintegrate in any way.  It was sort of an off-white,
6       a sandy white, if you will.  You could not -- because
7       it was hard you could not cut it with a knife.  You had
8       to use a saw or something with a serrated edge.  Just
9       about describes it.
10   Q   You described it as a pipe covering or a block.
11       There's been reference in this trial to other things
12       like asbestos blankets.  Was Kaylo an asbestos blanket?
13   A   No.  We were not in the asbestos business.  No.  All we
14       made was just what I've described.
15   Q   So you didn't make felt or cement or gaskets or
16       clothing, things like that?
17   A   Nothing other than those two products.
18   Q   Did Owens Illinois mine or mill asbestos?
19   A   No.  We were not in the absestos business.  We -- what
20       we used we purchased from somebody who was.
21   Q   Who were your customers, sir?
22   A   Well, because our material was a premium-type material
23       made at premium cost and sold at premium prices it was
24       a material that was sold to people who had either the
25       need for high temp insulation or had a need for an

1        insulation that would be impervious to the elements, if

2        you will.  So our principal customers were oil cracking

3        plants, chemical plants, petro chemical plants, power

4        generation plants, things of that nature.

5    Q   How about shipyards?

6    A   Sir?

7    Q   Shipyards?

8    A   We sold very little to the marine -- any shipyards.

9        Very little.

10   Q   Why was that, sir?

11   A   Well, I just don't think there was the need for that

12       type of material, and for that reason it was used very

13       sparingly.  It was high priced as compared to other

14       materials, and if they didn't need the high priced

15       material, they didn't use it.

16   Q   You said you and Mr. King had an assignment to make a

17       decision of the future of this business.  Did you reach

18       any decision, sir?

19   A   Yes.  It didn't take us very long to come to it.  Roof

20       tile and core materails -- we had excellent materials

21       but the marketplace would not support higher prices and

22       without higher prices we would never make it a viable

23       business, so reluctantly we made a recommendation,

24       which was let's get out of that business.  And in due

25       course management accepted it and said go to it.  So in

```
 1        the early spring of 1953 we shut down the Sayreville
 2        plant where we made those products and we disposed of
 3        the equipment.
 4               Now, the question was what did you do with
 5        this little operation that makes only two products in
 6        Berlin.  We were strange to the insulation industry.
 7        We were a glass company.  And is there any reason for
 8        staying in that?  And we came to the conclusion, no,
 9        there was no reason in staying in that business either.
10        So we approached our customers and told them what we
11        were thinking, and there was such a reaction that we
12        had to come back and rethink about it.  Evidently our
13        customers thought very highly of this product, not
14        enough to pay higher prices, however, so we felt that
15        if our customers, the people that used it thought so
16        much of it that there had to be some value there.  We
17        modified our thinking a little bit and said we should
18        go out of this business but we should do it by
19        continuing with the plant just as it was, not expand it
20        in any way, and that we should do whatever we could to
21        reduce the cost so as to stop this bleeding, these
22        losses that were being incurred every month.  And in
23        the meantime have somebody start to look for a possible
24        buyer, someone who was in the insulation business, per
25        say, and have a full line of products.  Someone who
```

```
1          would find these products useful to his line as a
2          natural adjunct in his line and eventually probably
3          would be able to sell this business to them.  And that
4          way we would continue to manufacture without staying in
5          the business any longer than was necessary to find a
6          buyer.  That was our two recommendations to management
7          and they bought it.
8     Q    Well, when management bought the recommendations what
9          did you do about it?
10    A    Well, of course we -- we had to cut our costs because
11         we couldn't stand the -- the -- if I can use the word
12         again, the bleeding, and we approached it in several
13         ways.  For instance, we felt that we didn't need to do
14         our own selling.  We were so small that if we could
15         find someone who would be -- who was in the insulation
16         business, per say, that they could buy our product at a
17         wholesale price, that they would maybe sell our product
18         that way, and that way we would not have to maintain a
19         sales force and the marketing efforts and all that.
20         And we did just that.
21              We then went to engineering and determined
22         from them what we could do to improve productivity, and
23         among other things we cut down the number of items that
24         we made.  We reduced our manufacturing list so as to
25         make only the popular once.  And the third thing was to
```

1       get into the field and see if we could get those people

2       that knew our product well to buy directly from us so

3       as to be able to move what we could make.  Part of it

4       would be sold to somebody who was in the -- the

5       insulation business by contract and we would sell the

6       rest of it.  And the fourth thing that we did was to

7       look at everything that we bought, to determine what we

8       could do to reduce the cost of materials to us.  We

9       looked at everything.  One of the things we looked at

10      was our raw materials.

11           Among our raw materials the most expensive one

12      was chrysotile asbestos.  Not only was it high priced

13      but it was difficult to get, for whatever reason, which

14      I have never fully been able to understand.  We could

15      never get a continuous supply, and on occasion we would

16      just run out and have to stop.  So Mr. King asked the

17      engineering department, what could we do about this

18      fiber.  And first I want to explain that the need for

19      this fiber was not for insulation purposes.  The need

20      for this -- for this fiber was the grains of sand.

21      When they were put together in -- the chemical

22      reactions were not strong enough to withstand handling

23      in the plant, shipping sometimes long distances, and

24      rehandling on the job, therefore, you had to have

25      something in it to act as binder to give it strength

1    and -- and fortitude in the product so it would

2    withstand all that handling and shipping.  So the --

3    engineering said that they had been trying for some

4    years to find a substitute because of the unreliability

5    of supplies, plus the cost, and so forth, and never

6    been successful.  And Mr. King said, let's try it

7    again.  I was there and saw the test results of that

8    particular trial.  I don't remember all the fibers.

9    There were a lot of them tried.  I remember three of

10   them specifically, fiberglass, other one is baggasse,

11   sugar cane fiber, and the third one was wood fiber.

12   The lime in our product attacked the glass so it has

13   its fiber quality and it has begun to a certain extent,

14   survived the autoclave, chemical reaction, but

15   something happened to it because it was organic

16   material.  And those pieces that we salvaged split

17   after we put them in a warehouse to watch what the

18   reaction would be.  So that we found that we could use

19   no other product other than asbestos chrysotile.  Those

20   were the things that we did to attack it overall.

21   Q   During the period 1952 to 1954 you were telling us an

22       attempt was made to substitute some other material for

23       the chrysotile in the pipe covering and it was

24       unsuccessful?

25   A   Yes.  I think it was a second attempt in doing this.

```
 1              They may have made it before.  Yes, exactly what I am
 2              at.
 3     Q        Now, you indicated that in 1953 the Sayreville plant
 4              where they made this other kind of Kaylo --
 5     A        Yes.
 6     Q        -- the roof tile and door was closed, no more door core
 7              material was ever made by Owens Illinois?
 8     A        Yes.
 9     Q        Did that mean --
10     A        No.  We're an honorable company and we -- when we make
11              a commitment, we make a commitment.  That's how
12              Owens Illinois is.  We had a number of customers that
13              made fire doors.  These were used in hospitals, hotels,
14              things like that, and they had converted their
15              operation to using this material and manufactured their
16              doors, and we couldn't just arbitrarily say, sorry, we
17              don't make it any more and let it go with that because
18              no one else was making it.
19                   Now, this material was a different material in
20              density and in ingredient than what we made at the
21              Berlin plant, which was the pipe covering and block.
22              So what we did to keep our word to them was this, that
23              we're going to go out of the business but we will keep
24              you supplied until you find another material or someone
25              else who can make it for you.  Whatever long period of
```

3

```
1    time that takes we'll supply you.  And the way that I
2    set it up and it continued after I did it, I'm aware of
3    that, was that we would monitor the inventory and when
4    it got too low we would ask our customers for estimates
5    of how much they were going to need for the next six
6    months or year.  I don't remember which -- what it was.
7    And they would give us those estimates.  Then we would
8    gather all of the ingredients necessary to make this
9    material and when the time was right we would shut the
10   plant down, clean out all of the tanks and pipes and
11   what have you, and then we would make this other
12   material, which is the core material.  And this core
13   material was made in density, 20 pounds per cubic foot,
14   and it contained -- in addition to sand and lime it
15   contained some diatomaceous earth, which is a little
16   form.  So it contained a little cement.  This is how
17   you got 20 pounds of density, whereas the other
18   product, the one made for insulation, that was made at
19   about 11, 11-and-a-half pounds density.  It was only
20   sand and lime chrysotile asbestos.  Any way, we would
21   make it.  We would run out of all the ingredients.  We
22   had to accumulate and stack it up in the warehouse,
23   excuse me.  This is how we supplied those customers to
24   which we have made a commitment with the product that
25   we would have.
```

1            Now, I know before I left we either made one

2        run or we were going to make it right after I left, and

3        I am aware that they had made other runs after that.

4     Q   You said when you learned the business you spent time

5        on each shift at each step of the process?

6     A   Exactly.

7     Q   Including the part where you saw and square off the

8        ends of this material?

9     A   Exactly.  Everything.  I even loaded trucks.

10    Q   Did you ever, you, yourself, saw Kaylo --

11    A   Many times.  Many times.

12    Q   -- pipe covering?  Your field visits, those trips you

13        made out in the field --

14    A   Yes.

15    Q   -- did you observe Kaylo pipe covering being applied

16        when you went on those field trips?

17    A   That was the principal reason for making the trip.

18    Q   Did you ever go to a shipyard to see Kaylo pipe

19        covering applied?

20    A   Only twice.

21    Q   This is during that '52 to '54 period, right, sir?

22    A   Yes, um-hum.

23    Q   So you had an opportunity to observe the -- whether

24        dust was created when Kaylo pipe covering was cut on

25        the shipyard?

```
 1    A    I was there when they were applying it, yes.
 2    Q    And what did you observe when you saw Kaylo pipe
 3         covering cut?
 4    A    In relation to what?
 5    Q    With respect to dust.
 6    A    Oh, well, since our material was hard material and it
 7         had to be sawed there would be a lot of granuals fall
 8         to the floor.  I'm sure there was some small degree of
 9         dust created from that, but the thing that -- that
10         sticks in my mind is the fact that whatever dust there
11         was was absolutely minimal compared to what we had in
12         our factory where we produced the stuff and had control
13         of conditions.
14    Q    Did you also familiarize yourself with your
15         competitors' pipe covering products, sir?
16    A    To the extent that I could, yes.  I wanted to know
17         what -- what the competiton was like.
18    Q    Did you observe those types of covering materials when
19         they were cut?
20    A    I may have.  I don't specifically remember.
21    Q    What was the composition of competitors' materials
22         compared to this hydrous calcium silica?
23    A    There were many different types of materials.  The one
24         I remember most is the one with magnesium, 85 --
25         85 percent magnesium.
```

```
 1                    You want me to describe it or what?
 2        Q    Yes.  Yes, sir.  In the same terms.  In terms of
 3             dustiness, what you personally observed.
 4        A    Well, I know that magnesium was chalk white material
 5             that was water soluble, slippery when wet.  I remember
 6             that.  It was patable.  You can pound it, shape it a
 7             little bit, but you could cut it with a knife.  Pure
 8             white, I know that.  It broke down after a series of
 9             getting wet and drying, getting wet and drying.  It
10             would break down.  I have seen some magnesium that was
11             hanging by the -- the cotton wrapping that it had, just
12             hanging on the pipes.  Looked like it was scallop.  I
13             can remember that.
14        Q    Sir, were you familiar with Owens Illinois' policy
15             regarding health and safety in this period of 1952 to
16             '54?
17        A    Of course, yes.
18        Q    Okay.  And what was your understand of that policy,
19             sir?
20        A    Well, see, there was an overriding policy which said
21             that Owens Illinois would never make a product that was
22             hazardous for -- to the people that made it, people
23             that handled it and the people that used it.  And from
24             that was derived other policies such as if you have a
25             new product it will be tested and it will be tested by
```

```
 1              outside experts, people who are recognized experts in
 2              the field.  The -- the organization -- the
 3              Owens Illinois organization at the corporate level had
 4              a personnel department that was divided in several
 5              parts, administrative, insurance and industrial
 6              relations, and so forth.  It also had a medical arm.
 7              The medical arm, um, was supervised by a doctor.
 8              Charles Shook was the doctor, and it was divided in
 9              several parts.  One part being industrial hygiene and
10              it was headed up by an industrial hygienist, and then
11              there was a safety director.  And their job was to
12              visit the plant and make sure that the programs in each
13              of the plants were such that the company policy of
14              number one, making no hazardous materials, was
15              followed, and where there was need to take any special
16              attention to anything that had to deal with hygiene,
17              safety or otherwise, they would see to it that rules
18              were laid and applied, and then the personnel
19              department at the factory level would see to it that
20              they were carried out.
21    Q         So I take it, sir, then that the industrial hygienist,
22              Mr. Hazard, and Dr. Shook, it was their job to focus on
23              their aspect of the policies as opposed to yours?
24    A         Oh, yes.  They had the expertise.  They were the people
25              that laid the rules.  It was our job to see that it be
```

1      followed.

2   Q   All right.  Now, do you have any understanding -- I'm

3      sorry.  Let me start over.

4          Did you have any understanding in the 1952 to

5      1954 period whether the policies you have just

6      described were followed with respect to Kaylo pipe

7      covering?

8   A   I know they were followed implicitly.

9   Q   There has been some discussion in this case about the

10      actual reports, details done by a Saranac Lake.  Were

11      you aware of those documents and details back in the

12      1952 to 1954?

13   A   No.  I was aware only that someone had tested it in

14      accordance with company policy.  That's all.

15   Q   And did you hear any report from Mr. Hazard in terms of

16      that?

17   A   In the transitional meeting when we -- when Mr. King

18      and I first took over I recall Mr. King asking

19      Mr. Hazard, has this product been tested in accordance

20      with public people policy.  The answer was yes, and

21      they found it to be safe to use under normal

22      conditions.  There was no need for us to pursue it

23      beyond that point.  They were the boys with the

24      expertise and with the responsibility and they knew the

25      company policy.

```
 1    Q    You are referring to Mr. Hazard now?
 2    A    Mr. Hazard, everyone in the -- that was involved, yes.
 3    Q    In 1952 to 1954 did you feel comfortable relying upon
 4         Mr. Hazard's advise to you, sir?
 5    A    Oh, yes.  I knew Mr. Hazard for many years.  I knew he
 6         was not only capable but a very conscious person.  I
 7         had no reason to be concerned about that.
 8    Q    You said you at the plant would do what you were told
 9         to do.  Were you told to do anything with respect to
10         health and safety programs in the '52 to '54 period at
11         the plant?
12    A    Well, there were rules that had been -- and procedures
13         that had been -- had been installed in accordance with
14         company policy from the day one when the plant went
15         commercial.  During that two-year period I recall the
16         only thing that was -- that came to my attention was
17         that Mr. Hazard felt that we ought to have just a wee
18         bit more dust collecting capacity, and just to be on
19         the safe side to make sure that we complied with the
20         laws of the state.  And we saw to it that it was
21         provided immediately.
22    Q    Did the New Jersey State officials come in and -- into
23         your plant, sir, in 1952 to 1954 to do dust
24         measurements and apply  the --
25    A    Yes.
```

```
 1    Q    -- whatever the prevailing standards were at the time?

 2    A    Yes, they did.

 3    Q    Did you ever see -- receive any report that the dust

 4         concentrations were any higher than the minimum

 5         standards?

 6    A    Anything I heard from, they were congratulations for

 7         what a good job we were doing.

 8    Q    Okay.  How about the employees?  Was there any health

 9         review for your employees at the Kaylo plant, sir?

10    A    Yes.  Long before there was such a thing as Kaylo,

11         Owens Illinois was aware that all loose minerals --

12         loose minerals could be potentially hazardous.  And

13         after all in the glass business we had a lot more loose

14         minerals; soda ash, sand, lime, feldspar, et cetera,

15         down the line.  Owens Illinois was aware that silica

16         could cause silicosis, and therefore we had what I call

17         a silicosis program, which meant that any one working

18         anywhere where there were any loose minerals, and that

19         would be where they were unloaded, when they were

20         brought in the factory or where they mixed them in the

21         batches, so forth.  They had rather stringent rules as

22         to how they were to conduct themselves.  They wore

23         respirators in that area and the company would see to

24         it that they had a chest ray -- chest x-ray once a year

25         to monitor their health and be sure that nothing
```

1     adverse was happeneing, and these were read, not by our

2     people, but by experts outside the company.

3     When Kaylo came into being that procedure was

4     immediately applied and the people in the plant, those

5     that were exposed to excessive amounts of -- of loose

6     minerals, one kind or the other, were given chest

7     x-rays also and precautions were taken in accordance

8     with company rules so that most of the people that

9     worked in that small plant in Berlin had to -- chest

10    x-rays and they were read by what I have since learned

11    was the Saranac Lab people.  They were the experts.

12    Never had any problem.  Never had any indication of a

13    problem and the best I see -- I worked there two years

14    and I was never more than 40 or 50 feet away from all

15    the cutting and grinding that was going on, so --

16  Q  Sir, I have asked you to go back 35 years or more

17    today.  You told us an awful lot of detailed

18    information about the things that you did and saw.  How

19    is it that you remember after all these years?  How is

20    it that that stuff sticks in your mind?

21  A  Well, the only way I can answer that is, as you recall

22    I didn't quite get a degree, and like it or not that

23    can be a little bit of a stigma, and that assignment

24    was the first opportunity I had to show what I was

25    capable of doing with managing a business that was in

1            trouble.  And believe me, I lived with it day and night

2            and I remember what happened.

3    Q   Now, sir, you indicated you do some consulting for

4            Owens Illinois in the radio or television product area;

5            is that correct?

6    A   Well, during the -- during the last ten years that I

7            was with the company I spent most of my time in T.V.

8            products.  And I had a number of contracts outside of

9            the country regarding our technology and so forth, and

10           some of those contracts are still ongoing, and

11           Owens Illinois from time to time gives me a modest

12           retainer and from time to time I am asked to answer

13           questions or to say, well, what did actually happen

14           here or what was the understanding whenever it comes

15           up, but it's a very modest thing.

16    Q   But -- but T.V. products, that's the subject?

17    A   Primarily that.  Other things -- I've been asked

18           questions about other things.  I did fiber cans, for

19           instance, so forth.

20    Q   All right.  How much money, for example, does that

21           consulting work provide you in a year?

22    A   Well, I don't know what it's going to be this year but

23           I can tell you what the total amount of money that I

24           received for 1988, last year, is.  Does that answer

25           your question?

```
 1    Q    Sure.  That would be fine.
 2    A    I got $5,500 total.
 3    Q    All right.  Now --
 4    A    For the year.
 5    Q    Do you recieve a pension as a retired employee of
 6         Owens Illinois?
 7    A    Yes.
 8    Q    Is that a vested --
 9    A    Yes.
10    Q    -- pension?
11    A    It is.
12    Q    Is it in any way dependent on your given testimony
13         with --
14    A    No, it's vested.  They can't take it away from me.
15    Q    All right.  Have you ever owned stock in
16         Owens Illinois?
17    A    At one time, yes.
18    Q    Bought it with your own money?
19    A    Oh, bought it with my own money, a payroll deduction.
20    Q    Do you own it today?
21    A    No.
22    Q    You sold it?
23    A    It's sold.
24    Q    Sir, you have testified in cases like this on more than
25         one occasion.  Is that correct, sir?
```

```
1    A    Yes.

2    Q    Numerous times?

3    A    Yes.

4    Q    Do you get paid for coming into a courtroom like this

5         to give testimony?

6    A    Not for testifying.  They pay my hotel -- my hotel and

7         meals while I'm here.  They pay for my plane tickets,

8         but I don't get paid for testimony, no.

9    Q    Nothing beyond the expenses of traveling?

10   A    Nothing.

11   Q    Well, if you don't get paid, sir, why is it at age 75

12        that you're willing to come and give your testimony?

13   A    Well, as you get older you start thinking about things

14        a little differently than you did when you were

15        younger, but as I see it I'm without a doubt the last

16        person who is -- who was once part of the management of

17        this division that is still alive and physically

18        capable to come here and tell you my story, tell my

19        experiences in the Kaylo Division.  I was there.  I

20        know what we knew then.  I know what we did then.  I

21        know what company policies were at that time and I feel

22        that that testimony would be helpful to this court or

23        any court and I am not going to taint that testimony by

24        taking money for it.

25             MR. RILEY:  Thank you, Mr. Schillaci.  No
```

```
 1              further questions.
 2                      THE COURT:  Okay.  Anybody else have any?
 3                      MR. MURPHY:  I have nothing.
 4                      MR. BOGAN:  No questions.
 5                      THE COURT:  Okay.  Mr. Hart, it's up to you, I
 6              guess.
 7                           CROSS-EXAMINATION
 8         BY MR. HART:
 9         Q    Hello, Mr. Schillaci.
10         A    How are you?
11         Q    How you doing, sir?
12         A    Fine.
13         Q    I know sometimes you need to adjust to a new speaker in
14              terms of enunciation, so if you will get adjusted and I
15              want to ask you a few questions.
16                      I met you, I think, on one prior occasion; is
17              that correct?
18         A    I believe so.  Yes.
19         Q    That was on a trial?
20         A    I remember your face.
21         Q    That was a trial in Kansas?
22         A    Yes.
23         Q    Okay.
24                      MR. RILEY:  Excuse me.  I don't want to
25              interrupt.  I want to make sure Mr. Schillaci has
```

| | | |
|---|---|---|
| 1 | | enough water. |
| 2 | | THE WITNESS:  Thank you. |
| 3 | Q | (By Mr. Hart)  Mr. Schillaci, you're 75 now? |
| 4 | A | I was 75 last September 26. |
| 5 | Q | Okay.  And truth be known, you really haven't quit, |
| 6 | | have you?  You are still doing things that you want to |
| 7 | | do. |
| 8 | A | Well, I think I retired about four times, then I |
| 9 | | thought better of it. |
| 10 | Q | You didn't -- you didn't really quit at 65, did you? |
| 11 | A | Well, I was 66 when I retired, "retired" from |
| 12 | | Owens Illinois and was no longer an employee of |
| 13 | | Owens Illinois. |
| 14 | Q | But you -- |
| 15 | A | I was held -- I was kept on retainer for the purposes I |
| 16 | | have just described. |
| 17 | Q | Right.  Even though you reached 65 or 66 you have kept |
| 18 | | active, have you not? |
| 19 | A | More or less. |
| 20 | Q | Kept doing the things that you wanted to do? |
| 21 | A | Yes. |
| 22 | Q | Okay.  And some of those things produce income and some |
| 23 | | of them do not? |
| 24 | A | Most of the time not. |
| 25 | Q | Yeah.  But you have been able to do what you wanted to |

```
 1          do since then; is that correct, sir?
 2     A    Well, within limits.  If my wife would permit me.
 3     Q    Right.  I think we all have that limitation.
 4     A    I have been married to a fine gal for 52 years but she
 5          at times can set the limits.
 6     Q    Congratulations.  Now, the Kaylo you remember making in
 7          '52 to '54, you said it was kind of expensive?
 8     A    You will have to come back with that again.
 9     Q    The Kaylo that you made in 1952 to 1954, you told the
10          Jury it was kind of expensive compared to other
11          products.  I just want to ask you what was the cost of
12          Kaylo?
13     A    I don't remember that specifically.  All that I
14          remember in relation to -- to other competitive
15          products, our costs were higher but we had to sell at
16          competitive prices and that was the crux of our
17          problem.  That's why we were loosing our shirt.
18     Q    Was your product -- how much would a three foot section
19          of pipe covering have cost back then?  We talking about
20          dollars or cents or what?
21     A    Well, depends on the size of pipe that you are to put
22          it on.  Depends on how thick it was.  And there was
23          quite a range.  I mean, it was one inch pipe and half
24          inch thick insulation that would be, let's say, x
25          amount for prices.  I don't remember those.  I'm not
```

1          that good, but if it was two inch pipe, two inches of

2          insulation, then it would be ten times what the

3          one-inch pipe was.  I don't know.

4   Q   Okay.

5   A   There was quite a range there.

6   Q   I understand.  I just didn't know whether you recalled

7          it or not.

8   A   No.

9   Q   No.  Now, Illinois and Owens-Corning Company, in the

10         past, particularly when you joined them, had some sort

11         of relationship; is that correct?

12  A   Well, at one time Owens Illinois had considerable

13         amount of stock in the company, if that's what you

14         mean.

15  Q   Yes, sir.  Yes, sir.  Owens Illinois created

16         Owens Corporation along with another company; is that

17         correct?

18  A   Owens Illinois and Corning Glass Company together

19         merged -- pooled their patents and know-how to form

20         Owens-Corning Fiberglas.

21  Q   And Owens Illinois assisted Owens-Corning Fiberglas in

22         the development of things like fiberglass and the other

23         insulation materials?

24          MR. RILEY:  May we have a time frame to the

25          question?

1    Q    (By Mr. Hart)   In the '40's.

2    A    Well, now you are -- you are talking about something

3         that is not within my camp of knowledge and expertise.

4         All I can tell you is that I read in -- somewhere in

5         the documents that in about 1935, '36, something like

6         that, that two companies pooled their interests.

7         That's about as far as I go, and then Owens-Corning

8         Fiberglas was a separate entity and development went

9         from there, and that's about the extent of my knowledge

10        of what happened and who did what.

11   Q    Okay.  Do you know if Bill Hazard did the industrial

12        hygiene for Owens Illinois, assisted Owens Corporation

13        maybe or was it a health matter in 1940?

14   A    I would have no knowledge of that.

15   Q    He never told you of that matter?

16   A    I have no knowledge of that whatsoever, one way or the

17        other.

18   Q    Now, in 1953 you had been in the Kaylo Division for

19        about a year and you recommended, number one, that they

20        stop making the door core at the Sayreville plant.

21        That was one of your recommendations; is that correct?

22   A    Yes, that was one.

23   Q    Okay.  So they shut it down, shut down Sayreville,

24        correct?

25   A    Yes.

1    Q    And the only plant remaining was Berlin, New Jersey,

2          correct?

3    A    That's correct.

4    Q    And Berlin, New Jersey's plant was the one that was the

5          original Kaylo plant, that is the paylot plant that

6          began test marketing materials back in 1953; is that

7          correct?

8    A    That was the paylot plant, yes.

9    Q    And it always made pipe covering and insulating block;

10        is that correct?

11    A    Not in the --

12    Q    I'm talking about before the Sayreville plant closed.

13    A    Well, now wait a minute.  Let's -- let's get --

14    Q    Sure.

15    A    Are you talking about from 1948 or?

16    Q    Yes.

17    A    Yes, that's all that was made at the -- at the --

18    Q    Berlin?

19    A    -- Berlin plant, except for the times that they had to

20        make this core material to replenish the supply, which

21        they would do periodically as it was needed.  Other

22        than that they made only the two products.

23    Q    So before -- before 1953 the only thing made at Berlin

24        was insulation for pipe covering and block; is that

25        correct, from 1948 to 1953?

1    A    That is all they were making there, yes, just pipe

2         covering and block.

3    Q    Then after 1953 the majority of material they made was

4         pipe covering and block and then occasionally they

5         would make an order of or make a run of this door core

6         material?

7    A    Yes.  Yes.  If I would have to guess, the door core

8         material was made either when -- just about the time

9         that I left, which was maybe '54 or a little after.  I

10        know it was set up to do it and they -- they ran door

11        core after that on other occasions.  I'm aware of it.

12        I don't know specifically when.

13   Q    Generally it was infrequently that they made door core

14        material at Berlin; is that correct?

15   A    Oh, yes, because it was not one of the things that you

16        would want to do.

17   Q    Now, you talked about going to New Jersey and working

18        with the Berlin plant and Sayreville plant when you

19        first got your assignment; is that correct?

20   A    Mr. King took over the Sayreville plant, I took over

21        that business at the Berlin plant, so that was my part

22        of the assignment.

23   Q    Mr. King -- and you told us that you tried to learn all

24        you could about the Kaylo manufacturing process; is

25        that correct?

1    A    Yes.

2    Q    Did you try to learn all that you could about the

3         marketing aspect of Kaylo?

4    A    That's the reason for going into the field as often as

5         I did.

6    Q    Did you conduct any investigation into the health

7         aspects of Kaylo in 1952?  Did you, yourself?

8    A    To the extent that I have just stated.  Mr. --

9         Mr. Hazard was asked whether a product had been tested

10        in -- in accordance with company policy and the answer

11        was yes.  And his answer was it was safe to handle, and

12        there was no reason for me personally to pursue it

13        beyond that because he knew his business.  He knew the

14        company policy.  I saw no reason to pursue it and I did

15        not.

16   Q    Just so that we're clear, you didn't ask Mr. Hazard,

17        Mr. King asked him that question?

18   A    Yes.  We were there --

19   Q    Okay.

20   A    -- at a meeting together.

21   Q    Right.  Now, the reason why you wanted to know all you

22        could about Kaylo was to do your job better; is that

23        correct?

24   A    Well, I had to learn that business in order to make the

25        judgments necessary to carry out the assignment.

```
 1    Q    Okay.  And you had to know as much information as
 2         possible to help you in making that; is that correct?
 3    A    Yes.
 4    Q    Okay.  Now, the policy that you had for protecting your
 5         workers from all types of dust you said went back for
 6         many years?
 7    A    Oh, yes.  I was aware of it when I first came to the
 8         company in 1932.
 9    Q    Okay.  When did they tell you what dusts were
10         dangerous?
11    A    Well, Owens Illinois, making glass, used a great deal
12         of minerals and they were aware that all loose minerals
13         are potentially hazardous.  That was drilled into
14         everybody that came into the plant, I know, anybody
15         that came in.
16    Q    Did they tell you, sir, which dusts were dangerous?
17    A    All dusts, all minerals.  That's the way it was -- it
18         was told us.  Treat them all as being dangerous.  We
19         always thought of all minerals as being potentially
20         dangerous.
21    Q    You knew silica caused silicosis when you --
22    A    I remember hearing about it in the early years, yes.
23         At that time I wasn't too concerned about it.
24    Q    Then you were aware silica caused silicosis, right,
25         when you went into the Kaylo Division?
```

1    A    Yes.  Yes.

2    Q    You had workers use respirators because of the risk of

3         dust, silica dust?

4    A    Where there was loose minerals, yes.

5    Q    Okay.  You didn't even -- you never were told by your

6         own company in 1953 that absestos could cause

7         asbestosis, were you, sir?

8    A    Not specifically, no.

9    Q    You didn't even hear about asbestos until about 1979;

10        is that correct?

11   A    That's a statement that I have made.  I may have heard

12        of it.  I don't remember specifically making any

13        reference to it until about that time, yes.

14   Q    Okay.  So in all the times you testified you can never

15        recall your own company ever telling you one time that

16        asbestos caused asbestosis until you learned about that

17        generally through the newpapers in 1979?

18   A    No.  No.  No.  Specifically asbestosis?  No, I never

19        had any discussion, but all loose minerals and asbestos

20        is a mineral.  It was all treated as potentially

21        dangerous in its loose form.

22   Q    And you took precautions for your workers to protect

23        them from hazardous minerals but you didn't tell them

24        that asbestos in particular was dangerous, did you,

25        sir, when you were at the Berlin plant?

6

1    A    I don't know whether anybody was specifically told or
2         not, but the rules were such and they were set by
3         people in industrial hygiene levels that that
4         certain -- the rules, if followed, would make the place
5         a safe place to work and that -- and they had to be
6         followed and supervised.  Incidentally, when I became
7         supervisor that was drilled into us, to make sure that
8         your people followed the rules.  Our company was very
9         stringent on these things.

10   Q    Okay.  Did you post signs?  Did you post signs
11        concerning these safety rules in the plant?

12   A    Well, I'm sure there were.  I don't remember
13        specifically how it was, but I can assure you that
14        there was no one that worked in any area that had
15        specific rules to follow that didn't know about it,
16        whether it was written or repeated every day or
17        whatever.

18   Q    Did you provide respirators?  Was that one of the
19        rules, people had to use respirators when there was
20        dust in a dusty area?

21   A    Where they unloaded loose raw materials or where they
22        mixed the loose raw materials, that's the only places
23        respirators were required and that was strictly a
24        precaution on top of a precaution.

25   Q    Didn't you have respirators available for people doing

1              the sawing of Kaylo with the bench saw?

2         A    None was necessary.

3         Q    Didn't you have respirators available for people doing

4              the sawing?

5         A    Doing the sawing?

6         Q    Yes, sir.

7         A    Where?

8         Q    At the bench saw?

9         A    No.  There were no repirators there.  We had dust

10             collecting systems.

11        Q    Okay.  You had a suction device that would remove the

12             dust as it was being cut?

13        A    We had a system where all of this work was done that

14             would keep the dust level within the -- the -- what was

15             specified by the State of New Jersey and there were

16             some other ones.  I'm not exactly clear on that, but

17             there were some licenses we had to comply with those

18             elements and we did.  We have.

19        Q    Dr. Schall was the person in the State of New Jersey

20             who was responsible for industrial hygiene, was it not?

21             Lynn Schall, do you know him?

22        A    The name does ring a bell, but --

23        Q    Now, the -- those suction devices was to remove the

24             dust while the sawing was going on; is that correct?

25        A    Yes.  There was extensive sawing.  It was done eight

1        hours a day, eight hours a shift, 24 hours a day and it

2        was constant, yes.  So that was --

3    Q   Okay.  If the suction devices were not attached or

4        working you would expect dust to have been produced

5        from those machines, would they?

6    A   Dust would have been, yes.

7    Q   Dust in the air?

8    A   Well, to what extent I don't know, but I would assume

9        some would be there, yes.

10                MR. RILEY:  Excuse me.  Your Honor, I would

11       object, that's speculation since the fans were going.

12       He's not an industrial hygienist, Your Honor.

13                MR. HART:  He said he was experienced in all

14       modes of the plant, Your Honor.  I was asking about one

15       mode.  I'm going on to something else now.

16                THE COURT:  Okay.  We'll let it stand.

17   Q   (By Mr. Hart)  Mr. Schillaci, you went to the shipyards

18       twice.  Now, that wasn't near Wisconsin, was it?

19   A   No.  It was somewhere on the east coast.  I don't

20       remember specifically which ones they were.  East coast

21       somewhere.

22   Q   And the only work you saw being done with the Kaylo was

23       merely notching out pieces of Kaylo to fit it on the

24       pipe; is that correct?

25   A   Well, I don't remember exactly what they were doing.  I

```
1              know that I had to get there at a specific time because
2              they wouldn't be working -- working with our product
3              very long because there wasn't going to be very much to
4              be applied.  So I had to get there at a specific time.
5              I can only say this, if it was hung by anything they
6              would have to notch where the hanger would be.  I don't
7              remember specifically those.  The only thing I remember
8              about those two shipyards, that the most hazardous --
9        Q     Let's -- don't get to anything else.  I just want to
10             talk about Kaylo, because those shipyards may not be
11             anything like what was here in Wisconsin.
12       A     I'm sorry.
13       Q     Any way, did you ever see him cutting the Kaylo with
14             the skill saw on those shipyards?
15       A     Skill saw?  Is that one of those power saws?
16       Q     Yes.
17       A     No.  No.  No.  There was never that much cutting that I
18             know that had to be done.
19       Q     Did you ever see Kaylo block being cut with a skill
20             saw?
21       A     I never saw it, no, sir.  I never saw it used with a
22             power saw.
23       Q     So you don't know whether or not that would produce
24             dust?  Is that fair?
25       A     I never saw it cut with a skill saw so I can't answer
```

1           that question.

2    Q     Okay.  Now, the Kaylo that you made and that was sold

3           to the shipyards was the same Kaylo that you sold to

4           other industrial locations; is that correct?

5    A     Oh, yes.  It would be the same.

6    Q     There was nothing especially different with the Kaylo

7           that was sold to the shipyards from the Kaylo that you

8           sold elsewhere; is that correct?

9    A     No.  There would be no difference.

10   Q     It wasn't specifically designed to go on a ship, was

11          it, as opposed to someplace else.

12   A     No.  The product had a k-factor.  It was a measuring

13          device for how much insulation would on a

14          specification.  It would fit one inch or two inch,

15          whatever it was made for.  Other than that it would be

16          the same regardless of where it was being applied.

17   Q     It was made to go on hot pipes where ever those hot

18          pipes were being used?

19   A     Yeah.  It was a insulating material, yes, sir.

20   Q     Now, one of the hazardous dusts that you were familiar

21          with was diatomaceous earth; is that correct, sir?

22               MR. RILEY:  I'm going to object to that

23          testimony.  The testimony has consistently been with

24          reference to loose minerals.  That misstates prior

25          testimony.

```
 1                    THE COURT:  Let me have that question read
 2          back.
 3                    (Previous question read by reporter)
 4                    THE COURT:  Assumes a fact not in evidence.
 5          Objection sustained on that basis.
 6      Q   (By Mr. Hart)  Do you know if it is hazardous,
 7          diatomaceous earth, sir?
 8      A   No.  No more than I did of any other, the fact that it
 9          was another mineral, period.
10      Q   Did you ever see warnings on backs of diatomaceous
11          earth beginning in 1952?
12      A   No.
13      Q   Oh, let's talk about how you made Kaylo.  We know we
14          had asbestos in there and something called calcium
15          silicate?
16      A   85 percent was equal parts of sand and lime and
17          15 percent was chrysotile asbestos.
18      Q   Okay.  So you would have some sort of device.  You
19          would first of all mix the material in; is that
20          correct?  What would it be?  Was it a hopper?
21      A   Material came to the mixing floor and it was mixed
22          together with water into a slurry about the consistency
23          of wet concrete and it would pour.
24      Q   So you would put in the lime, what was it, limestone,
25          the other materials and the asbestos?
```

| | | |
|---|---|---|
| 1 | A | Lime and sand and the little asbestos and they were all |
| 2 | | mixed together with water to a consistency that I just |
| 3 | | described, then it was conveyed to the -- to the room |
| 4 | | where it was poured into molds. |
| 5 | Q | Okay.  It was put into molds and the molds would be the |
| 6 | | shape that you wanted the Kaylo to come out in? |
| 7 | A | A mold in the case of -- of a pipe covering was a piece |
| 8 | | of sheet metal 36 inches long, bent half load end |
| 9 | | pieces so it would stand up.  That was the female part. |
| 10 | | There was a male part that fit into a -- with a spacer |
| 11 | | so you could pour around it and that would produce a |
| 12 | | part that looked like a piece of sur pipe cut in half |
| 13 | | horizontially so the two pieces could go together |
| 14 | | covering the circumference of a pipe. |
| 15 | Q | Now, what's an autoclave? |
| 16 | A | An autoclave is a pressure cooker -- |
| 17 | Q | Okay. |
| 18 | A | -- if you will.  I don't mean to be facetious, but |
| 19 | | it's a chamber in which you can reduce the heat and |
| 20 | | pressure and you can close it so that whatever you have |
| 21 | | in there is subject to that condition. |
| 22 | Q | Did you have any autoclaves in the making of Kaylo? |
| 23 | A | Yes.  Part of the process was that after you poured the |
| 24 | | slurry in the molds you put it on trucks and then you |
| 25 | | formed a train.  And when we had about 25 feet of train |

1       you would take it to the autoclave, and in our case an

2       autoclave was a huge cylinder about 28 feet long with

3       doors at both ends and tracks running down the middle,

4       and you run this train into it, close the doors and

5       apply high pressure steam.  This could cause a chemical

6       reaction to take place immediately, and this happened

7       so fast that the water is driven out and where the

8       water had been you would have literally millions of

9       little tiny air bubbles in each piece and that is what

10      gave the material its insulating properties.

11   Q   So this autoclave would dry out the material?

12   A   Yes.  It had a -- depending on how long -- how thick a

13      piece you were making it would have a drying cycle of

14      three to five hours, then you would take it out and you

15      would strip it from the mold and then you send it to

16      the finish room.

17   Q   And how hot was your autoclave?  Was it about

18      400 degrees?

19   A   I don't know.  All I know is -- all I know is we

20      applied high pressure steam.  You are getting

21      technical.  I knew at one time.  I don't know

22      specifically now.  I'm not going to give you a number

23      because I don't know.  I don't remember, rather.

24   Q   High pressure steam.  So it was hotter than boiling

25      water?

1    A    Yes.  Yes.

2    Q    Oaky.

3    A    It is --

4    Q    Okay.  And would three to 400 degress be the range?

5         I'm just asking.  If you don't know tell me you don't

6         know.

7    A    I just don't.

8                    MR. RILEY:  I think he said I don't know.

9         Object.

10   Q    (By Mr. Hart)  Okay.  That's fine.  Now, the effect of

11        autoclaving would be to dry out the material and to

12        make little pockets of air in there?

13   A    No.  The -- the primary thing was to get the material

14        set up, harden and do it so fast that you would drive

15        the water out and thereby creating those little

16        vacuums, those little bubbles of air, if you will.  And

17        that would then in part be the insulation -- the

18        insulating properties to that material.  That's why it

19        was such a good high heat material.

20   Q    Okay.  Now, during the time you've been consulting with

21        the company you have reviewed a number of documents,

22        have you not?

23   A    Yes.  Not all of them but here and there.  Some

24        milestones, um-hum

25   Q    Are you familiar with the fact that when you were there

1    and afterwards the Kaylo manufacturing process was

2    being experimented with?  Different materials were

3    being tried out for experimental purposes; is that

4    correct?

5            MR. RILEY:  Excuse me, Mr. Schillaci, an

6    objection.

7            I want to inform the Court --

8            THE COURT:  Okay.  Jurors, we are going to

9    have to excuse you for a few minutes.  There is a

10   couple of questions we would like to ask the witness

11   outside of your presence, then we'll have you back.

12           (Jury exits courtroom)

13           THE COURT:  For those of you who are here for

14   1:30 matters, we'll get to you shortly.  We haven't

15   broken for lunch yet, so this is nothing that we have

16   picked up after lunch.  We have worked through the

17   lunch hour, and we'll get to you as soon as we can.

18           MR. HART:  May I go forth?

19           THE COURT:  Go ahead.

20   Q  (By Mr. Hart)  Mr. Schillaci, let me show you

21      Exhibit 439.

22           THE WITNESS:  We have a little problem.

23           THE COURT:  Maybe Owens Illinois could come up

24   with a product that doesn't leak.

25           THE WITNESS:  These are not Owens Illinois.

```
 1              These are not Owens Illinois, I'll guarantee that.
 2      Q     (By Mr. Hart)  Did I -- let me show you Exhibit 439.
 3              And this is -- do you recall having seen this in your
 4              consultations with the company?
 5                   MR. RILEY:  Time frame, please, in the
 6              question.
 7      A     I think I have seen this document before.  It's dated
 8              August 20, 1957, this is.
 9      Q     (By Mr. Hart)  Is that one of the things the lawyers
10              have shown you during your consultations?
11      A     I -- no.  No.  No.  I think that came up at a trial, I
12              believe Seattle.
13                   THE COURT:  That's good enough.  That's not a
14              basis for questioning this witness on that document.
15                   MR. HART:  Okay.  Your Honor, I would like to
16              go ahead and make a proffer, if I may, concerning the
17              document --
18                   THE COURT:  Okay.
19                   MR. HART:  -- outside the presence of the
20              Jury.
21      Q     (By Mr. Hart)  Mr. Schillaci, do you see the statement
22              here, Kaylo molded pipe covering in 1955 was produced
23              at the plant from a formulation in which all of the
24              asbestos was of the chrysotile type, and this product
25              exhibited k-factor at 550 degrees fahrenheit, mean of
```

1          point 70.  Do you see that statement, sir?

2     A    Yeah.

3     Q    Let me show you back here on Table 1 on Page 8.  They

4          experiment with k-factors in 1955, Kaylo, Test No. 1a.

5          Plant 1955, 20 percent chrysotile.  Do you see that,

6          sir?

7     A    I read that.

8     Q    Okay.  Does that plant -- and it shows the k-factor is

9          point 70.  That was referred to earlier.

10    A    Well, I read that, yes.

11    Q    Okay.  Does that plant 1955 refer to Kaylo that was

12         being manufactured for production in the plant?

13    A    No.  That would not be that.  I don't know.  That would

14         not be it.  See, this is -- this is a -- this is

15         research.  This would probably be at a test that was

16         made and the results are rather recorded as to what

17         their findings were.

18    Q    Let me show you here, sir, Table 1, Appendix C.  Do you

19         see where the term laboratory, Kaylo, 20, and it has

20         information about the composition and also has Plant

21         Normal Kaylo, first of all, Normal Kaylo was the low

22         density Kaylo?

23    A    Well, it was a --

24    Q    Low temp Kaylo?

25              MR. RILEY:  I don't think that's correct.  I

1      object.   There is no foundation this is the author of

2      those words or that he has any understanding what the

3      author meant.   It calls for speculation.

4              THE COURT:  Sustained.  It just seems to me,

5      the record that we're making, that this witness

6      consistently is saying that he is not familiar with the

7      contents of this document.

8              MR. HART:  I'm making a proffer for future

9      record.  I understand your ruling.

10              THE COURT:  I know, but I understand that.

11      But we're trying to get the witness to answer questions

12      to which he doesn't know the answers and I don't see

13      how we can do that in the form of offer of proof.

14              MR. HART:  Well, let me go through these

15      questions, Your Honor.  I'll see if he knows the

16      answers.  He can say yes or no if he doesn't know.

17              MR. RILEY:  Excuse me a second.  For the

18      record, once it is established there is no foundation I

19      think the rules of evidence prohibit, even under an

20      offer of proof, going through and insisting the witness

21      tell you time and time again if responses to successive

22      questions -- when he's already told you he didn't

23      author the document, and there isn't any foundation to

24      testify to its meaning.

25    Q    (By Mr. Hart)  Did you discuss this document with

```
 1              Mr. Riley last night?

 2     A        Yes.

 3     Q        Okay.  He went over these terms with you?

 4     A        No.  Not in any great detail, because when he showed it

 5              to me I said I have seen this before.  An attorney for

 6              a plaintiff, I believe it was Seattle, Washington, I'm

 7              not sure of that, had brought this up and I had seen it

 8              at that time.  There was no need for me to get involved

 9              with it because I'm not a scientist.

10     Q        Was that product called Kaylo 20 that was made in

11              Berlin?

12                   MR. RILEY:  Your Honor, we're pretty far field

13              now.

14                   THE COURT:  Listen.  My concern is that we had

15              some arrangement what we were going to try to handle

16              today.

17                   Mr. Hart, you are the one who said we didn't

18              want to go late on Friday if we're going to come back

19              on Monday morning.  Now, if you want to take the time

20              on this, fine, but we're going to do it after we do our

21              1:30 pretrials and after we see what happens on the

22              other trial.  I'll put this over to either this

23              afternoon if that's what you want to -- want to do,

24              otherwise, move around it.

25                   MR. HART:  May I ask certain questions on the
```

1    ruling?  I cannot at this time.  I'm just asking for --
2    what the Court's instructions are.  You want me to move
3    on?
4              THE COURT:  I -- yes.  I think we should move
5    on.  I think you have had an ample opportunity to ask
6    him questions about that document.
7              MR. HART:  I'm ready for the Jury, Your Honor.
8              THE COURT:  Okay.
9              (Jury enters courtroom)
10             THE COURT:  Be seated, please.
11             Go ahead, Mr. Hart.
12             MR. HART:  Thank you, Your Honor.
13   Q    (By Mr. Hart)  Mr. Schillaci --
14   A    Yes, sir.
15   Q    -- let me show you Plaintiff's Exhibit 14, which is a
16        letter dated February 12, 1943 which has been
17        previously identified initiating certain studies on
18        Kaylo with the Saranac Laboratory.
19   A    Yes.  I have seen this before.  This means that
20        Mr. Bowes, who was in charge of research, started what
21        company policy dictated, tested the product.
22   Q    And they asked the Saranac Laboratory to consider the
23        product from the standpoint of employees working in the
24        plant; is that correct?  Right down here.
25   A    Yes.

```
 1   Q     And also from the standpoint of applicators to erectors
 2         at the point of use?
 3   A     That's what it says.
 4   Q     What would -- that would be from the point of view from
 5         insulators?
 6              MR. RILEY:  Your Honor, there is no
 7         foundation.  This witness testified he didn't see the
 8         documents during that period of time itself and only
 9         substantive.  This could be directed more toward Mr.
10         Hazard, not this witness.
11              MR. HART:  Your Honor, he brought these up on
12         direct.  He referred to these studies and the fact he
13         became familiar with them.
14              THE COURT:  Let me see where.
15              MR. RILEY:  So the record is clear, what we
16         established on direct is that he did not review those
17         documents.  The witness did not review the documents
18         from 1952 through '54.
19              THE COURT:  You are through with this one?
20              MR. HART:  Yes.
21              THE COURT:  I don't see anything.  You are
22         through with this.
23              MR. HART:  Okay.
24   Q     (By Mr. Hart)  The company was told by Mr. Gardner that
25         the fact that you're starting with a mixture of 2
```

1        quarts asbestos would certainly suggest that you have

2        all the ingredients of a first-class hazard.  Do you

3        see that?

4    A   That's what it said.

5                MR. RILEY:  Same objection, Your Honor.  This

6        witness didn't ever see these documents during the

7        relevant time periods.  If you want to direct a

8        question like that to Mr. Hazard, that would be proper,

9        but not for Mr. Schillaci.

10               MR. HART:  The document is in evidence.  I

11       just want to ask that question about that statement

12       that was not made to him.

13               THE COURT:  Objection overruled.

14   Q   (By Mr. Hart)  Mr. Schillaci, my question to you is,

15       sir, in 1952 when you were trying to gather all the

16       information about Kaylo, did your company ever tell you

17       of that statement or --

18   A   No.  No reason to.

19   Q   Okay.

20               MR. HART:  I move that that be striken, too,

21       Your Honor, "no reason to."  I just simply wanted to

22       know whether he was told that.

23               THE COURT:  His answer will stand.

24   Q   (By Mr. Hart)  Do you see the report, November, 1948

25       from Dr. Verwald to Mr. U.C. Bowes?

1    A    Yes.

2    Q    Okay.  It says, I realize that our findings regarding

3         Kaylo are less favorable than anticipated.  However,

4         since kaylo is capable of producing asbestosis, it is

5         better to discover it now in animals rather than later

6         in industrial workers.  Thus, the company, being

7         forewarned will be in a better position to institute

8         adequate control measures for safeguards regarding

9         those exposed employees, and protecting its own

10        interest.  Were you ever advised of that, sir?

11   A    No.

12   Q    What safeguards were employed to protect the workers in

13        the plant?

14   A    Sir?

15   Q    What safeguards were employed to protect the workers in

16        the plant manufacturing Kaylo?

17   A    What I have been describing all -- all afternoon.

18   Q    What safeguards were employed to protect the

19        applicators at the point of use or users of the

20        products?

21             MR. RILEY:  Objection.  There is no foundation

22        of those not people, Owens Illinois employees at his

23        plant.  He doesn't know what the employers of the

24        people in the shipyards did or didn't do for those

25        workers.

```
 1                    MR. HART:  I'm asking what Owens Illinois did
 2            for them, Your Honor.
 3                    MR. RILEY:  He's not in a position to respond
 4            to that.
 5                    MR. HART:  Your Honor, I think that's the law.
 6            A manufacturer has certain responsibilities.
 7                    MR. RILEY:  I object.
 8                    That is a mischaracterization of the law,
 9            Mr. Hart.
10                    THE COURT:  I think indirectly what he's
11            asking is whether or not there were any warnings given.
12            And if he's asking that, I think that he can ask this
13            witness if he knows of any warnings that were given.
14                    MR. RILEY:  That question I have no objection.
15      Q     (By Mr. Hart)  What warnings or anything else, what did
16            the Owens Illinois Company do to protect industrial
17            workers whom the projects and the tests were designed
18            to explore?
19      A     Well, I don't understand the connection, sir, so I'm
20            confused.
21      Q     What, if anything --
22      A     This is an interoffice report.
23      Q     I'll restate the question for you, sir.
24      A     Had nothing.  About half way through the testing period
25            of six years -- this is three years.
```

1    Q    The final report came out in 1952.  Did they ever give

2         you that one?

3    A    I have read it since I became involved.

4    Q    The lawyers give it to you?  Owens Illinois ever give

5         it to you in 1952?

6    A    No.

7    Q    When you got the report and you were heading up the

8         Kaylo Division?  Did they ever, sir?  Just yes or no.

9    A    The answer is no.

10   Q    Okay.  What, if anything, did Owens Illinois Company do

11        to protect applicators of Kaylo insulation products?

12        What did they do?

13             MR. RILEY:  Excuse me.  I want to interpose an

14        objection.  This is the plant manager in Berlin,

15        New Jersey.  There is no foundation that this witness

16        can answer that question.  It's not in his job area.

17        He's --

18             THE COURT:  To the extent of his knowledge.  I

19        think he's already answered it.  He's been asked it and

20        objection is sustained on that basis.

21   Q    (By Mr. Hart)  Do you know why the company didn't

22        bother to tell you, sir, about the results of these

23        experiments?

24             MR. RILEY:  Objection.

25   A    There was no reason to.

1                        THE COURT:  Sustained.

2                        MR. HART:  Thank you.  That's all I have.

3                        THE COURT:  Redirect.

4                        MR. RILEY:  Just a few.

5                            REDIRECT EXAMINATION

6        BY MR. RILEY:

7        Q    Mr. Schillaci --

8        A    Yes.

9        Q    -- were all of these Kaylo products, roof tile, door

10            core, block and pipe covering, developed in the paylot

11            plant efforts that were made at Berlin?

12       A    Yes.  Everything was done.

13       Q    In those early years?

14       A    Berlin.  In the paylot plant, yes.

15       Q    You testified several times yourself that all loose

16            minerals represented a potential hazard.  Did you

17            consider the finished Kaylo pipe covering to be loose

18            minerals?

19       A    No.  Of course not.

20       Q    Okay.  You referred in the plant to constant sawing,

21            eight hours a shift, four hours a day at Berlin.  When

22            you went out in the shipyards did you see that kind of

23            constant sawing, piece after piece, 24 hours a day?

24       A    Heavens no, and if I hadn't been quick I wouldn't have

25            seen the installation.  It was that fast.  It was

```
1              used -- this is a special premium type product and it
2              was used very sparingly where you had excessively high
3              temps.
4       Q      Was it made in standard lengths?
5       A      It was made in -- yes, 36 inches long.
6       Q      Based on observations did every piece of Kaylo pipe
7              covering have to be cut to be applied on a pipe?
8       A      No.  No.  Pipe covering was made in two parts, as I
9              have indicated, and it was wrapped with cotton, a
10             material, and that was pasted on in such a way that on
11             the job all that you had to do was to open it up, clamp
12             the shell, put it over.  We always allowed little extra
13             piece of cotton material so you just pull that up at
14             the bottom and paste over that and it was in place.
15             The only time you had to do any cutting is when you
16             came to an end.  If you had an excess, then you would
17             have to make a minor cut to turn a corner or on
18             occasion if you were hanging some piece you might have
19             to take one of these notches and notch a hole.  That
20             was the extent of the cutting that -- that had to take
21             place in pipe covering.
22      Q      Mr. Hart asked about Kaylo in shipyards and Kaylo in
23             other commercial business.
24      A      Yes.
25      Q      When Kaylo was being used in a military ship did it
```

1          have to meet military specifications?

2     A    I assume so, yes.

3     Q    You have told us about what Mr. Hazard said in response

4          to Mr. King's question about whether or not the

5          product, Kaylo pipe covering, had been tested.

6     A    Yes.

7     Q    Were you, sir, as an Owens Illinois employee satisfied

8          with Mr. Hazard's advice to you?

9     A    Absolutely.

10    Q    And why, sir?

11    A    Well, first of all I known him for many, many years.  I

12         knew what his background was.  I knew what his basic

13         education was.  I knew he was a man of integrity, and

14         most important of all I knew that he knew -- knew what

15         the company policies were and how he felt about them

16         being followed.  So there was no reason -- when he said

17         this is our considered opinion, there wasn't any reason

18         to question him and I never did.

19    Q    Thank you, sir.

20              MR. RILEY:  Nothing further.

21              THE COURT:  Further cross.

22                     RECROSS EXAMINATION

23    BY MR. HART:

24    Q    You don't know anything about the shipyards in

25         Sturgeon Bay; is that correct?

```
1    A    No, sir.  I do not.

2    Q    You don't.  You have never been on a -- the

3         construction of a wooden mine sweeping vessel where it

4         is important to insulate materials greater than in

5         other ships?

6              MR. RILEY:  That's a fact no in evidence in

7         terms of relative importance.  This is also

8         duplicative.

9              THE WITNESS:  Sir, I lost you after the part

10        of the question that said you have never been on a

11        wooden ship, whatever it was.  Beyond that it escaped

12        me.

13             MR. HART:  I'll ask you a different question.

14   Q    (By Mr. Hart)  You don't know whether or not the

15        experiences that you have with Kaylo on a shipyard are

16        any way like they were using Kaylo in --

17             MR. RILEY:  Objection.  Asked and answered.

18   A    I have no basis to judge that.

19   Q    (By Mr. Hart)  Mr. Hazard, when he had these

20        conversations with you, did he ever relate to you what

21        Dr. Garrett Schippers (phonetic) had told him about

22        Kaylo?

23   A    No.

24   Q    Did he ever tell you that Dr. Garrett Schippers had

25        recommended that these x-rays -- plans be put into
```

1        effect at the Berlin, New Jersey plant to measure the

2        effect of asbestos?

3               MR. RILEY:  Excuse me.  Your Honor, he just

4        said he didn't.  He doesn't recall anything

5        Dr. Skeebers said.  This is redundant.

6               THE COURT:  Sustained.

7    Q   (By Mr. Hart)  Did Mr. Hazard, to your knowledge, ever

8        take any steps to protect users of the products, of the

9        Kaylo products, from the asbestos that was in it?

10              MR. RILEY:  Asked and answered, Your Honor, on

11       cross-examination.

12              MR. HART:  I haven't asked that.

13              THE COURT:  Yes.  I think so.  Objection

14       sustained.

15              MR. HART:  I didn't recall it, but that's all

16       I have.

17              Thank you, sir.

18              THE COURT:  You may step down, sir.  Thank

19       you.

20              Okay.  Jurors, we are going to break now for

21       the weekend.  We'll reconvene -- what, 8:30?

22              MR. RILEY:  Yes.

23              THE COURT:  8:30, Monday morning, and our goal

24       will be to try to finish the testimony in the case on

25       Monday.

1              I'm aware of what your problem is, ma'am.

2              Okay.  Court's in recess.

3              (Jurors exit courtroom)

4              MR. HART:  Your Honor, I just want to put on

5       the record I would have asked Mr. Schillaci many

6       identifying aspect of Exhibit 439, including a

7       description of what is Kaylo 20.  That I believe was

8       within his knowledge.  He testified on other occasions

9       about normal Kaylo, the type of Kaylo being produced in

10      the plant.  I also like to put on the record at this

11      time that I believe he's the singlely qualified person

12      to respond to questions about 439 due to the facts

13      elicited by his own counsel, he's the sole remaining

14      person who was involved in Kaylo, which is relevant to

15      this case.

16              My position was that it was proper to ask him

17      to interpret what a document made by his own company

18      shortly after he left, what the terminology of that

19      document referred to under the common understanding of

20      the Owens Illinois Company, and I believe that

21      Your Honor's ruling did not permit me to do that within

22      the time frame.

23              THE COURT:  The -- I think that the basis of

24      the Court's ruling is amply set forth on the record.  I

25      don't think there is any reason why I should amplify

1          that any more.

2                    I would like to alert you to one thing.

3          Juror Gordon said, don't forget about my problem.  Her

4          problem is she has a real estate closing Wednesday at

5          one o'clock or something like that.  I'm going to

6          remind you of that.  We may have to discuss how we can

7          work out that problem some time next week.  So

8          that's -- that's what she was talking to me about.

9          Okay.

10                   (Proceedings concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF WISCONSIN    )
                      ( SS:
MILWAUKEE COUNTY      )


      I, JULIE A. CAMPSHURE, a Court Reporter in and for the State of Wisconsin, do hereby certify that I reported the foregoing proceedings and that the foregoing transcript consisting of 68 pages is a true and correct transcript of my stenograph notes made at said time and place.

      Dated at Milwaukee, Wisconsin this 12th day of September, 1989.


JULIE A. CAMPSHURE
Court Reporter